## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| I. STEPHEN RABIN, on behalf of himself and all others similarly situated, | CIVIL ACTION |
| Plaintiff, | NO. 2:15-CV-00551-GAM |
| v. | CLASS ACTION |
| NASDAQ OMX PHLX LLC, NASDAQ OMX GROUP, INC., BEDROCK TRADING LTD, BLUEFIN TRADING, LLC, CONSOLIDATED TRADING LLC, ELM TRADING, L.P., FIRST DERIVATIVE TRADERS, LP, HAP TRADING, L.L.C., KEYSTONE TRADING PARTNERS, LLC, LARGO TRADING, L.P., SUMMIT SECURITIES GROUP, LLC, SUMO CAPITAL, LLC, SUSQUEHANNA INTERNATIONAL GROUP, LLP, SIG HOLDING LLC, SUSQUEHANNA INVESTMENT GROUP, SUSQUEHANNA SECURITIES, TSR ASSOCIATES, L.L.C. and V TRADER-CG, LLC, | TRIAL BY JURY DEMANDED |
| Defendants. | |

## CORRECTED AMENDED COMPLAINT

## TABLE OF CONTENTS

I.      SUMMARY OF THE CASE ..................................................................................1

II.     JURISDICTION AND VENUE ...........................................................................2

III.    PARTIES .............................................................................................................3

IV.     BACKGROUND ON TRADING OPTIONS RELATED TO THE
        MANIPULATION ...............................................................................................8

        A.      Option Trading Practices ....................................................................... 8

        B.      Summary of Terms Relating to Long and Short Call Options............................. 10

        C.      The Steps to Exercise an Option to Collect Dividends......................................... 10

V.      IMPROPER MANIPULATIVE OPTIONS TRADING BY CERTAIN MARKET
        MAKERS ON PHLX EXCHANGE.................................................................11

        A.      Steps In The Manipulative Scheme To Improperly Capture Dividends .............. 13

        B.      A Detailed Example of How the Process Used by the Market Maker
                Defendants Works................................................................................... 16

        C.      The Injury to Plaintiff from His Pfizer Inc. Options Positions Due to
                Defendants' Manipulative Practices ...................................................... 20

        D.      The Manipulation of the Options Contracts of CME Group, Inc. Provides
                Another Example of Market Maker Defendants' Practices and Resulting
                Injury....................................................................................................... 23

VI.     PLAINTIFF AND THE MEMBERS OF THE CLASS WERE DAMAGED BY
        DEFENDANTS' MANIPULATIVE PRACTICES .........................................25

VII.    ADDITIONAL SCIENTER AND RELIANCE ALLEGATIONS ...................25

VIII.   PLAINTIFF'S CLASS ACTION ALLEGATIONS.........................................28

COUNT I
Violation of Section 10(b) of th Exchange Act And Rule 10b-5(a) and (c) Promulgated
Thereunder Against All Defendants..........................................................................30

COUNT II
Unjust Enrichment Against All Defendants ..............................................................31

Plaintiff, I. Stephen Rabin ("Rabin" or "Plaintiff"), individually and on behalf of all other persons similarly situated, alleges the following upon information and belief based upon, *inter alia*, the investigation made with his attorneys, except for those allegations regarding his personal trading which is made on personal knowledge.

## I.   SUMMARY OF THE CASE

1.     This is a class action on behalf of all persons who suffered damages when certain market makers[1] and conspiring broker-dealers on the options market of NASDAQ OMX PHLX ("PHLX Exchange") manipulated certain options in advance of dividend payments on underlying stock and exchange traded funds ("ETFs") for their personal benefit to the detriment of other options investors during the Class Period.[2]   Specifically, the market maker and conspiring broker-dealers defendants identified below ("Market Maker Defendants") damaged other writers of call options by executing among themselves huge pre-arranged manipulative matched options trades on an underlying security immediately prior to the date for that security's dividend payment.   The result is that the Market Maker Defendants materially increased the likelihood that such defendants would obtain, and did improperly obtain, dividends that would have been paid to Plaintiff and the other members of the Class.   The Market Maker Defendants have improperly used their privileged regulatory status as market makers (including exemptions

---

[1]     A market maker is "a dealer who, with respect to a particular security, (i) regularly publishes bona fide, competitive bid and offer quotations in a recognized interdealer quotation system; or (ii) furnishes bona fide competitive bid and offer quotations on request; and, (iii) is ready, willing and able to effect transactions in reasonable quantities at his quoted prices with other brokers or dealers."   Exchange Act Rule 15c3-1(c)(8), 17 C.F.R. § 240.15c3-1(c)(8).

[2]     As defined herein, the proposed Class and the Class Period is: all persons who held short positions on "in the money" call options contracts on dividend paying stocks and exchange traded funds ("ETFs") and who were adversely affected by Defendants' conspiracy to manipulate, and manipulation of the options markets prior to the ex-dividend date on such securities from February 6, 2010 through the present (the "Class Period").   Excluded from the Class are Defendants, members of their immediate families and their legal representatives, parents, affiliates, heirs, successors or assigns and any entity in which Defendants have or have had a controlling interest (the "Excluded Persons").   Also excluded are any officers, directors, or trustees of the Excluded Persons.

from certain credit limits) to make these manipulative trades (which are outside their proper market function).  In short, these Market Maker Defendants have diverted the dividend payments to themselves from other writers of call options by manipulating the options clearing system.[3] During the Class Period, the actions of the Market Maker Defendants and other Defendants (identified below) have already damaged options investors by hundreds of millions of dollars.

2.     As alleged in detail below, Plaintiff was injured as a result of Market Maker Defendants' manipulation of the options contracts in Pfizer, Inc. ("Pfizer" or "PFE") during the Class Period.  Plaintiff alleges details of Market Maker Defendants' manipulation of options contracts in Pfizer.  The Market Maker Defendants inflated the size of the options open interest pool for Pfizer stock by flooding the market with over a million additional option contracts one day before the ex-dividend date of PFE common stock.  The result of this manipulation was to ensure that the bulk of PFE dividend payments would be directed to the Market Maker Defendants rather than to Plaintiff and the other Class members.  These trades added almost no risk for the Market Maker Defendants.

3.     Market Maker Defendants have engaged in similar manipulative activities with regard to options on other dividend paying stocks and ETFs during the Class Period at the PHLX Exchange.

4.      Plaintiff's remedies arise under the Securities Exchange Act of 1934 (the "Exchange Act") and state law.

## II.     JURISDICTION AND VENUE

5.     Plaintiff I. Stephen Rabin ("Mr. Rabin" or "Plaintiff") brings this action pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), as well as Rule 10b-5(a) and (c), 17 C.F.R. § 240.10b-5(a) and (c), promulgated

---

[3]     A description of "writers" of call options is more fully set forth in Section IV.A. below.

thereunder. Options contracts, including the options at issue here, are securities registered with the Securities and Exchange Commission ("SEC") and can only be traded on a securities exchange under the jurisdiction of the SEC.

6.      In connection with the acts alleged in this complaint, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, and the facilities of a national securities exchange.

7.      This Court has jurisdiction of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, and the provisions of the federal securities laws identified above. This Court also has supplemental jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1367.

8.      At the time of the wrongs alleged herein, Mr. Rabin transacted business in this district. During the Class Period, Plaintiff's purchases and sales of the relevant options occurred in this district. Prospective witnesses reside in and/or can be found in this district. Venue is thus proper in this district pursuant to Section 27 of the Exchange Act and 28 U.S.C. §§ 1391(b) and 1391(c).

## III.   PARTIES

9.      Plaintiff I. Stephen Rabin is an individual who resides in New York.  As detailed in its Certification attached hereto as Exhibit A, Plaintiff had short positions[4] on options contracts during the Class Period, and as a result thereof, suffered damages from Defendants' unlawful conduct alleged herein.

10.     Market Maker Defendants are market makers who participate in the options market of the PHLX Exchange, with an obligation to provide liquidity in the market, but who conspired to engage in, and engaged in, the wrongs detailed herein.  Market Maker Defendants

---

[4]      A description of "short positions" is more fully set forth in Section IV.A. below.

include those market makers and other broker-dealers who improperly traded in the Pfizer option contracts of the same series as the Plaintiff, as described herein.  The PFE manipulative trading incidents resulted in injury to Plaintiff, and is only one example of a pattern of trades engaged in by Defendants for the purpose of wrongfully conspiring to capture, and capturing, the dividend payments on unexercised call options. Exhibit B to this complaint – titled "Ongoing and Massive Trading Manipulation for a Typical Quarter (2014 Q3)" – provides three months of instances of manipulated call options as evidenced by the ballooned trading pattern immediately prior to a security's ex-dividend date.[5]   *See* attached Exhibit B. The records of Defendant NASDAQ/PHLX revealed the names of the market makers who conspired to engage in, and engaged in, this improper practice during the relevant period in stocks or ETFs going ex-dividend.  Market Maker Defendants who wrote more than 700,000,000 contracts of the 789,381,178 call options written in this scheme during the Class Period were the principal participants of this fraudulent scheme and conspiracy.

11.     Defendant Bedrock Trading Ltd ("Bedrock") is a Pennsylvania limited partnership having an address at 19 Bryn Mawr Ave., Bala Cynwyd, PA 19004.  Bedrock is a market maker on the PHLX Exchange who wrote 88,646,571 call options during the Class Period identified on the records of Defendant NASDAQ/PHLX as dividend rebate strategy trades.

12.     Defendant Bluefin Trading, LLC ("Bluefin") is a New York limited liability company having an address at 3 Park Avenue, 37th Fl., New York, NY  10016.  Bluefin is a market maker on the PHLX Exchange who wrote 7,780,102 call options during the Class Period identified on the records of Defendant NASDAQ/PHLX as dividend rebate strategy trades.

---

[5]     The ex-dividend date refers to the timing of entitlement to the payment of dividends on a security.  If an investor purchases a stock on its ex-dividend date or after, he will not receive the next dividend payment.  Instead, the seller gets the dividend.  If an investor purchases before the ex-dividend date, he gets the dividend.

13.     Defendant Consolidated Trading LLC ("Consolidated") is an Illinois limited liability company having an address at 200 W Jackson Blvd., Ste. 2300, Chicago, IL 60606. Consolidated is a market maker on the PHLX Exchange who wrote 60,106,008 call options during the Class Period identified on the records of Defendant NASDAQ/PHLX as dividend rebate strategy trades.

14.     Defendant ELM Trading, L.P. ("ELM") is a Pennsylvania limited partnership having an address at 1900 Market St., Ste. 705, Philadelphia, PA 19103.  ELM is a market maker on the PHLX Exchange who wrote 70,102,794 call options during the Class Period identified on the records of Defendant NASDAQ/PHLX as dividend rebate strategy trades.

15.     Defendant First Derivative Traders, L.P. ("First Derivative") is a Pennsylvania limited partnership having an address at 419 Minden Way, Wynnewood, PA 19096.  First Derivative is a market maker on the PHLX Exchange who wrote 87,519,180 call options during the Class Period identified on the records of Defendant NASDAQ/PHLX as dividend rebate strategy trades.

16.     Defendant HAP Trading, LLC ("HAP") is a New York limited liability company having an address at 33 Whitehall St., 6th Fl., New York, NY 10004.  HAP is a broker-dealer on the PHLX Exchange who wrote 13,087,239 call options during the Class Period identified on the records of Defendant NASDAQ/PHLX as dividend rebate strategy trades.

17.     Defendant Keystone Trading Partners, LLC ("Keystone") is a Pennsylvania limited liability company having an address at 660 Narcisi Ln., Wayne, PA 19018.  Keystone is a market maker on the PHLX Exchange who wrote 75,697,284 call options during the Class Period identified on the records of Defendant NASDAQ/PHLX as dividend rebate strategy trades.

18.     Defendant Largo Trading, L.P. ("Largo") is a Pennsylvania limited partnership having an address at 361 North Highland Ave, Merion Station, PA 19066.  Largo is a market maker on the PHLX Exchange who wrote 88,836,075 call options during the Class Period identified on the records of Defendant NASDAQ/PHLX as dividend rebate strategy trades.

19.     Defendant Summit Securities Group, LLC ("Summit") is a Delaware limited liability company having an address at 140 Broadway, 46th Fl., New York, NY 10005.  Summit is a broker-dealer engaged in activity on the PHLX Exchange who wrote 7,831,442 call options as Summit and 14,308,717 call options under its predecessor, White Bay PT LLC, during the Class Period identified on the records of Defendant NASDAQ/PHLX as dividend rebate strategy trades.

20.     Defendant Sumo Capital LLC ("Sumo") is an Illinois limited liability company having an address at 440 S. LaSalle Street, Ste. 2101, Chicago, IL 60605.  Sumo is a market maker on the PHLX Exchange who wrote 7,315,750 call options during the Class Period identified on the records of Defendant NASDAQ/PHLX as dividend rebate strategy trades.

21.     Defendants Susquehanna International Group, LLP, a Delaware limited liability partnership having an address of 1201 N. Orange St., Ste. 715, New Castle, DE; SIG Holding LLC, a Pennsylvania limited liability company having an address of 401 City Ave., Ste. 220, Bala Cynwyd, PA 19004; Susquehanna Investment Group, a Pennsylvania general partnership having an address at 401 City Ave., Ste. 220, Bala Cynwyd, PA 19004 and Susquehanna Securities, a Delaware general partnership having an address at 401 City Ave., Ste. 220, Bala Cynwyd, PA 19004 (collectively "Susquehanna").  Susquehanna is a market maker on the PHLX Exchange who wrote 34,657,232 call options during the Class Period identified on the records of Defendant NASDAQ/PHLX as dividend rebate strategy trades.

22.     Defendant TSR Associates, L.L.C. ("TSR") is a Pennsylvania limited liability company having an address at 10 West Mermaid Lane, Philadelphia PA 19118.  TSR is a broker-dealer engaged in activity on the PHLX Exchange who wrote 43,529,645 call options during the Class Period identified on the records of Defendant NASDAQ/PHLX as dividend rebate strategy trades.

23.     Defendant V Trader-CG, LLC, trading as V Trader Pro, LLC ("V Trader") is a Pennsylvania limited liability corporation having an address at 1818 Market Street, 18th Fl., Philadelphia, PA 19103.  V Trader is a broker-dealer engaged in activity on the PHLX Exchange who wrote 158,747,261 call options during the Class Period identified on the records of Defendant NASDAQ/PHLX as dividend rebate strategy trades.

24.     Defendant NASDAQ OMX PHLX LLC ("NASDAQ/PHLX") is a limited liability company organized under the laws of the State of Delaware.  NASDAQ/PHLX is a Self-Regulatory Organization ("SRO"), which owns and operates the PHLX Exchange.  The PHLX Exchange focuses on options trading, trading more than 3,000 classes of equity options.

25.     Defendant The NASDAQ OMX Group Inc. ("NASDAQ OMX") is a Delaware corporation that is the parent of NASDAQ/PHLX.  NASDAQ OMX is a for-profit entity. NASDAQ OMX is not itself a securities exchange, but owns and operates several securities exchanges, including the PHLX Exchange through its subsidiary NASDAQ/PHLX.

26.     The "Market Maker Defendants," together with Defendant "NASDAQ/PHLX" and Defendant "NASDAQ OMX" are collectively "Defendants" herein.

27.     Identification of the specific Market Maker Defendants who participated in this conspiracy was accomplished by discovery at the outset of the case from the NASDAQ/PHLX. NASDAQ/PHLX maintains records that identified each party to options trades and specifically asks option writers to code any trade that is executed in conjunction with any dividend rebate

strategy.  The Options Clearing Corporation ("OCC") also possesses such records of parties to option trades.  Review of such trading information from NASDAQ/PHLX allowed Plaintiff to identify the Market Maker Defendants who conspired to manipulate, and who manipulated, trading in the relevant options, aimed at capturing the dividend payments from unexercised call options during the Class Period.  This discovery also identifies which call options were manipulated. '

## IV.   BACKGROUND ON TRADING OPTIONS RELATED TO THE MANIPULATION

### A.   Option Trading Practices

28.   A listed option is a security guaranteed by the OCC.  An option is a contract to buy or sell a specific underlying security.  The options guaranteed by the OCC are traded on multiple securities exchanges in the United States, including the PHLX.  Options trading activity is regulated by the SEC.

29.   The predominant form of options that trade on the options exchanges in the United States are "American-style" options, which means that the options can be exercised at any time prior to their expiration.

30.   In addition to guaranteeing options, the OCC serves as the clearing agent and intermediary of options transactions. By taking the counterparty side in each purchase and sale transaction respectively, the OCC ensures performance between buyers and sellers, and ensures that obligations of the options contracts are fulfilled.

31.   Each option contract normally represents 100 shares of the underlying security.

32.   A "call" is an option that gives the holder (the "buyer") the right, but not the obligation, to buy 100 shares of the underlying security (*i.e.*, to "call" or "assign" it away from the current owner) at a specified price (the "strike price") for the period of time beginning on the purchase date and ending on the expiration of the option (the "expiration date"). The seller of a

call option, known as the "writer," is obligated to sell the underlying security to the buyer should the buyer so elect. When a holder of a call chooses to buy the security through the option contract, their election to buy is called an "exercise" of the option contract.  When the seller of a call option is obligated to sell the underlying security through the option contract, such an obligatory sale is termed an "assignment."  The seller is the "assigned party."

33.     Buyers of call options are known as taking a "long" position, in the options and sellers of options are known as taking a "short" position. As stated by the OCC in its publication "Characteristics and Risks of Standardized Options":

**Long position:** A position wherein an investor's interest in a particular series of options is as a net holder (*i.e.*, the number of contracts bought exceeds the number of contracts sold).

**Short position:** A position wherein a person's interest in a particular series of options is as a net writer (*i.e.*, the number of contracts sold exceeds the number of contracts bought).

34.     In purchasing a call option (taking a long position) a purchaser pays a "premium," *i.e.*, the price for the option. Premiums are set in the market, plus any commissions and transaction costs. The seller of the option, in turn, receives the premium (less any commissions and transaction costs) in exchange for his selling or "writing" of the option.

35.     Logically, the holder of a call option will only exercise the option if it is "in the money."  A call option is considered to be "in the money" if the underlying security's trading price is higher than the call strike price.  If the trading price of the underlying security is below the specified strike price, then the call option would be "out of the money."

36.     By way of further background, the chart below summarizes the differences between long and short positions in calls.

### B.      Summary of Terms Relating to Long and Short Call Options

|  |  | CALL |
|---|---|---|
| LONG | 1. | Buying a call is taking a long position. |
|  | 2. | Buyer pays a premium. |
|  | 3. | Buyer hopes the value of the call increases as the value of the underlying security goes up. |
|  | 4. | If the value of the security goes up, buyer exercises the call and buys the  security at the strike price or buyer sells his call at a profit. |
|  | 5. | If the value of the security goes down, the most buyer loses is the premium paid (*i.e.*, limited to loss exposure). |
| SHORT | 1. | Writing or selling is taking a short position. |
|  | 2. | Writer is paid a premium. |
|  | 3. | Writer hopes the value of the security does not change or goes down. |
|  | 4. | If price does not go above the strike price, writer keeps premium as option expires worthless. |
|  | 5a. | If price goes up and the option writer owns the underlying security (known as a "covered call writing") and his option is assigned, then he is paid the strike price for his security.  He keeps both the premium and security payment. |
|  | 5b. | If price goes up and the writer does not own the security (*i.e.*, "naked"), he has unlimited loss exposure and either has to buy back his call, or if the call is assigned, then the writer keeps the premium and delivers shares in the underlying security to the option holder at the lower strike price. |

### C.      The Steps to Exercise an Option to Collect Dividends

37.      To exercise a long options contract, one has to send an exercise notice to the OCC.  Exercises at the OCC occur after the end of each trading day.  The OCC issues an assignment to the broker/dealer who is the custodian for the writer.

38.      Assignments are made on a random basis by the OCC across the entire pool of broker/dealers who are the custodians for options writers for each call option series.

39.     In order to receive a dividend on an underlying security, one must be the owner on the record date.  To receive the dividend using an options strategy, one must exercise an "in the money" call option on the last trading day prior to the ex-dividend date in order to be the owner on the record date.  The ex-dividend date is normally set for a security two business days prior to the record date for the dividend to allow time for the security purchase to be recorded on the register for the underlying security.

40.     Historically, however, a percentage of "in the money" call holders have not exercised their calls to purchase the underlying dividend paying security on the day before the ex-dividend date. This failure to exercise is due to various reasons, including mistake or oversight, lack of economic resources to exercise the option, lack of sophistication, or ignorance of the process.  The measure of these unexercised options is the contract's "open interest" at the close of trading on the day before ex-dividend.  Open interest is the number of outstanding option contracts reported at the end of each day.

## V.     IMPROPER MANIPULATIVE OPTIONS TRADING BY CERTAIN MARKET MAKERS ON PHLX EXCHANGE

41.     The Market Maker Defendants have conspired, engaged, and continue to conspire and engage, in improper market manipulation by artificially expanding the size of the option contract open interest pools to increase their *own* chances of not being assigned as writers of the calls on the day before the ex-dividend on the underlying security, thereby collecting the dividend.  These actions thus ultimately allow the Market Maker Defendants to "skate" (*i.e.*, not be compelled to deliver the underlying security and thereby collect the dividend payment on the remaining underlying security position that they continue to hold since the calls they had written were not assigned by the OCC).

42.     Market makers, unlike retail investors or other professional traders, have a unique advantage in that they are the only options industry participants that are permitted to be in both

11

long and short identical option contracts and to exercise any long options contracts prior to the OCC netting at the end of the trading day (their offsetting positions are not automatically extinguished by the OCC until after the market makers have decided whether to exercise).  This advantage allows them to take these large offsetting positions without true risk.

43.     The Market Maker Defendants' scheme is grounded in part by an OCC practice that the Market Maker Defendants improperly use to their advantage.  When a market maker has offsetting open long and open short option positions in the same option series, the market maker is still permitted to exercise just one side of their positions.  For market makers alone, the OCC does not net the short and long positions until after all the exercise instructions for that day have been processed.  If a market maker fails to exercise any long option, the OCC will still net it against the market maker's short option positions, immediately prior to allocating assignments. The result of this practice is that the market maker is never at risk for failing to exercise an "in the money" long option while it has an offsetting short position.  This special treatment of market makers by the OCC provides the Market Maker Defendants with the ability to execute large pre-arranged manipulative "wash" trades ("wash trades" are prohibited under SEC rules) to expand the open interest pool, of the relevant option and thereby radically increase the Market Maker Defendants' position in the open interest pool, thereby increasing their probability of capturing the dividend windfall from among the pool of unassigned call options.

44.     In contrast to market makers, retail investors, like Plaintiff, generally are not permitted to have open long and short offsetting positions.

45.     As a result, market makers are the only participants in the options market that can maintain both long and short market open positions without any consequent risk.

A. **Steps In The Manipulative Scheme To Improperly Capture Dividends**

46.     The manipulative dividend scheme involve the Market Maker Defendants using their privileged role to capture as much of the potential "skate" of short call options for dividend paying securities.  In order to do this, the Market Maker Defendants conspire to buy and sell the same series in prearranged trades  of "in the money" calls with a "partner" broker deal the day prior to the ex-dividend date of the underlying stock or ETF. Multiple pairs of Market Maker Defendants engage in this conspiracy immediately prior to ex-dividend dates of securities.  At the end of the day prior to the ex-dividend date, these participating Market Maker Defendants conspire to, and are, completely hedged with both huge open long and huge open short positions on the same call options series.

47.     Once the Market Maker Defendants exercise their open long call options after the end of the day, their short option positions remain open prior to the OCC assignment process. This allows the Market Maker Defendants to dramatically expand the size of their collective share of the short call options open interest pool.  Given the size of their holdings, the probability of the market makers' positions not being assigned is maximized and thus the Market Maker Defendants receive the majority of any dividend windfall after these maneuvers.

48.     The Market Maker Defendants are not concerned about the large assignments allocated to them resulting from increasing their short positions because they have correspondingly exercised their dominant positions relative to the pre-existing open interest of long call options.

49.     In other words, because the Market Maker Defendants conspire to be fully hedged, (buying and selling the same series for the same price), this illicit dividend trade strategy has little, if any, risk.  The Market Maker Defendants either, skate and keep the dividend, or they get assigned on options series which they just exercised to end up with a net offsetting position.

Even if a Market Maker Defendant makes an error and fails to exercise, OCC will net their position prior to assignment so that the Market Maker Defendant winds up with no net option position in that series.

50.     In addition, Market Maker Defendants conspire to flood the options market with the matched call options on stocks or ETFs about to go ex-dividend because market makers are given special margin privileges, ostensibly to allow them to open positions to provide liquidity to the market. However, rather than enhance market liquidity and engage in bona fide market making, the Market Maker Defendants have used this margin privilege to conspire to, and to engage in, these manipulative dividend trades in an unfair, deceptive and anti-competitive manner, solely for their own benefit.

51.     The SEC has real time risk management rules which should normally restrict this abuse for the large dollar trades, Exchange Act Rule 15c3-1 and Regulation 15c3-5, 17 C.F.R. §§ 240.15c3-1 and 15c3-5.  Under these rules, either the clearing firm or market maker must ensure there is available capital in the market maker's account or clearing member's account upon exercise of the option.  These improper ex-dividend call option market-maker trades have been transacted without regard to the capital requirement at the time of the exercise of the calls.  These dividend trades provide zero liquidity because their sole purpose is to steal the assignment opportunity and dividends from the non-market maker investors.

52.     In possible violation of the net capital rules, the Market Maker Defendants have conspired to implement, and have implemented, these massive matched positions to capture the non-assignment opportunity.  Notably, the Chicago Board of Exchange ("CBOE") bars such prearranged trades suggesting they are not done for legitimate economic purpose nor are the transactions subject to market risks.  The International Stock Exchange ("ISE") similarly prevents this practice and has disseminated opinions that such trades are improper.  In contrast,

Defendants NASDAQ/PHLX and NASDAQ OMX (improperly) have not limited such prearranged trading on the PHLX Exchange.

53.     Market Maker Defendants' conspiracy with the assent of the Defendants NASDAQ/PHLX and NASDAQ OMX of prearranged matched trading is a classic form of market manipulation prohibited by Section 10(b) of the Exchange Act.  This conspiracy to engage in manipulative transactions also contravenes numerous rules and regulations prescribed by the Securities and Exchange Commission ("SEC") that restrict the conduct and practices of market makers and others in order to maintain the integrity of the securities markets for the protection of investors.  In addition to Rule 15c3-1 and Regulation 15c3-5 described above, these include the following:

a)      Rule 10b-5(a) and (c), 17 C.F.R. § 240.10b-5(a) and (c) (prohibiting the employment of manipulative and deceptive devices or engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person);

b)      Rule 11b-1(a)(2)(ii)(iii), 17 C.F.R. § 240.11b-1(a)(2)(ii)(iii)[6] (requiring specialists to maintain a "fair and orderly market" for investors)[7].

---

[6]      Exchange Act Rule 11b-1(a)(2) states in relevant part:

\*\*\*

(2) The rules of a national securities exchange permitting a member of such exchange to register as a specialist and to act as a dealer shall include:

(ii) Requirements, as a condition of a specialist's registration, that a specialist engage in a course of dealings for his own account to **assist in the maintenance, so far as practicable, of a fair and orderly market**, and that a finding by the exchange of any substantial or continued failure by a specialist to engage in such a course of dealings will result in the suspension or cancellation of such specialist's registration in one or more of the securities in which such specialist is registered;

(iii)  Provisions restricting his dealings so far as practicable to those reasonably necessary to permit him to **maintain a fair and orderly market** ….

(emphases added).

[7]      "Specialists" are included in the Exchange Act's definition of "Market Makers." Section 3(a)(38), 15 U.S.C. § 78c(a)(38) states:  "The term 'market maker' means any specialist permitted to act as a dealer…."

54.     The Market Maker Defendants' manipulative transactions alleged herein also violated rules prescribed by NASDAQ, including Rule 782, prohibiting manipulative operations; Rule 1014(a), prohibiting Specialists and Registered Options Traders (ROT) from entering into transactions or make bids or offers that are inconsistent with the maintenance of a fair and orderly market; and Rule 1020(d), specifically prohibiting such options trading by a Specialist for his own account.

**B.      A Detailed Example of How the Process Used by the Market Maker Defendants Works**

55.     The following simplified example demonstrates how the market manipulation alleged herein works:

- Stock is trading at $40 and will pay a dividend of $0.50 per share.

- Dividend trade strategies are transacted in the in-the-money call options such that the market makers have agreed among themselves to use the dividend trade strategy in the $30 strike calls series for the stock.  (Note: A series of an option is a particular option that has a certain strike price and date of expiration in a particular stock.)

- 10 retail investors each have written 1,000 $30 strike calls on the stock before the stock goes ex-dividend.

- Open interest in the $30 strike calls (at the beginning of the trading day prior to the ex-dividend date) is therefore 10,000 contracts (each of the 10 retail investors are short 1,000 calls).

- Each retail investor has a one in ten chance of not being assigned by the OCC ("skating") at the beginning of the trading day (1,000 divided by 10,000).

- Market Maker One conspires to enter into trades with Market Maker Two. He sells 500,000 contracts of the $30 strike call to Market Maker Two, meaning Market Maker One is now short that call.  Immediately thereafter (pursuant to the prearranged agreement between Market Maker One and Market Maker Two), Market Maker Two sells 500,000 contracts of the same $30 strike call to Market Maker One at the same price.  That is, he executes a mirrored transaction in the exact same option series and of the exact same size and exact same price.

- At the end of the day, Market Maker One and Market Maker Two end up with the following positions in the $30 strike calls:

**Market Maker One**

| Long positions | Short positions |
|---|---|
| 500,000 | 500,000 |

**Market Maker Two**

| Long positions | Short positions |
|---|---|
| 500,000 | 500,000 |

- Assume then 90% of market participants in the original open interest pool of 10,000 contracts exercise their call options, leaving 1,000 call options "unexercised." Because of the transactions of the market makers, the open interest has increased from 10,000 contracts to 1,010,000 contracts and the retail investor's chances of skating have fallen from 1/10 to 1/1,010 (from 10% to .099%).

- Market Makers One and Two will have exercised all of their long call options, meaning they are now long the stock (as illustrated by the lines stricken out in the following chart):

**Market Maker One**

| Long positions | Short positions |
|---|---|
| ~~500,000~~ | 500,000 |
| ~~options~~ | options |
| ~~contracts~~ | contracts |
| ↓ | |
| Exercise all long options positions | |
| ↓ | |
| 50,000,000 shares | |

**Market Maker Two**

| Long positions | Short positions |
|---|---|
| ~~500,000~~ | 500,000 |
| ~~options~~ | options |
| ~~contracts~~ | contracts |
| ↓ | |
| Exercise all long options positions | |
| ↓ | |
| 50,000,000 shares | |

- Market Maker One has exercised 500,000 call options. Market Maker One is assigned on 99.901% of his corresponding short calls (499,505 contracts). In the end, Market Maker One retains a balance of 495 short call options. He keeps the stock for 495 of the long call options he exercised and since a single option contract is equal to 100 underlying shares of the stock, the Market Maker One ends up with 49,500 shares of stock. He collects a dividend of $0.50 on each of these shares, $24,750 total.

- Market Maker Two has exercised 500,000 call options. Market Maker Two is assigned 99.901% of his corresponding short calls (499,505 contracts). In the end, Market Maker Two retains a balance of 495 short call options. He keeps the stock for 495 of the long call options he exercised and ends up with 49,500 shares of stock. He collects a dividend of $0.50 on each of these shares, or $24,750 total.

- Collectively, the pool of remaining retail investors is assigned on 99.901% of their short calls and as a group they are left with 10 short call contracts holding stock for 1,000 shares. The pool of retail investors therefore share just $500 in dividends. Note that if the market makers had not been permitted to execute this dividend scheme the retail investors would have shared the full $50,000 in dividend payments. Each writer would have received $5,000 instead of the $50.

- Both Market Makers One and Two have collected the dividend payments associated with those shares, and both remain fully hedged with short in-the-money calls. This means they can trade out of the hedged position (or wait until expiration if it is near) after they collect the dividend.

- Market Makers One and Two have each exercised shares of stock with a market value of $2 billion (500,000 shares at $40) without regard to the minimum capital requirement.

- Because of this manipulative practice Market Makers One and Two were able to extract 99% ($49,500) of the dividend payments from the original call writers.

56. These incestuous trades among Market Maker Defendants do not serve any economic purpose. They do not provide any liquidity to the marketplace. Market Maker Defendants who engage in this practice wrongfully benefit at the expense of Plaintiff and other members of the Class. The rules of the various securities exchanges prohibit such pre-arranged "wash sales" since they do not serve any economic purpose. Market makers would normally be prohibited from making these sham trades because they are not within the bona fide market making functions that justify special margin treatment of market makers by an exchange because they do not help to maintain market liquidity.

57. Far from providing a "fair and orderly" options trading market for investors in which random assignment determines who receives the gain from the phenomenon of unexercised call options on days prior to ex-dividend, the Market Maker Defendants conspire to intentionally *disrupt* normal market activity by flooding the market with a massive volume of sham prearranged trades. The sole purpose of their trades is to wrongfully increase their *own*

odds of non-assignment in order to misappropriate the underlying dividend for themselves at the expense of the Plaintiff and the other members of the Class.[8]

58.     The Market Maker Defendants have been able to conspire and to engage in this manipulative trading scheme with the knowledge and knowing assistance of the Defendants NASDAQ/PHLX and NASDAQ OMX, securities clearing firms, and the OCC.  In fact, each of these entities, along with the SEC itself, benefits by receiving increased trading fees from these sham trades.  These regulatory institutions thus benefit by this options market manipulation. These symbiotic relationships cause these various regulatory bodies, self-regulatory organizations and market participants to turn a "blind eye" to these improper activities.

59.     The role and benefit of each regulator or participant and the benefit that regulator or participant receives is as follows:

  a.    The Clearing Houses:  Certain clearing houses, such as Merrill Lynch Professional Clearing Corporation (a subsidiary of Bank of America) ("Merrill Pro") and ABN AMRO Clearing Chicago (a subsidiary of ABN – Fortis AMRO Clearing Bank N.V.) promote this dividend trade manipulation in order to receive:  (a) transaction fees; (b) fees on margin interest for the market makers capital at risk and (c) interest on the massive balances used by the market makers to buy the options and underlying security if an option is exercised.  Notably, these clearing houses give preferred pricing to market makers who do these market maker dividend strategy trades.  In contrast, Goldman Sachs is one clearing house that does not permit this activity.

  To artificially expand their call options, the market makers borrow on their margin accounts to cover the massive size of their options positions.  To finance these massive positions, they use their market maker margin lending capacity provided by their clearing houses. The clearing firms encourage this "hidden" abuse of the net capital rules of the market makers because neither the clearing firms nor any regulatory body calculate the net capital ratios of the market making firms at the close of each trading day.  Thus, they ignore the exercise of the market makers'

---

[8]     Exhibit B attached to this Complaint is a chart delineating the trading data for major dividend yield stocks and ETFs in a typical quarter (3Q 2014), illustrating the breadth of this improper practice.  Due to this improper strategy, as shown in the chart, just prior to the ex-dividend date there are consistently huge spikes in the volume for "in the money" option contracts on dividend paying stocks and ETFs.  Additional data and analysis shows this practice has been widespread.

long options prior to any assignments by the OCC.  In the Detailed Example above, prior to assignments each market maker would be long 50,000,000 shares of stock worth $2 billion.  The clearing houses are extending margin credit for these massive improper transactions in an amount that dramatically exceeds the clearing houses' stated risk parameters for such market making firms.

b.    NASDAQ/PHLX:  Although this market maker dividend manipulation has been prohibited by the CBOE and ICE exchanges, it has flourished on the PHLX Exchange because this exchange has permitted this fraudulent trade practice.  The advantage of the market making dividend trades to the PHLX Exchange has been:  (a) transaction fees; and (b) inflation of the exchange's reported trade volume.  Such inflated exchange trade volume enhances the exchange's competitiveness and consequent attractiveness for investors, bondholders and creditors.  Supporting this sham dividend trade activity, the PHLX Exchange gave low-cost pricing to the market makers via rebates for these dividend seeking transactions.  Rebates have been given via a cap in charges per option series such that the increased volume of trading does not significantly raise the cost to the market maker of doing a huge volume of transactions.  Similarly, rebates are given to cap the overall charges to the market maker per month.  In short, there is relatively little additional cost to the market maker for its voluminous trading in this dividend play scheme.

The extremely inflated trading volumes, generated from these sham option trades, have improperly skewed the market value of the PHLX Exchange by inflating its national options volume market share.  The distortion in options volume market share is clear when looking at the difference in options volume on days in issues when dividend trades are transacted as compared to when they are not.  This false inflation of trading volume then has a multiplier effect for the PHLX Exchange since some market participants, especially those who use electronic option order routing, send their option order flow to the exchange which has the highest volume.

c.    The OCC:  The OCC receives fees for each trade by the market makers on these options.  The OCC is owned by the exchanges so the exchanges further benefit from the inflated volume.

**C.    The Injury to Plaintiff from His Pfizer Inc. Options Positions Due to Defendants' Manipulative Practices**

60.    As described below, the conspiracy and manipulation by the Market Maker Defendants of the options contracts in Pfizer resulted in injury to the Plaintiff.

61.    The Plaintiff's PFE options contracts had an expiration date of August 21, 2010 and a strike price of $15. The PFE stock had an ex-dividend date of August 4, 2010.  Therefore,

to obtain the dividend, an owner of a call option had to exercise his option on or before August 3, 2010 in order to be a shareholder of record on the dividend date of August 6, 2010 and therefore have a right to the dividend.   The Market Maker Defendants' manipulations occurred on August 3, 2010.  Plaintiff had his call assigned and exercised on August 3 (reported by his broker on August 4 as reflected in his attached certification attached as Exhibit A hereto).

62.     On August 3, 2010, Plaintiff was short 68 call options on the PFE series expiring August 21, 2010 at the strike price of $15 a share.  This option was "in the money" as the stock was trading at $16.34 at the close of trading on August 3, 2010.

63.     At the very end of that same day (based upon information and belief), there were 14 separate rapid fire transactions by Market Maker Defendants totaling 1,312,000 contracts (out of the 1,419,021 contracts traded that day), which drastically increased the open interest pool on the PFE series at the strike price of $15 and an expiration date of August 21, 2010.  Each Market Maker Defendant had the same number of long positions as short positions, perfectly hedged. By conspiring to make, and by making, these manipulative and improper trades, the Market Maker Defendants expanded the open interest pool from the original 173,679 contracts by at least another 1,312,000 on that one day for a total open interest of 1,485,000 contracts, an increase of *over 750%*.

64.     Each of the Market Maker Defendants then exercised all of their long call options, leaving each of them with only short call options. When the options were then assigned by the OCC, 16,545 short calls remained.   Collectively, the Market Maker Defendants' holdings became the vast majority of the remaining short calls in the open interest pool (because they had a much higher percentage of the short positions).   They thereby collected the bulk of the $297,810 in PFE dividends from among the unexercised short call options ($.18 dividend x 16,545 open options x 100 shares per option).

21

65.     The remaining PFE investors, including Plaintiff, however, held a much smaller percentage of the short options than they would have, absent this manipulation of the market. Specifically, absent this manipulation, each PFE option contract would have obtained, on average $1.71 per option contract, calculated as:

$297,810 (dividends to distribute) ÷ 173,679 (options contracts open) = **$1.71 (per option)**

of the dividend distribution from the open interest pool. Instead, because of the manipulation, each contract only obtained, on average, the much smaller dividend distribution of $.20 per option contract, calculated as:

$297,810 (dividends to distribute) ÷ 1,485,679 (new open interest following manipulation) = **$.20 (per option)**

The Market Maker Defendants' thus caused all other investors to lose approximately $1.51 per contract ($1.71-$.20), or over $262,000 of the distributable dividends on this one incident of manipulation of option contracts. The Market Maker Defendants thus stole approximately 88% of what would have otherwise gone to Plaintiff and the other members of the Class investing in this PFE option.

66.     Plaintiff Rabin also wrote 100 calls on December 17, 2010 (Expiration date 2/19/2011, strike price $17) that was assigned on February 1, 2011 (reported by his broker on February 2, 2011).  The Market Maker Defendants had again ballooned the open interest with 11 huge trades of 42,000 each, amounting to 462,000 in additional open interest on February 1, 2011.  The prior day the open interest had been only 21,030.

67.     There are thousands of incidents similar to the PFE option manipulation, many in the million dollar range, diverting the dividend payments on underlying stocks and ETFs to the Market Maker Defendants for their own financial benefit and not in any valid market making function.

D.     **The Manipulation of the Options Contracts of CME Group, Inc. Provides Another Example of Market Maker Defendants' Practices and Resulting Injury**

68.     Another striking example of this widespread manipulative practice on the PHLX Exchange is the pattern of Market Maker Defendants' trading in the open interest options contracts of the CME Group, Inc. (Stock Ticker: CME) in the days prior to the ex-dividend date of the underlying CME stock.  In that incident, detailed below, the Market Maker Defendants inflated the size of the options open interest pool for CME stock by flooding the market with 440,000 additional option contracts one day before the ex-dividend date of the CME common stock.  The result was to radically reduce all "ordinary" (*i.e.* typical) non-market maker investors' share of unassigned options on CME.  The Market Maker Defendants' short option holdings increased the size of the open interest pool and thereby directed the dividend payments to the Market Maker Defendants for these extraordinary trades.  The CME incident provides another stark illustration, but is only one example, of Market Maker Defendants' manipulative trading activities in numerous option contracts.

69.     The CME options contracts involved in the CME manipulation had an expiration date of January 18, 2014 and a strike price of $65. The CME stock had an ex-dividend date of December 24, 2013. Therefore, to obtain the dividend, an owner of a call option had to exercise his option on or before December 23, 2013 in order to be a shareholder of record on December 27 and therefore have a right to the dividend.  The Market Maker Defendants' manipulations in the CME example occurred on December 23, 2013.

70.     On December 23, 2013 (based upon information and belief) at least ten market makers drastically increased the open interest pool.  Each Market Maker Defendant bought and sold 40,000 contracts on CME series at a strike price of $65 with an expiration date of January 18, 2014 to each other; the result was that each Market Maker Defendant had 40,000

long positions and 40,000 short positions, thus perfectly hedged.  The ten Market Maker Defendants had thereby expanded the open interest pool from the original 20,027 contracts to approximately 460,000 contracts in one day, an increase of over 2200%.

71.    Each of the Market Maker Defendants then exercised all of their long call options, leaving each of them with 40,000 short call options. When the options were then assigned by the OCC, 20,001 short calls remained.  Collectively the Market Maker Defendants skated on the vast majority of the short calls in the open interest pool (because they had a much higher percentage of the short positions).  They thereby collected the bulk of the dividends on CME from the unassigned short call options.

72.    As a result, the remaining CME investors skated on a much smaller number of options than they would have absent this manipulation of the market. Instead of obtaining, on average:

$5,200,260 (dividend) ÷ 20,000 (open short options) = **$260.01 (dividend payment per open option)**

from the dividend distribution, because of the manipulation, each contract only obtained:

$5,200,260 (dividend) ÷ 460,000 (open short options)
**= $11.30 (dividend payment per open option)**

The Market Maker Defendants thus stole over 95% of what would have gone to all other investors in the open interest pool.

73.    In the CME incident, the Market Maker Defendants' actions caused all other investors to lose approximately $249 per contract, or over $4.9 million on this one incident. There are numerous such multi-million dollar incidents capturing the dividend payment by the Market Maker Defendants for themselves.  This CME example provides an illustration, but is only one example, of Market Maker Defendants' manipulative trading activities in numerous

open interest option contracts that benefitted Market Maker Defendants while wrongfully depriving typical investors of the value of the dividend payments.

## VI.   PLAINTIFF AND THE MEMBERS OF THE CLASS WERE DAMAGED BY DEFENDANTS' MANIPULATIVE PRACTICES

74.     Individual retail investors, legitimate market making professionals, and non-market making professionals, who were short (*i.e.*, had written call positions in the relevant options) had their chances of skating (and thereby earning the dividend payment) reduced dramatically because of the dividend manipulation conspiracy of the Defendants.  Defendants' conspiracy dramatically increased the size of the short call option pool the day before underlying securities went ex-dividend.  As a result, Plaintiff and other Class members were damaged.  Market Maker Defendants (with the knowing acquiescence and participation of the complicit Defendants NASDAQ/PHLX and NASDAQ OMX in furtherance of the scheme) routinely engaged in this option trade strategy and thereby improperly appropriated the dividends to themselves.  All writers of the calls, including Plaintiff and other members of the Class, were harmed by this manipulative device – even if they became aware of the practice since there was no alternative for call options writers.

## VII.   ADDITIONAL SCIENTER AND RELIANCE ALLEGATIONS

75.     National securities exchanges historically operated as not-for-profit mutual organizations charged with enforcing market rules to protect investors.  This structure was intended to minimize conflicts of interest between the exchanges and the investing public and to enable the exchanges to fulfill their roles as self-regulatory organizations.

76.     Since the mid-1990s, the exchanges have demutualized, adopting a "for-profit" model that conflicts with their responsibilities as self-regulatory organizations.

77.     As recognized by the securities industry, "[t]he traditional model of self-regulation for the exchanges found its justification in the alignment of interests between the

investing public and member firms," but that model has given way to the exchanges "now [being] oriented toward maximizing profits for their shareholders."

78.     Commentators have noted the recent exchanges' fundamental shift from a regulatory to a profit-making role.   As the lobbying arm of the broker-dealer industry has admitted:

> [T]he interests, incentives and functions of the member-owned cooperative exchange of 1934 bear little resemblance to those of the for-profit publicly traded exchange of today.  Since the wave of demutualizations, exchanges have rightly focused their efforts on the part of their business that earns profits to maximize the return for their shareholders, and, in some cases, *minimized their actual performance of regulatory functions*.[9]

79.     A federal district court has summarized this transformation most succinctly:  "As exchanges have evolved into for-profit enterprises, an irreconcilable conflict has arisen, rendering independence unattainable in the context of an exchange regulating its own, for-profit business conduct."[10]

80.     Defendant NASDAQ/PHLX gave special treatment to the Market Maker Defendants who engaged in matched trading on the PHLX Exchange on days prior to the ex-dividend date.  This special treatment allowed the Market Maker Defendants to capture the assigned open interests for the valuable dividends.  This trading scheme has nothing to do with NASDAQ/PHLX's duties as a self-regulatory organization (such as the regulatory oversight of its respective members or the discharge of any regulatory duties it has under the securities laws) and everything to do with serving its profit-based motives.  Defendant NASDAQ/PHLX profited by attracting more trades than it would have, thereby reaping trading fees and dramatically boosting call option trading activity on the exchange. As alleged above, the huge trading spike

---

[9]     Letter from the Securities Industry and Financial Markets Association to SEC Chair Mary Jo White, July 31, 2013, *available at* www.sifma.org/issues/item.aspx?id=8589944673 (emphasis added).

[10]    *In re Facebook, Inc., IPO Secs. and Derivative Litig.*, 986 F.Supp.2d 428, 453 (S.D.N.Y. 2013).

caused by the Market Maker Defendants' sham trades enabled Defendant NASDAQ/PHLX to report inflated trade volumes and market share, thereby enhancing its competitiveness in order to generate yet additional revenue.  In doing so, Defendant NASDAQ/PHLX was serving its private business interests and acting outside of its role as a self-regulatory organization.[11]  These business decisions permitting the manipulative transactions for the exchange's own profit serve as the basis of the claims of Plaintiff and other members of the Class.  Defendant NASDAQ/PHLX and Defendant NASDAQ OMX reaped these profits at the expense of Plaintiff and other members of the Class.

81.     As alleged herein, all Defendants acted with scienter in that all the Defendants were motivated to allow the wrongful conduct alleged herein and had actual knowledge of and/or willfully participated in the fraudulent conduct alleged herein.  In similar situated transactions, the Market Maker Defendants massively diluted the open interest pools to obtain a larger portion of the "skate" than the rest of the investing public, thereby realizing hundreds of millions of profit from their illegal conduct. Defendants NASDAQ/PHLX and NASDAQ OMX profited by increased revenue from the high volume of these manipulative trades made on the PHLX Exchange as well as by reporting a greater market share of options trades.  The increased volume was not related to any valid purpose and reflected simply the activity of the Market Maker Defendants buying and selling the same contracts, akin to wash sales.  The conduct of the Market Maker Defendants, as alleged herein, had no legitimate market making purpose other than to manipulate the market.  The actions of the Market Maker Defendants created no additional liquidity to the market although their role and privileges are to ensure liquidity.  The Market

---

[11]     As previously noted, parent NASDAQ OMX Group, Inc. ("NASDAQ OMX") is the sole owner of the PHLX Exchange through its subsidiary NASDAQ/PHLX.  NASDAQ OMX is a for-profit entity and. is not itself a securities exchange and is not a self-regulatory organization.

Maker Defendants knowingly exceeded their allowed margins and credit requirements while doing these manipulative dividend trades.

82.     In sum, Defendants were motivated to participate in the wrongful scheme by the enormous profits they took. They systematically participated in the scheme with knowledge of its consequences to other investors.

83.     Other investors, including Plaintiff and other members of the Class, assumed the existence of an honest and fair market when selling options in the marketplace. Plaintiff and other members of the Class believed that the Market Maker Defendants provided liquidity rather than that the Market Maker Defendants were deceptively taking the dividends for themselves.

## VIII.   PLAINTIFF'S CLASS ACTION ALLEGATIONS

84.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class, consisting of all persons who held short positions on "in the money" call options contracts on dividend paying stocks and ETFs and who were adversely affected by Defendants' conspiracy to manipulate, and manipulation of the options markets prior to the ex-dividend date on such securities from February 6, 2010 through the present (the "Class Period"). Excluded from the Class are Defendants, members of their immediate families and their legal representatives, parents, affiliates, heirs, successors or assigns and any entity in which Defendants have or have had a controlling interest (the "Excluded Persons").  Also excluded are any officers, directors, or trustees of the Excluded Persons.

85.     The members of the Class are so numerous that joinder of all members of the class is impracticable. The exact number of Class members is unknown to Plaintiff at this time but can be ascertained through appropriate discovery.  Plaintiff believes that there are thousands of members of the proposed Class. Members of the Class may be identified through records kept

by the PHLX Exchange and the OCC and may be notified of the pendency of this action by mail or electronically, using the form of notice customarily used in securities class actions.

86.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct.

87.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

88.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.     Whether Defendants implemented the manipulative acts, devices or contrivances or engaged in the alleged fraudulent scheme and course of business alleged herein;

b.     Whether rules and regulations governing market makers were violated by Defendants' acts as alleged herein;

c.     Whether Defendants' actions artificially and repeatedly inflated the size of the options open interest pool;

d.     Whether Defendants acted with scienter in connection with the wrongful conduct;

e.     Whether Plaintiff and the other members of the Class have sustained damages and, if so, the appropriate measure thereof; and

f.     Whether Defendants were unjustly enriched through their actions.

89.     Every Class member relied on the assumption that they were trading in an honest and fair market free of manipulation by fraudulent means.

90.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.   There will be no in insurmountable difficulty in the management of this action as a class action.

91.   This action is also properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(2) because Defendants have conspired and acted on grounds that apply generally to the Class in that they conducted the illegal behavior complained of herein and have continued to do so. Final injunctive relief or corresponding declaratory relief is thus also appropriate respecting the Class as a whole.

## COUNT I
## Violation of Section 10(b) of the Exchange Act And Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants

92.   Plaintiff repleads and realleges the allegations in the prior paragraphs as if set forth in full.

93.   This claim is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j and Rule 10b-5(a) and (c), 17 C.F.R. § 240.10b-5(a) and (c) against all Defendants.

94.   During the Class Period, each of the Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did manipulate the options to the detriment of the investing public, including Plaintiff and other Class members, in connection with the purchase and/or sale of options contracts.

95.   Defendants, conspired, and employed devices, schemes, and artifices and engaged in acts, practices, and a course of business as alleged herein to unlawfully manipulate and profit from illegal trading in options contracts.

96.     Defendants' actions constitute manipulative acts. Through massive matched trades, Defendants utilized their margin and other privileges to falsely increase volume in the options to benefit themselves.

97.     Plaintiff and other members of the Class traded in options during the Class Period and held one or more short positions on options contracts during the Class Period and thereby suffered losses as a result of the Defendants' trading which manipulated the options marketplace.

98.     Plaintiff and other members of the Class were damaged by relying on an assumption of an honest and fair market, free of manipulation, when buying and selling options in the marketplace.

99.     Defendants acted with scienter in connection with the manipulative acts alleged herein in that they acted knowingly and/or recklessly when they artificially inflated the size of the options open interest pool and thereby interfered with the market for options.

100.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class were damaged as a result of their purchase or sale of the options.

101.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5(a) and (c) promulgated thereunder.

### COUNT II
### Unjust Enrichment Against All Defendants

102.    Plaintiff repleads and realleges the allegations the prior paragraphs as if set forth in full.

103.    The Market Maker Defendants have benefitted through the acts complained of herein.  The Market Maker Defendants have earned a huge windfall on option contracts. NASDAQ/PHLX and NASDAQ OMX have benefitted by collecting fees on the increased trading activity.

104.    As a direct and proximate result of Defendants' manipulation of the options market, Plaintiff and other Class members have suffered damages in an amount to be proven at trial.

105.    In equity and in good conscience, it would be unjust and inequitable to permit Defendants to enrich themselves at Plaintiff's and other Class members' expense and to retain the benefits of their inequitable conduct.

106.    Plaintiff and other members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

107.    Declaring this action to be a proper class action maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure and declaring Plaintiff to be a proper class representative.

108.    Awarding Plaintiff and the Class compensatory damages as a result of the wrongs alleged herein, including interest thereon, and further awarding disgorgement and restitution.

109.    Declaratory Judgment and/or injunctive relief requiring Defendants to end the practices complained of herein.

110.    Awarding Plaintiff and the Class their costs and expenses in this litigation, including reasonable attorneys' fees, experts' fees, and other costs.

111.    Granting Plaintiff and the Class such further relief as allowed by law and/or as is equitable under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  June 10, 2015                           Respectfully submitted,

**BERGER & MONTAGUE, P.C.**

/s/ Lawrence Deutsch
Lawrence Deutsch, PA Bar No. 45653
Robin B. Switzenbaum, PA Bar No. 44074
Phyllis M. Parker, PA Bar No. 77336
1622 Locust Street
Philadelphia, PA  19103
Tel: (215) 875-3000
Fax: (215) 875-4604
Email: ldeutsch@bm.net
            rswitzenbaum@bm.net
            pparker@bm.net

Jeffrey H. Squire
Lawrence P. Eagel
**BRAGAR EAGEL & SQUIRE, P.C.**
885 Third Ave., Suite 3040
New York, NY 10022
Tel: (212) 308-5858
Email: squire@bespc.com
            eagel@bespc.com

*Attorneys for I. Stephen Rabin*

KAL6981849