**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| **I. STEPHEN RABIN, on behalf of himself:** | | |
| **and all others similarly situated,** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiff,** | : | **No. 2:15-cv-00551-GAM** |
| | : | |
| **v.** | : | **Class action** |
| | : | |
| **NASDAQ OMX PHLX LLC** *et al.*, | : | |
| | : | |
| **Defendants.** | : | |

_____

**DEFENDANT SUMO CAPITAL LLC'S MOTION TO DISMISS**
**CORRECTED SECOND AMENDED COMPLAINT WITH PREJUDICE**

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendant SUMO

CAPITAL LLC, by and through its attorney, Zachary J. Ziliak, hereby moves the Court to

dismiss with prejudice Plaintiff's Corrected Second Amended Complaint as to Defendant SUMO

CAPITAL LLC for failure to state a claim upon which relief can be granted, as time-barred in

part, and in part for lack of standing.

A Form of Order and a Brief in Support of Defendant Sumo Capital LLC's Motion to

Dismiss Corrected Second Amended Complaint accompany this motion.

August 12, 2015                                    Respectfully submitted,


                                    s/ Zachary J. Ziliak_____
                                    ZACHARY J. ZILIAK (pro hac vice)
                                    ELAINE WYDER-HARSHMAN
                                    ZILIAK LAW, LLC
                                    141 West Jackson Boulevard, Suite 4048
                                    Chicago, Illinois 60604
                                    (312) 462-3350
                                    zachary@ziliak.com

                                    *Attorneys for Defendant Sumo Capital LLC*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| I. STEPHEN RABIN, on behalf of himself: | | |
| and all others similarly situated, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | No. 2:15-cv-00551-GAM |
| | : | |
| v. | : | Class action |
| | : | |
| NASDAQ OMX PHLX LLC *et al.*, | : | |
| | : | |
| Defendants. | : | |

_____

**BRIEF IN SUPPORT OF DEFENDANT SUMO CAPITAL LLC'S MOTION TO**
**DISMISS CORRECTED SECOND AMENDED COMPLAINT WITH PREJUDICE**


ZACHARY J. ZILIAK (pro hac vice)
ELAINE WYDER-HARSHMAN
ZILIAK LAW, LLC
141 West Jackson Boulevard, Suite 4048
Chicago, Illinois 60604
(312) 462-3350
zachary@ziliak.com

*Attorneys for Defendant Sumo Capital LLC*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 2

ARGUMENT ..................................................................................................................... 6

I.      PLEADING STANDARDS ...................................................................................... 6

II.     RABIN'S CLAIMS SHOULD BE DISMISSED AS TIME-BARRED AND FOR LACK
        OF STANDING. ........................................................................................................ 7

        A.      Those Claims Based on Trading Activity in 2010 and 2011 are Time-Barred. ..... 7

                1.      Securities Fraud Claims ........................................................................... 7

                2.      Unjust Enrichment Claims ........................................................................ 9

        B.      Rabin Lacks Standing to Bring Claims Based on December 23, 2013 Trading
                Activity Because He Does Not Allege That He Was Injured by Those Trades. .... 9

III.    BECAUSE PLAINTIFF HAS NOT STATED AND CANNOT STATE A CLAIM, THIS
        COURT SHOULD DISMISS HIS COMPLAINT WITH PREJUDICE. ........................ 10

        A.      Rabin's Speculative and Conclusory Allegations of Conspiracy Among the
                Market Maker Defendants Cannot Be Taken as True. ......................................... 10

        B.      Rabin Fails to State a Claim for Securities Fraud Under Section 10(b) of the
                Exchange Act or SEC Rule 10b-5. ..................................................................... 11

                1.      Rabin Has Not Sufficiently Alleged Manipulative, Deceptive Conduct
                        Such as Would Constitute a Material Misrepresentation or Omission by
                        Any Market Maker Defendant. ............................................................... 13

                2.      Rabin Has Not Established, and Cannot Establish, Scienter Under the
                        Facts Pleaded. ........................................................................................ 15

                3.      Rabin's Allegations Preclude the Establishment of the Element of
                        Reliance ................................................................................................. 17

                4.      Rabin Does Not Plead Economic Loss in Connection with the Trading
                        Activity of December 23, 2013 ................................................................. 19

        C.      Because Plaintiff Does Not Allege That He Conferred a Benefit on Sumo, He
                Fails to State a Claim for Unjust Enrichment. ...................................................... 20

                1.      This Court Reviews the Substance of Rabin's State-Law Claim under
                        Pennsylvania Law, and the Sufficiency of the Pleadings under Federal
                        Standards ............................................................................................... 20

                2.      Rabin Fails to State a Claim for Unjust Enrichment ................................. 20

CONCLUSION ................................................................................................................. 21

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
    568 U. S. ____, 133 S. Ct. 1184 (2013)....................................................11–13, 15, 17, 19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)..........................................................6, 10, 14, 16

*Ballentine v. United States*, 486 F.3d 806 (3rd Cir. 2007)..............................................9

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)..................................................................18

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..............................................6, 10, 11

*Burgettstown-Smith Twp. Joint Sewage Auth. v. Langeloth Townsite Co.,*
    588 A.2d 43 (Pa. Super. Ct. 1991)...............................................................20–21

*Chin v. Chrysler LLC*, 538 F.3d 272 (3d Cir. 2008)...............................................20, 21

*Cole v. Lawrence*, 701 A.2d 987, 989 (Pa. Super. Ct. 1997) ........................................9

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) ...................................12–13, 15, 19

*Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014) ...................17–18

*In re Digital Secs. Litig.*, 357 F.3d 322 (3d Cir. 2004) ...................................................7

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .....................................................9

*Merck & Co. v. Reynolds*, 559 U.S. 633 (2010) ..............................................8, 16, 17

*Mitchell v. Moore*, 729 A.2d 1200 (Pa. Super. Ct. 1999) ............................................20

*Santa Fe Indus. v. Green*, 430 U.S. 462, 476 (1977)............................................11, 13

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008) ..........12

*Styer v. Hugo*, 422 Pa. Super. 262 (1993)....................................................................21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)...............................16

*Wolgin v. Magic Marker Corp.,* 82 F.R.D. 168 (E.D. Pa. 1979) .................................13

**ADMINISTRATIVE DECISIONS AND GUIDANCE**

*Batterman*, Admin. Proc. File No. 3-4519,
　　　46 S.E.C. 304 (1976); 1976 SEC LEXIS 2053 ....................................................13, 14–15

*Graham*, Initial Decision Release No. 82,
　　　60 S.E.C. Docket (Dec. 28, 1995); 1995 SEC LEXIS 3457 ...........................................13

Self-Regulatory Organizations, Exchange Act Release No. 34-72677,
　　　79 FR 44480, 44481 (July 31, 2014) .........................................................................8, 14

**STATUTES AND RULES**

Section 9 of the Securities Exchange Act of 1934, 15 U.S.C. § 78i .......................................13, 15

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ......................... *passim*

15 U.S.C. §§ 78a *et seq.* ......................................................................................................7, 15

15 U.S.C. § 78u-4 ...............................................................................................7, 15–16, 17

17 C.F.R. § 240.10b-5 ........................................................................................... *passim*

17 C.F.R. § 240.15c3-1(c)(8) ................................................................................................2

28 U.S.C. § 1367 ................................................................................................................20

28 U.S.C. § 1658(b) ........................................................................................................7–8

Fed. R. Civ. P. 8 ..................................................................................................................6

Fed. R. Civ. P. 9 ...............................................................................................................6, 7

Fed. R. Civ. P. 12(b)(1) ...........................................................................................6, 9, 10, 22

Fed. R. Civ. P. 12(b)(6) .............................................................................................6, 7, 22

**MISCELLANEOUS**

5 C. Wright & A. Miller, Federal Practice and Procedure § 1216 (3rd ed. 2004)...........................6

*OCC to Adopt a Policy to Restrict Exercises to Net Long Positions* (available at
http://www.optionsclearing.com/about/newsroom/releases/2013/05_23.jsp)...................14

# INTRODUCTION

This Court should dismiss Plaintiff I. Stephen Rabin ("Rabin")'s Corrected Second Amended Complaint (the "Complaint") pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), with respect to Defendant Sumo Capital LLC ("Sumo"). Count I alleges securities fraud under section 10(b) of the Securities Exchange Act of 1934 ("the Act"), 15 U.S.C. § 78j(b) ("section 10(b) of the Act") and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"). (Compl. ¶¶ 92–101.) Count II alleges unjust enrichment. (Compl. ¶¶ 102–106.)

Rabin cannot show that he is entitled to relief on any of his claims. First, he brings claims that he either lacks standing to bring because he does not allege injury, or cannot bring because they are time-barred. This alone is reason to dismiss his complaint.

Second, Rabin fails to plead any cause of action sufficiently. Although Rabin speculates about the existence of a conspiracy in the allegations relating to Count I, his allegations are speculative and conclusory and therefore cannot be taken as true. Those facts sufficiently pleaded do not support his assertions of securities fraud, and in fact preclude such a claim. Rabin also fails to state a claim for unjust enrichment, as the facts pleaded do not support the first element of that claim—that Rabin have conferred a benefit upon Sumo.

Under the facts alleged, as will be discussed, Rabin cannot cure the defects of the Complaint through amendment. This Court therefore should dismiss Rabin's Complaint with prejudice.

# BACKGROUND

Sumo is a market maker on the NASDAQ OMX PHLX exchange ("PHLX"), where Sumo trades options (Compl. ¶ 20); that is, contracts that grant the bearer the right, but not the obligation, to buy or sell specific underlying securities (*see* chart "Summary of Terms Relating to Long and Short Call Options" following *id.* ¶ 36). For purposes of calculating net capital requirements, market maker is defined as:

> a dealer who, with respect to a particular security, (i) regularly publishes bona fide, competitive bid and offer quotations in a recognized interdealer quotation system; or (ii) furnishes bona fide competitive bid and offer quotations on request; and, (iii) is ready, willing and able to effect transactions in reasonable quantities at his quoted prices with other brokers or dealers.

SEC Rule 15c3-1(c)(8), 17 C.F.R. § 240.15c3-1(c)(8) (2015) (quoted in the Complaint at ¶ 1 n.1).

Unlike retail investor market participants such as Rabin, market makers on the PHLX exchange are permitted to hold both long and short positions in the same option contract, according to the Complaint. (Compl. ¶¶ 42–45.)[1] Rabin alleges that Sumo and other market makers (collectively, "Market Maker Defendants") conspired to and did secure an unfair and unlawful advantage over other market participants through a dividend strategy based on this ability to hold simultaneous long and short positions in the same option contract. (*Id.* ¶¶ 10, 41, 43, 47, 74, 91, 95.) This strategy involved purchasing a large number of "in-the-money" call options (buying the right to purchase the underlying securities) and writing corresponding calls (granting someone else the same right) on dividend-paying securities on the day before the underlying security's ex-dividend date, which is typically two business days before the "record

---

[1] For purposes of this Motion to Dismiss only, Sumo takes as true the well-pleaded facts of the Complaint.

date" of the underlying security for an upcoming dividend date. (*Id.* ¶¶ 39, 46.) The owner of the underlying security on the record date would be entitled to any dividend paid, and purchases preceding the ex-dividend date would clear in time for the buyer to be deemed the holder of record on the record date. (*Id.* ¶ 39; chart "Summary of Terms Relating to Long and Short Call Options" following *id.* ¶ 36.)

Per Rabin's allegations, a market maker pursuing this dividend strategy would exercise its long, in-the-money call options on the last trading day prior to the ex-dividend date, with the intent of becoming the owner of the underlying security on its record date and hence collecting the dividend. (*Id.* ¶ 39.) For each long call that was exercised, whether by the Market Maker Defendants or by anyone else, the clearing house would randomly assign some market participant with a short position in the same call to sell the underlying security, at the call's strike price, to the party who had exercised the call. (*Id.* ¶¶ 32, 37–38.) Crucially, a few in-the-money calls would typically go unexercised on that last day before the ex-dividend date, and thus an equal number of short calls would avoid assignment. (*Id.* ¶¶ 40-41.) The market participants – Market Maker Defendants and other parties alike – who held those short call positions that had avoided assignment ("skated") would thus remain the owners of record of the underlying securities on their record dates and receive what Rabin describes as "windfall" dividends. (*Id.* ¶¶ 41, 46-47.)

According to Rabin, the Market Maker Defendants wrote a large number of in-the-money calls just before the ex-dividend date, thereby increasing their chances of capturing these windfall dividends. (*Id.* ¶¶ 41–43.) By purchasing an equal number of the same call options on that same trading day, the Market Maker Defendants allegedly minimized their exposure to price movements in the underlying security, while retaining (thanks to the special rules that applied to

3

them as market makers) the increased likelihood that they would secure windfall dividends. (*Id.* ¶¶ 41–43.) While some exchanges prohibit such strategies, PHLX does not. (*Id.* ¶ 52.) Rabin had himself written call options and thus set himself up as the potential recipient of windfall dividends, but unlike the market makers, Rabin could not improve his chances by adding offsetting long and short positions in those same options. (*Id.* ¶¶ 42, 44–45.) In his complaint, Rabin contends that the sole purpose of the Market Maker Defendants' trades was to increase their chance of securing these windfall dividends, for their own financial benefit, at the expense of Rabin and those similarly situated. (*Id.* ¶¶ 57, 67.)

Rabin contends that the Market Maker Defendants executed this strategy on August 3, 2010 and February 1, 2011, with respect to options on shares of Pfizer (*id.* ¶¶ 60–67), and that their August 3 action deprived him of dividends that otherwise would have gone to him (*id.* ¶ 65). Instead, Rabin was assigned on all 68 of his short August 2010 calls, as was reported by his broker on August 4, 2010. (*Id.* ¶ 61; *id.* Exh. A at 1.) Rabin was similarly assigned on all 100 of his February 2011 calls following the market makers' alleged February 1 action, as was reported by his broker on February 2, 2011. (*Id.* ¶ 66; *id.* Exh. A at 2.)

Rabin further alleges that the Market Maker Defendants executed a similar strategy in relation to options contracts for shares of CME Group, Inc., on December 23, 2013. (*Id.* ¶¶ 68–73.) Rabin contends that this also wrongly deprived "typical investors" of dividend payments. (*Id.* ¶ 73.) He does not allege that he was deprived of dividends in this instance, or that he traded these options.

Throughout his Complaint, Rabin argues that the Market Maker Defendants' trading strategies constituted improper or unlawful manipulation of the market. (Compl. ¶¶ 41, 43, 46, 50, 53, 54, 63.)  He identified the Market Maker Defendants, and the calls that he believes were

manipulated, from PHLX records of options trades, based on codes entered by option writers indicating that such trades were executed in conjunction with a dividend rebate strategy. (*Id.* ¶ 27.)

Rabin further alleges that the Market Maker Defendants conspired together to engage in illegal wash trades or match trades. (*Id.* ¶¶ 1, 43, 50, 52–53, 56, 80–81, 96.) In what he entitles "A Detailed Example of How the Process Used by the Market Maker Defendants Works," Rabin explains at length how he believes that a conspiracy between Market Maker One and Market Maker Two might operate. (*Id.* ¶ 55.) He alleges conspiracy among the Market Maker Defendants generally, but does not identify conspiratorial actions taken by particular defendants. (*Id.* ¶¶ 56–58.)

## ARGUMENT

## I.   PLEADING STANDARDS

Pleading standards under the Federal Rules of Civil Procedure are well established. To state a claim for relief, a complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to state a claim of relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "Recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient, and the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* "Factual allegations must be enough to raise a right to relief above the speculative level, . . . something more than a statement of facts that merely creates a suspicion." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216 at 235–36 (3rd ed. 2004)) (alterations and internal quotation marks omitted).

Allegations of conspiracy in particular are subject to a heightened pleading standard. When pleading conspiracy, conclusory allegations of agreement among the alleged co-conspirators are insufficient and do not show illegality, even when the alleged co-conspirators have engaged in parallel conduct. *Id*. at 556.

Pleading standards also are heightened where fraud is alleged, under Rule 9 of the Federal Rules of Civil Procedure:

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

Fed. R. Civ. P. 9(b).

Finally, the Private Securities Litigation Reform Act ("PSLRA") raises pleading standards for securities fraud claims brought under section 10(b) of the Act and Rule 10b-5, altering the usual operation of inferences under Federal Rule of Civil Procedure 12(b)(6). *In re Digital Secs. Litig.*, 357 F.3d 322, 328 (3rd Cir. 2004); 15 U.S.C. § 78u-4(b)(2). Under the Federal Rules of Civil Procedure, even where fraud is alleged, state of mind may be alleged generally. Fed. R. Civ. P. 9(b). Under the PSLRA, however, "the complaint shall, with respect to each act or omission alleged to violate this title [15 U.S.C. §§ 78a *et seq.*], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The PSLRA further provides that "the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met." 15 U.S.C. § 78u-4(b)(3)(A).

## II. RABIN'S CLAIMS SHOULD BE DISMISSED AS TIME-BARRED AND FOR LACK OF STANDING.

### A. Those Claims Based on Trading Activity in 2010 and 2011 are Time-Barred.

#### 1. Securities Fraud Claims

At the outset, Rabin's claims of securities fraud under section 10(b) of the Act and Rule 10b-5 based on trades on August 3, 2010 and February 1, 2011 (Compl. ¶¶ 60–67) are time-barred. The applicable statute of limitations for a "private right of action" under section 10(b) of the Act states that

> a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws . . . may be brought not later than the earlier of—
>
> > (1) 2 years after the discovery of the facts constituting the violation; or
> >
> > (2) 5 years after such violation.

28 U.S.C. § 1658(b). "[D]iscovery of the facts constituting the violation," sufficient to start the two-year clock on asserting a claim, "encompasses not only those facts the plaintiff actually knew, but also those facts that a reasonably diligent plaintiff would have known." *Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010).

Here, the cause of action accrued when Rabin knew or should have known of the huge spikes in trading immediately prior to the ex-dividend dates, and of his ensuing assignments on August 3, 2010, and February 2, 2011. The dividends strategy was not hidden or new. According to a recent SEC release, "dividend plays are an options trading strategy that has been executed for many years." Self-Regulatory Organizations, Exchange Act Release No. 34-72677, 79 FR 44480, 44481 (July 31, 2014). Any reasonably diligent options investor should have been aware of the flood of trading activity, a hallmark of dividend strategies such as Rabin cites in the Complaint. Furthermore, as Exhibit B of Rabin's original complaint shows, Rabin was able to obtain a list of trades that he believes reflect dividend plays prior to filing suit. (Compl. ¶ 57 n. 8; *see also* Original Complaint (Feb. 5, 2015).) Thus Rabin could have mounted a legal challenge to this strategy at any time, but did not do so until this year. As a result, this Court should deem any potential claims to have accrued when Rabin first learned of the assignments from his broker in 2010 and 2011, where he also reasonably should have known of the spike in trading on the very options that he had written.

The applicable statute of limitations is two years. 28 U.S.C. § 1658(b). Thus, the latest any claim could have been brought based on these events was 2013. Rabin, however, waited until February 5, 2015 to file his original complaint in this matter. (*See* Original Complaint (Feb. 5, 2015).) As a result, to the extent that Rabin's claims of securities fraud in Count I are based on those events, his claims are time-barred.

### 2.      Unjust Enrichment Claims

Rabin's claim for unjust enrichment is likewise partially time-barred. Under Pennsylvania law, an unjust enrichment claim has a four-year statute of limitations. *Cole v. Lawrence*, 701 A.2d 987, 989 (Pa. Super. Ct. 1997). As noted above, Rabin filed his original Complaint in this cause on February 5, 2015—a little over four years after the more recent of the two dates. The statute of limitations for these claims had thus run on Rabin's unjust enrichment claims as well, to the extent that they were based on the events of 2010 and 2011. This Court should therefore partially dismiss Counts I and II of the Complaint, to the extent that they are based on trades that Sumo allegedly made on or before February 1, 2011.

### B.      Rabin Lacks Standing to Bring Claims Based on December 23, 2013 Trading Activity Because He Does Not Allege That He Was Injured by Those Trades.

This Court should dismiss for lack of standing those claims of Rabin's, for both securities fraud and unjust enrichment, that are based on the trades in 2013 because Rabin has not pleaded that he suffered economic loss or any other injury as a result of those trades. A motion to dismiss for lack of standing is properly brought under Federal Rule of Civil Procedure 12(b)(1), because standing is a jurisdictional matter. *Ballentine v. United States*, 486 F.3d 806, 810 (3rd Cir. 2007). This Court must grant such a motion if it lacks subject matter jurisdiction to hear a claim. Under Rule 12(b)(1), "the Court must accept as true all material allegations set forth in the complaint, and must construe those facts in favor of the nonmoving party." *Id*. The plaintiff bears the burden of establishing the elements of standing. *Id*. Each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof at that same stage litigation. *Id*. Among other elements, to establish standing, "the plaintiff must have suffered an 'injury in fact' -- an invasion of a legally protected interest which is . . . concrete and particularized." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

Here, Rabin has not pleaded that he suffered economic losses, or any other injury, in connection with the trading of December 23, 2013. Notably, he fails to allege any personal involvement in trading that day, much less injury. Instead, he alleges that the Market Maker Defendants' actions wrongly deprived "typical investors" of dividend payments. (Compl. ¶ 73.) Accordingly, because Rabin fails to plead injury, these claims must be dismissed for lack of standing under Federal Rule of Civil Procedure 12(b)(1).

## III.   BECAUSE PLAINTIFF HAS NOT STATED AND CANNOT STATE A CLAIM, THIS COURT SHOULD DISMISS HIS COMPLAINT WITH PREJUDICE.

Given the facts pleaded, Rabin has not stated and cannot state a claim under section 10(b) of the Act, under Rule 10b-5, or under the common law of unjust enrichment. The facts alleged do not establish the required elements of any of these claims. Furthermore, well-pleaded facts preclude establishment of at least one element of each of Rabin's claims for securities fraud and unjust enrichment. This Court should therefore dismiss Rabin's Complaint with prejudice.

### A.   Rabin's Speculative and Conclusory Allegations of Conspiracy Among the Market Maker Defendants Cannot Be Taken as True.

At the outset, this Court should not take as true Rabin's claims of conspiracy among the Market Maker Defendants. As previously noted, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Likewise, conclusory statements are insufficient, and the Court is "not bound to accept a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (internal citation omitted).

Under this standard, Rabin has not adequately pleaded conspiracy. While Rabin explains in great detail how a conspiracy between market makers might be carried out (*id*. ¶ 55 ("A Detailed Example of How the Process Used by the Market Maker Defendants Works")), he does not make concrete allegations of acts specific to any defendant, and certainly not specific to

Sumo (*id.* ¶¶ 56–58). Nor will similar types of trading activity by the Market Maker Defendants

permit an inference of conspiracy, under the Supreme Court's decision in *Twombly*, 550 U.S. at

556. Allegations of agreement among alleged are co-conspirators are insufficient even where it is

alleged that the co-conspirators engaged in parallel conduct. *Id*. Rabin alleges nothing more

specific than that. Thus, because Rabin has not sufficiently pleaded conspiracy, this Court should

not take his allegations of the existence of a conspiracy as true when reviewing his Complaint for

purposes of this Motion to Dismiss.

**B.      Rabin Fails to State a Claim for Securities Fraud Under Section 10(b) of the Exchange Act or SEC Rule 10b-5.**

Rabin further fails to plead sufficient facts to state a claim for securities fraud. Indeed, the

facts pleaded preclude such a claim.

Section 10(b) of the Act and Rule 10b-5 provide a private cause of action "for any

plaintiff who suffer[s] an injury as a result of deceptive practices touching its sale [or purchase]

of securities." *Santa Fe Indus. v. Green*, 430 U.S. 462, 476 (1977) (alterations in original)

(internal quotation marks omitted); *see also Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568

U. S. ____, 133 S. Ct. 1184, 1191–92 (2013) (cause of action implied).

Section 10(b) of the Act provides in pertinent part that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means
> or instrumentality of interstate commerce or of the mails, or of any facility of any
> national securities exchange—
>
> [* * * *]
>
> b)  To use or employ, in connection with the purchase or sale of any
> security registered on a national securities exchange or any security not so
> registered, or any securities-based swap agreement[,] any manipulative or
> deceptive device or contrivance in contravention of such rules and
> regulations as the Commission may prescribe as necessary or appropriate
> in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  Rule 10b-5 was promulgated by the Securities and Exchange Commission

under the authority granted to it under section 10(b) of the Act. *Stoneridge Inv. Partners, LLC v.*

*Scientific-Atlanta, Inc.*, 552 U.S. 148, 156 (2008). Rule 10b-5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means
> or instrumentality of interstate commerce, or of the mails or of any facility of any
> national securities exchange,
>
> > (a) To employ any device, scheme, or artifice to defraud,
> >
> > [* * * *] or
> >
> > (c) To engage in any act, practice, or course of business which operates or
> > would operate as a fraud or deceit upon any person, in connection with the
> > purchase or sale of any security.

17 C.F.R. § 240.10b-5 ("Employment of manipulative and deceptive devices").  Rabin brings his

Count I claims for securities fraud under section 10(b) of the Act and Rule 10b-5, subsections (a)

and (c).

To recover damages for securities fraud under either section 10(b) of the Act or Rule

10b-5, a plaintiff must prove the following elements:

> (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a
> connection between the misrepresentation or omission and the purchase or sale of
> a security; (4) reliance upon the misrepresentation or omission; (5) economic loss;
> and (6) loss causation.

*Amgen*, 133 S. Ct. at 1191–92 (internal quotes and citation omitted).

Rabin brings his claim of securities fraud under a theory of market manipulation. Section

10(b) of the Act prohibits, in connection with the purchase or sale of any security, the use of

"any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j(b). Manipulation, the

Supreme Court has explained, is "virtually a term of art when used in connection with the

securities markets." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976). The term "connotes

intentional or willful conduct designed to deceive or defraud investors by controlling or

artificially affecting the price of securities," *id.*, and generally refers to practices that are intended to mislead investors by creating artificial market activity, through such means as wash trades or matched orders, *Santa Fe*, 430 U.S. at 476. Transactions in which there is no beneficial change of ownership (or in other words, "wash trades," *see Batterman*, Admin. Proc. File No. 3-4519, 46 S.E.C. 304 (1976), 1976 SEC LEXIS 2053 (available in appendix to this brief)), or transactions in which the market participant places simultaneous, offsetting buy-sell orders for the same security ("match trades," *see id.*) are prohibited under section 9 of the Act if done

> [f]or the purpose of creating a false or misleading appearance of active trading in any security other than a government security, or a false or misleading appearance with respect to the market for any such security.

15 U.S.C. § 78i. Where such trading operates as a fraud or deceit on the marketplace, illegal activity under section 9 of the Act also violates section 10(b) of the Act and Rule 10b-5 thereunder. *Graham*, Initial Decision Release No. 82, 60 S.E.C. Docket 2707, 2714 (Dec. 28, 1995), 1995 SEC LEXIS 3457 at *24 (available in appendix to this brief); *see also Wolgin v. Magic Marker Corp.,* 82 F.R.D. 168, 181 (E.D. Pa. 1979) (cause of action could be brought under section 9 of Act or Rule 10b-5).

### 1. Rabin Has Not Sufficiently Alleged Manipulative, Deceptive Conduct Such as Would Constitute a Material Misrepresentation or Omission by Any Market Maker Defendant.

Rabin's claim fails first because he does not adequately plead manipulative, unlawful trading activity, and thus cannot establish the element of "a material misrepresentation or omission by the defendant," *Amgen*, 133 S. Ct. at 1191–92, or, as the element is modified in cases of alleged manipulation, "conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities," *see Ernst*, 425 U.S. at 199 (discussing manipulation). His conclusory allegations of illegality (Compl. ¶¶ 9, 53–54, 81, 91, 95) should

13

not be taken as true. *See Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). Additionally, the well-pleaded facts contradict those conclusions.

Rabin has not alleged the type of illegal market manipulation designed to mislead investors that would support a claim of securities fraud. To start, there was nothing illegal about the Market Maker Defendants' dividend strategy. Rabin concedes that the rules do allow the Market Maker Defendants to have offsetting short and long positions. (Compl. ¶¶ 44–45.) Nor is a dividend strategy inherently unlawful, contrary to what Rabin would have the Court believe. In fact, in a relatively recent release discussing proposed changes to clearing house rules, the SEC discussed dividend plays at length. Self-Regulatory Organizations, Exchange Act Release No. 34-72677, 79 FR 44480, 44481 (July 31, 2014). The SEC acknowledged that the strategy had been perceived negatively and criticized as unfair, based on its distortions of trading volume. *Id.* at 44481. The release in no way suggested, however, that the trades involved were anything but legal. *See id.* at 44481–82. In a May 23, 2013 press release, the Options Clearing Corporation ("OCC") similarly referred to dividend plays as "a controversial but legally permitted options trading strategy." *OCC to Adopt a Policy to Restrict Exercises to Net Long Positions* (available at http://www.optionsclearing.com/about/newsroom/releases/2013/05_23.jsp) (last visited Aug. 8, 2015). To the extent that Rabin alleges that trades taking offsetting positions are *per se* illegal, or constitute unlawful market manipulation, he is wrong.

Nor were the trades alleged illegal wash or match trades. "Wash trades" or "wash sales" occur when "a person seeking to raise or support the price of a [security] places simultaneous orders to buy and sell quantities of the same security in transactions involving no change in the beneficial ownership of the [security]." *Batterman*, Admin. Proc. File No. 3-4519, 46 S.E.C. 304,

305 (1976), 1976 SEC LEXIS 2053. "Matched orders" occur when "a person places buy or sell orders for a security with the knowledge that sell or buy orders of substantially the same size and price will be placed simultaneously therewith." *Id*. Wash and match trades are illegal under section 9(a)(1) of the Act, 15 U.S.C. § 78i(a)(1), only when traded "[f]or the purpose of creating a false or misleading appearance of active trading in any security other than a government security, or a false or misleading appearance with respect to the market for any such security."

Rabin has not alleged that the trades provided misleading market information to investors, including himself. Rather, he alleges that the trades were made in order to "wrongfully increase [the Market Maker Defendants'] own odds of non-assignment in order to misappropriate the underlying dividend for themselves at the expense of the Plaintiff and the other members of the Class." (Compl. ¶¶ 57, 67.) The strategy described is a strategy to reap dividends, not a strategy to deceive investors.

As a result, Rabin has not pleaded the first element of a securities fraud claim, that is, conduct by the Defendants that constitutes a misrepresentation, in that it is designed to deceive or defraud investors. *See Amgen*, 133 S. Ct. at 1191–92 (elements of cause of action); *Ernst*, 425 U.S. at 199 (discussing manipulation). Rabin's securities fraud claims therefore must be dismissed on this ground alone.

> **2.      Rabin Has Not Established, and Cannot Establish, Scienter Under the Facts Pleaded.**

Rabin also has failed to plead the second element of his cause of action, scienter, under the standard set forth in the PSLRA. Under the PSLRA, "the complaint shall, with respect to each act or omission alleged to violate this title [15 U.S.C. §§ 78a *et seq*.], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."

15 U.S.C. § 78u-4(b)(2)(A). The PSLRA further provides that "the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met." 15 U.S.C. § 78u-4(b)(3)(A). Rabin has not pleaded such facts with the particularity required by the PSLRA. Quite the opposite: the facts positively pleaded preclude Rabin from establishing this element.

In a securities fraud action, the material misstatement must have been made (or in this case, the manipulation must have occurred) "*with an intent to deceive*--not merely innocently or negligently." *Merck*, 559 U.S. at 648–49. A complaint for securities fraud will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

Under the facts pleaded, Rabin cannot establish scienter. Rabin's conclusory allegations of scienter are insufficient because they rely upon bald characterizations of the Market Maker Defendants' trading activities as fraudulent. For example, Rabin alleges that "all Defendants acted with scienter in that all the Defendants were motivated to allow the wrongful conduct alleged herein and had actual knowledge of and/or willfully participated in the fraudulent conduct alleged herein," and that "[t]hey systematically participated in the scheme with knowledge of its consequences to other investors." (Compl. ¶¶ 81–82.) These bare allegations of fraudulent activity cannot be taken as true, and thus do not support a determination that the Market Maker Defendants acted with the intent to deceive investors. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (internal citation omitted)).

16

In addition, in an admission fatal to the element of scienter, Rabin avers that "[t]he *sole purpose* of [the Market Maker Defendants'] trades [was] to wrongfully increase their own odds of non-assignment in order to misappropriate the underlying dividend for themselves at the expense of the Plaintiff and the other members of the Class." (Compl. ¶¶ 57, 67 (emphasis added).) In other words, Rabin alleges that the profit motive was the Market Makers Defendants' *only* motivation for their trading, exclusive of intent to deceive investors about the value of securities. Accordingly, because Rabin does not plead intent to deceive, and alleges an exclusive, alternative motivation, he has not sufficiently pleaded scienter. *See Merck*, 559 U.S. at 648–49 ("A plaintiff cannot recover without proving that a defendant made a material misstatement with an intent to deceive--not merely innocently or negligently.").

Count I of Rabin's complaint thus must be dismissed for this reason as well. Rabin has not pleaded scienter with particularity. *See* 15 U.S.C. § 78u-4(b)(2)(A) ("facts giving rise to a strong inference that the defendant acted with the required state of mind" must be pleaded with particularity); 15 U.S.C. § 78u-4(b)(3)(A) (private action must be dismissed if pleading requirements for state of mind are not met). Moreover, because Rabin's allegations about Market Maker Defendants' sole motivation foreclose establishment of the element of deceptive intent, this Court should dismiss Count I with prejudice.

### 3.    Rabin's Allegations Preclude the Establishment of the Element of Reliance.

Rabin's pleadings similarly preclude him from establishing the element of "reliance upon the misrepresentation or omission," *Amgen*, 133 S. Ct. at 1191–92. In cases alleging fraud-on-the-market, a plaintiff may establish the reliance element

> by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation.

*Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2413 (2014). To invoke that

presumption, the plaintiff must prove

> (1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed.

*Id.* at 2408 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 248–49 (1988)). Any showing that

severs the link between the alleged misrepresentation and the decision to trade will rebut the

presumption of reliance. *Id.*  If the plaintiff would have bought or sold the stock anyway, even if

he had been aware of the alleged fraud, then the presumption of reliance does not apply. *Id.*

Here, Rabin cannot show reliance on the Market Maker Defendants' allegedly

manipulative trading. Once he had written the options at issue, he had no choice but to sell the

underlying securities once the calls were exercised. For example, on August 3, 2010, Rabin was

short 68 call options for shares of Pfizer. (Compl. ¶ 62.) The expiration date of those options was

August 21, 2010. (*Id.* ¶ 61). At the end of the day on August 3, the Market Maker Defendants

traded 1,312,000 copies of that same call. (*Id.* ¶ 63.) Rabin's call was assigned on August 3, and

reported by his broker on August 4. (*Id.* ¶ 61.)

Rabin had no decision to make; he was contractually obligated to sell the underlying

securities for which he had written options. Furthermore, assignments were made on a random

basis by OCC. (*Id.* ¶ 38.) Rabin thus had no choice about whether to sell. As a result, Rabin

*cannot* establish the element of reliance. He has pleaded himself out of court on his securities

fraud claim. For this reason as well, this Court should dismiss Count I of the Complaint with

prejudice.

**4.    Rabin Does Not Plead Economic Loss in Connection with the Trading Activity of December 23, 2013.**

Finally, with respect to the trading that occurred on December 23, 2013, Rabin has not alleged that he suffered any losses. The Complaint does not indicate that Rabin was affected in any respect. Rather than alleging his own losses, Rabin pleaded that the Market Maker Defendants' actions wrongly deprived "typical investors" of dividend payments. (*Id.* ¶ 73.) Because "economic loss" is a required element of a securities fraud claim, *Amgen*, 133 S. Ct. at 1191–92. Rabin's claim relating to the trades of December 23, 2013 must fail.

In short, Rabin has utterly failed to state a claim for securities fraud under section 10(b) of the Act and Rule 10b-5. His allegations of conspiracy are speculative and conclusory, and should not be taken as true. In addition, the trading practices that Rabin labels as unlawful were not in fact unlawful. Dividend strategies are legal, and according to the allegations of the complaint, were allowed under the exchange's rules.

In addition, the purported manipulation alleged by Rabin simply is not the type of deceptive market activity that may serve as the basis for a securities fraud action. The trading at issue was not "designed to deceive or defraud investors." *See Ernst*, 425 U.S. at 199 (discussing manipulation). Furthermore, Rabin has not pleaded scienter with particularity, as he does not allege an intent to deceive on the part of the Market Maker Defendants, but rather a "sole purpose" to profit. (Compl. ¶ 57.) Nor can he establish reliance. The alleged market manipulation could not have influenced Rabin's trading decisions, because he was contractually obligated to sell the securities for which he had written options. The facts alleged are thus entirely inconsistent with the elements of a claim for securities fraud, and those defects cannot be cured through additional pleading. This Court therefore should dismiss Count I of Rabin's Complaint with prejudice.

**C.      Because Plaintiff Does Not Allege That He Conferred a Benefit on Sumo, He Fails to State a Claim for Unjust Enrichment.**

Count II of the Complaint, which asserts a claim for unjust enrichment (Compl. ¶¶ 102–106), likewise fails to state a claim upon which relief can be granted.

**1.      This Court Reviews the Substance of Rabin's State-Law Claim under Pennsylvania Law, and the Sufficiency of the Pleadings under Federal Standards.**

Plaintiff asks this Court to exercise supplemental jurisdiction over his state law claim for unjust enrichment under 28 U.S.C. § 1367. (Compl. § 7.) Where this Court exercises supplemental jurisdiction over a state law claim, and where the matter to be determined is substantive, the Court must apply the substantive law of the forum state. *Chin v. Chrysler LLC*, 538 F.3d 272, 278 (3rd Cir. 2008). When reviewing the substance of Plaintiff's claim of unjust enrichment, this Court therefore looks to Pennsylvania law.

Conversely where the matter to be determined is procedural, the Court must apply the federal rules of procedure. *Id*. Accordingly, this Court reviews the adequacy of Rabin's pleading of his claim for unjust enrichment under the federal standard set forth in *Twombly*, *Iqbal*, and the Federal Rules of Civil Procedure.

**2.      Rabin Fails to State a Claim for Unjust Enrichment.**

The doctrine of unjust enrichment is an equitable doctrine. *See Burgettstown-Smith Twp. Joint Sewage Auth. v. Langeloth Townsite Co.*, 588 A.2d 43, 45 (Pa. Super. Ct. 1991). An action for unjust enrichment is essentially an action for restitution based on the breach of an implied contract. *See Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa. Super. Ct. 1999) (discussing quasi-contractual nature of cause of action). To state a claim for unjust enrichment under Pennsylvania law, a plaintiff must plead the following elements: (1) that plaintiff conferred benefits on defendant, (2) the "appreciation of such benefits by defendant," and (3) "acceptance and

20

retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *See Burgettstown-Smith*, 588 A.2d at 45 (internal quotes and citation omitted) (discussing elements of cause of action for unjust enrichment). "Where unjust enrichment is found, the law implies a contract between the parties pursuant to which the plaintiff must be compensated for the benefits unjustly received by the defendant." *Styer v. Hugo*, 422 Pa. Super. 262, 268 (1993).

Plaintiff's claim fails at the outset because he has not alleged that he conferred a benefit on Sumo, or pleaded facts that would support such an allegation. There is no indication in the complaint that Rabin had a relationship of any kind with Sumo, much less a quasi-contractual one. Rather, Rabin pleads that he identified each defendant as a potential defendant based on PHLX records showing that the defendant had made certain trades. (Compl. ¶ 27 ("Review of such trading information from NASDAQ/PHLX allowed Plaintiff to identify the Market Maker Defendants.").) Rabin thus fails to state a claim for unjust enrichment, as he has pleaded facts that prevent him from alleging a quasi-contractual relationship in which he conferred a benefit upon Sumo. The defect cannot be cured by further pleading given the lack of any relationship between Rabin and Sumo. Accordingly, this Court should dismiss Count II of the Complaint with prejudice with respect to Sumo.

## CONCLUSION

Plaintiff's Corrected Second Amended Complaint must be dismissed. It fails to plead the causes of action asserted, namely securities fraud under section 10(b) of the Securities Exchange Act and SEC Rule 10b-5 (Count I) and common law unjust enrichment (Count II). Amendment will not cure the defects in the complaint. Plaintiff's factual pleadings regarding the Market Maker Defendants' intent preclude recovery on a theory of securities fraud. Likewise, Rabin has

not alleged *any* type of direct relationship between himself and Sumo, much less a quasi-contractual one in which Rabin conferred a benefit on Sumo by which Sumo was unjustly enriched. These claims therefore must be dismissed with prejudice. Dismissal is further warranted because the only claims for which Rabin has standing are time-barred.

WHEREFORE, Defendant Sumo Capital LLC respectfully requests that this Court enter an Order dismissing Plaintiff's Corrected Second Amended Complaint with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

August 12, 2015                                    Respectfully submitted,


                                                   s/ Zachary J. Ziliak
                                                   ZACHARY J. ZILIAK (pro hac vice)
                                                   ELAINE WYDER-HARSHMAN
                                                   ZILIAK LAW, LLC
                                                   141 West Jackson Boulevard, Suite 4048
                                                   Chicago, Illinois 60604
                                                   (312) 462-3350
                                                   zachary@ziliak.com

                                                   *Attorneys for Defendant Sumo Capital LLC*

# Appendix

## *1976 SEC LEXIS 2053*

Securities and Exchange Commission

March 29, 1976; Amended November 2, 1976

46 S.E.C. 304

**Reporter**

1976 SEC LEXIS 2053; 46 S.E.C. 304

## Admin. Proc. File No. 3-4519; SECURITIES EXCHANGE ACT OF 1934, Release No. 12278

In the Matter of Michael Batterman, 128 South Beverly Glen Rd., Beverly Hills, California; Ragnar Option Corporation, 39 Broadway, New York, New York; Victor Sperandeo, 39 Broadway, New York, New York

## Core Terms

customer, stock, margin, converter, match, conventional, manipulative, fictitious, thereunder, mislead, buy, market price, securities exchange, intra-account, register, dupont, violation of section, settlement offer, broker-dealer, floor, purchase and sale, active trading, month period, discretionary, expire, writer, hedge, staff, box

## Text

 **[\*\*304]**  **[\*1]**  FINDINGS AND ORDER ACCEPTING OFFER OF SETTLEMENT AND IMPOSING REMEDIAL SANCTIONS

The captioned respondents have submitted offers of settlement in these proceedings pursuant to Sections 15(b), 15A, and 19(a)(3) of the Securities Exchange Act of 1934 ("Exchange Act" ).

In their offers, respondents waived a hearing and post-hearing procedures. Solely for the purpose of these proceedings and any other proceedings pursuant to Sections 15(b), 15A and 19(a)(3) of the Exchange Act, and without admitting or denying the allegations in the Order for Public Proceedings, they stipulated that findings of willful violations may be made. They also consented to the imposition of specified sanctions and made certain representations and undertakings.

After due consideration of the offers of settlement, and upon the recommendation of its staff, the Commission has determined to accept such offers.

Findings

On the Basis of the Order for Proceedings, the record of the proceedings as to respondent Michael Batterman ("Batterman"), and the respondents' offers of settlement, the Commission makes the following findings:

(1) Manipulation. During the period from August 1, 1972 to January 31, 1973, Batterman,  **[\*2]**  Ragnar Option Corporation ("Ragnar"), and Victor Sperandeo ("Sperandeo") willfully violated and willfully aided and abetted violations of the antimanipulation provisions of Sections 9(a)(1), 9(a)(2), and 10(b) of the Exchange Act and Rule 10b-5 thereunder in connection with the purchase and sale of put and call options on common stock of Vetco Offshore Industries, Inc. ("Vetco"), and in connection with the purchase and sale of shares of Vetco  **[\*\*305]**  common stock. Throughout the relevant period, Batterman was a registered representative employed by duPont, Glore Forgan, Inc. ("duPont"), [1] a member of the American

---

[1]    Securities Exchange Act Rel. No. 10968

1976 SEC LEXIS 2053, *4; 46 S.E.C. 304, **305

Stock Exchange ("AMEX") and other securities exchanges, Ragnar was a registered broker-dealer primarily engaging as a "put and call" dealer, and Sperandeo was an officer, director and owner of voting securities of Ragnar. Vetco common stock was listed on the AMEX at all times relevant herein.

Section 9(a)(1) of the Exchange Act prohibits "wash sales," in which a person seeking to raise or support the price of a stock places simultaneous orders to buy and sell quantities of the same security in transactions involving no change in  [*3]  the beneficial ownership of the stock, and "matched orders," in which a person places buy or sell orders for a security with the knowledge that sell or buy orders of substantially the same size and price will be placed simultaneously therewith. These two practices constitute violations of Section 9(a)(1) when engaged in "* * * for the purpose of creating a false of misleading appearance of active trading in . . . or a false or misleading appearance with respect to the market for any . . . . security * * *." Section 9(a)(2) of the Exchange Act prohibits any series of transactions creating actual or apparent active trading in a security, or raising or lowering the price of a security, where the purpose of such transactions is to induce the purchase or sale of the security by others.

Similarly, the aforementioned activities in connection with the purchase or sale of any security operate as a fraud or deceit upon any person and are prohibited by Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

Both Section 9(a)(1) and 9(a)(2) require that the proscribed activities be engaged in with the requisite manipulative intent. The Commission has recognized that, absent an admission,  [*4]  "the finding of manipulative purpose must be based on inferences drawn from circumstantial evidence." [2] This inference of manipulative purpose is justified where a person with a financial interest in raising or depressing the price of a security engages in the type of market activity proscribed by Sections 9(a)(1) and (2). [3]

Unlike Sections 9(a)(1) and (2), no manipulative purpose is required to establish a violation of Section 10(b) and Rule 10b-5. It is sufficient for the person to engage in a course of business which operates as a fraud or deceit as to the nature of the market for the security. [4]

In violating Sections 9(a)(1), 9(a)(2) and 10(b) of the Exchange Act and Rule 10b-5, respondents engaged in the following activities:

 [**306]  (a) In cooperation with a customer of Ragnar ("Ragnar's customer" ) not named as a respondent in these proceedings [5], respondents engaged in the purchase and sale of over-the-counter put and call options in a manner calculated to produce matching purchase and sale orders  [*5]  for Vetco stock on the floor of the AMEX.

In one variation of this activity, Ragnar's customer sold expiring Vetco calls to Ragnar and placed orders with Ragnar for new Vetco calls. Ragnar and Sperandeo exercised the expiring calls and immediately resold the Vetco shares so acquired in a manner disigned to insure that the resulting sale order would arrive on the floor of the AMEX at a predetermined time. Ragnar and Sperandeo filled the customer's orders for new calls by purchasing Vetco puts from accounts at duPont managed by Atterman and having them converted into calls by option converters. [6] The orders were "matched" by Ragnar and Sperandeo timing the conversion of Batterman puts into calls such that the option converters' buy orders for Vetco stock arrived on the floor of the AMEX at the same time as the sell orders which were entered in connection with the exercise of the expiring Vetco calls.

 [*6]

---

[2]  Federal Corp., 25 SEC 227, 230 (1947)

[3]  Halsey, Stuart & Co., Inc. 30 SEC 106, 124 (1949)

[4]  Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787, (2d Cir., 1969)

[5]  See, SEC v. Eisenberger, Lit. Rel. No. 5765 (March 1, 1973)

[6]  Option converters provide calls to their customers in a risk-free transaction whereby the converter purchases a put from its customer and sells the customer a call. The converter buys the security underlying the call to insure upside protection. The put acquired from the customer provides downside protection. The converter charges a fee for his services.

1976 SEC LEXIS 2053, *6; 46 S.E.C. 304, **306

A similar matching of buy and sell orders was accomplished by a slightly different series of transactions in which Ragnar and Sperandeo purchased Vetco calls directly from Batterman and from call writers other than option converters for the purpose of filling the customer's orders for calls. Pursuant to the customer's instructions, Ragnar and Sperandeo required option writers to purchase Vetco stock concurrently with writing calls. Ragnar and Sperandeo's call purchases were timed so that those purchase orders for Vetco stock entered by Batterman and the other call writers were placed at the same time as the sell orders entered by Ragnar and Sperandeo in the course of exercising the expiring calls acquired from the customer.

In a third series of "matched" transactions, orders for the sale of Vetco stock placed by Ragnar's customer were matched with orders for the purchase of Vetco stock by Batterman's accounts, other call writers, and option converters. The option converters purchased Vetco shares in converting puts into calls for Ragnar's customer. Call writers other than Batterman purchased Vetco shares pursuant to Ragnar's customer's instructions. Matched transactions of **[*7]** this nature were also effected when Batterman's short sales of Vetco stock were matched with purchase orders entered by option converters writing calls for Ragnar's customer.

To insure that the buy and sell orders placed in connection with the above described three types of transactions would cross on the AMEX, respondents usually placed such orders following the close of trading on the afternoon prior to the trading day during which they were to **[**307]** match. Thus, respondents' purchase and sale orders were executed at the opening of trading on the morning of the next business day.

The matched orders created a false and misleading appearance of active trading in, and a misleading appearance with respect to the market for, Vetco stock, in violation of Sections 9(a)(1), 9(a)(2), and 10(b) of the Exchange Act and Rule 10b-5 thereunder. During the period from September 1, 1972 to January 31, 1973, the matched orders arranged by respondents accounted for 26 of the opening transactions on the AMEX of 1,000 or more Vetco shares. During the same period, only 50 openings in Vetco involved more than 1,000 shares total.

Respondents' matched orders created a false and misleading appearance with **[*8]** respect to the market for Vetco stock in that such orders prevented the depressing effect on the market price that Ragnar and Sperandeo's sales of Vetco shares following exercise of expiring calls acquired from the customer might otherwise have had. Furthermore, respondents' matched orders gave the Vetco market a misleading appearance of depth and active trading, thereby stimulating investor interest and preventing a decline in the market price of the security.

Batterman and Ragnar's customer had an identity of interest in raising or maintaining the market price of Vetco stock and in preventing its decline. Ragnar's customer's accounts and the accounts over which Batterman had discretionary authority had large positions in Vetco stock. Ragnar's customer purchased large quantities of Vetco calls which were profitable only if the market price of the underlying security rose. Batterman wrote large quantities of puts in his discretionary accounts. A decline in the market price of Vetco stock would have resulted in a large number of shares of Vetco stock being put to Batterman's account at prices higher than the then prevailing market. Thus, Batterman and Ragnar's customer had a **[*9]** motive to manipulate the market price of Vetco stock in order to insure that it did not decline. Ragnar and Sperandeo had a motive to act as the conduit for the manipulation in that they received substantial commission income in effecting transactions for the customer and desired to retain his accounts.

(b) In 84 transactions involving 180,500 shares, Batterman entered simultaneous orders to purchase and to sell short Vetco stock for accounts over which he had discretionary authority. These accounts, which were on both sides of the purchase and short sale transactions, also held substantial amounts of Vetco stock. In certain transactions, the purchases and short sales were made for the same customer's account, while in other transactions, Batterman effected trades in which customer accounts bought and sold short to each other. All of these transactions were crossed on the floor of the AMEX. Both types of transactions are hereinafter referred to as "intra-account crosses"

Batterman's intra-account crosses were fictitious in that they were "wash" transactions in which no change in beneficial ownership **[**308]** resulted. Furthermore, these transactions violated Sections 9(a)(1), 9(a)(2), **[*10]** and 10(b) of the Exchange Act and Rule 10b-5 thereunder in that they were intended to, and did, create a false and misleading appearance

1976 SEC LEXIS 2053, *10; 46 S.E.C. 304, **308

of active trading in and a false and misleading appearance with respect to the depth of the market for Vetco stock. The "transactions", which were of no economic substance whatsoever, were reported on the AMEX floor and shown on the trading tape. [7]

(2) Antifraud violations. Batterman willfully violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in that he made false statements of material fact and omitted to state material facts necessary in order to make the statements made, under the circumstances in which they were made, not misleading, in connection with his representations to his customers concerning his method of investing the funds in their accounts.

Batterman's techniques employed in managing the discretionary accounts purported [*11] to take advantage of margin requirements then in effect to enable his customers' accounts to maintain ostensible long positions in Vetco stock and write large quantities of options on extremely low margin. Such substantial option writing activity would not have been possible and Batterman's accounts provided the amount of margin customarily required in connection with these transactions. The high degree of leverage in the acounts, the excessive concentration in Vetco stock, and the unhedged puts written by the accounts subjected his customers' funds to extraordinary risks in the event of a decline in the market price of Vetco stock.

In order to write Vetco options on extremely low margin, Batterman first purported to establish long Vetco stock positions. He utilized the intra-account crosses to purportedly establish "short against the box" positions in which a particular account appeared to be simultaneously long and short Vetco stock. Of course, the account was neither long nor short Vetco stock because no transaction of economic substance had occurred. Falsely assuming the validity of the "short against the box" positions, under Regulation T promulgated by the Federal Reserve [*12] Board and Rule 431 of the New York Stock Exchange, as then in effect, Batterman's accounts were required initially to provide margin of only 10% of the value of the long position in the accounts in order to maintain short against the box positions. In contrast, a 55% and later 65% margin requirement was normally associated with purchases and short sales made independent of each other.

[**309] Batterman took the position that for margin purposes the puts were fully hedged by the accounts' short positions. Rule 431 of the New York Stock Exchange provided at that time that no margin was required to write puts or calls hedged by valid short or long positions in the securities underlying the options. As a result, Batterman did not require his accounts to provide any margin upon which to write puts. Utilizing the foregoing techniques, Batterman wrote as many puts and calls as the market, consisting largely of Ragnar's customer and the converters, could absorb.

Such transactions subjected Batterman's accounts to extreme risks. Because Batterman's customers were required to provide a minimal amount of margin, and because those accounts were heavily concentrated in Vetco stock, the slightest [*13] decline in the Vetco market could have wiped out the equity in the accounts. Furthermore, the puts which Batterman wrote in the accounts were not hedged. While puts can be hedged by valid short sales of the underlying security, Batterman's short sales were fictitious and, consequently, the puts were not covered by any underlying short positions. Thus, Batterman's accounts were subject to nearly unlimited downside risk.

The events following the suspension of trading in Vetco stock on February 12, 1973, clearly illustrate the risks to which Batterman subjected his accounts. When the market reopened and the market price for Vetco stock declined, the puts written by Batterman were exercised and his accounts compelled to purchase Vetco stock at a strike price above the current market. The stock so purchased could not be delivered to close out any valid short positions because none existed. Accordingly, Batterman's customers' realized substantial losses, in some accounts in excess of the amounts invested.

Batterman managed approximately 12 customers' accounts, most of which were referred to him by other duPont registered representatives. In order to induce these customers to open [*14] and maintain discretionary accounts with him, Batterman made false statements of material fact and omitted to state material facts with respect to the risks, probable rate of return, and trading practices to be employed jin the management of their accounts.

---

[7]   The intra-account crosses also enabled Batterman to establish large fictitious short positions against which he wrote puts in that the buy side of the cross prevented a minus tick, thereby enabling Batterman's short sales to appear to meet the requirements of Rule 10a-1 under the Exchange Act.

1976 SEC LEXIS 2053, *14; 46 S.E.C. 304, **309

In particular, Batterman stated to his customers that their accounts would enjoy an extremely high rate of return on capital, that in the worst possible circumstances their losses would be minimal, the funds invested in stock would be invested solely in ″blue chip″ securities, that the performance of the accounts would not depend on the performance of particular stocks or of the stock market and that any options written in their accounts would be fully hedged.

Batterman omitted to state to his customers that the accounts would be subject to an extraordinary degree of risk because of the concentration in Vetco securities, the writing of large numbers of **[\*\*310]** unhedged puts, and the vary high degree of leverage used in the accounts.

Furthermore, Batterman failed to inform his customers that commissions and interest on the debit balances arising from the intra-account crosses that were charged to their accounts were attributable to the **[\*15]** fictitious stock transactions. He also omitted to state that credit would be extended to and maintained in the accounts in violation of Regulation T of the Federal Reserve Board in connection with the fictitious transactions and the writing of unhedged options.

Batterman also omitted to state to his customers that other registered representatives who referred their customers' accounts to him would receive gross commission credits equal to 12% of the initial value of the accounts in the first year, 6% in the second year, and 3% in the third year following the referral. Batterman was, therefore, subject to extreme incentives to ″churn″ the accounts in order to generate commissions. In fact, Batterman effecting transactions in his customers' accounts which were excessive in amount and frequency in view of the resources and character of such accounts and their investment objectives. (See Suitability, infra)

Finally, Batterman omitted to disclose to his customers that fictitious and Bona fide transactions in Vetco stock would be effected in a manipulative fashion and that the performance of the accounts would be substantially dependent on respondents' ability to successfully raise **[\*16]** or support the market price of Vetco stock.

(3) Suitability. The investment techniques employed by Batterman with respect to his accounts were not suitable in view of some of his customers' resources and investment objectives. In general, Batterman's customers had conservative investment aims. One individual invested $ 600,000 which he held in trust for his childrenm and several other customers committed substantially all of their savings to Batterman. Batterman invested these funds in a fashion which subjected them to extremely high risk even though the customers had informed him of their conservative investment goals.

The Commission is concerned with the question of suitability of option transactions for particular customers and the standards of disclosure that should be required of brokers and dealers recommending option transactions. [8] A broker-dealer should disclose to the customer the nature and extent of the obligations and risks of any option transaction prior to effecting the transaction. In addition, the broker-dealer should have reason to believe that the recommended transaction is not unsuitable for the customer in light of that **[\*\*311]** customer's investment objectives and **[\*17]** financial condition. Furthermore, in the case of unhedged options such as those written by Batterman, the broker-dealer has a further obligation to inquire as to the customer's ability to evaluate the additional risk and to meet the terms of foreseeable exercise of the options. Batterman did none of the foregoing.

(4) Margin violations. Batterman willfully violated and willfully aided and abetted violations of Section 7(c)(1) of the Exchange Act and Regulation T thereunder by causing DuPont, while conducting a business in securities as a member of a national securities exchange, directly and indirectly to extend and maintain credit for Batterman and Batterman's customers on securities (other than exempted securities) registered on a national securities exchange, in contravention of Sections 220.3(d)(3) and (5) and Sections 220.3(g)(4) and (5) of Regulation T adopted by the Board of Governors of the Federal Reserve System pursuant to Sections 7(a) and 7(b) of the Exchange Act.

---

[8]   See Proposed Rule 9b-2 under the Exchange Act, Securities Exchange Rel. No. 9994 (February 8, 1973); revised Securities Exchange Act Rel. No. 10550 (December 13, 1973)

1976 SEC LEXIS 2053, *17; 46 S.E.C. 304, **311

Since the fictitious positions [*18] resulting from the intra-account crosses had no value for purposes of the Board's margin regulations, the short positions ostensibly established in those fictitious transactions were unavailable to serve as the margin required in connection with duPont's endorsement of Batterman's put options. [9]

(5) Books and records violations. Respondents violated and willfully aided and abetted violations of Section 17(a) of the Exchange Act and Rule 17a-3 thereunder, which require that broker-dealers make and keep current certain books and records relating to their business. Sperandeo violated Section 17(a) of the Exchange Act and Rule 17a-3 thereunder in that he withheld memoranda and other documents from Ragnar's records in connection with short sales of Vetco puts to option converters until Vetco puts to cover the short position were purchased from Batterman. This caused Ragnar's records to reflect inaccurately the dates of these transactions. Batterman willfully aided and abetted violations of Section 17(a) of the Exchange Act and Rule 17a-3 thereunder in that his reports to duPont of his intra-account crosses caused fictitious transactions to be reflected in duPont's books as establishing [*19] legitimate security positions.

2165*P312 [*20] The Settlement Offers

Batterman consents to the entry of an order barring him from association with any registered broker-dealer, investment company, of investment advisor provided that after two years he may apply to become so associated in a non-supervisory status upon a showing that he will be adequately supervised.

Sperandeo and Ragnar consent to the entry of an order censuring them and providing for certain restrictions on their activities in conventional options (those not traded on an options exchange) as set forth in the order below. These restrictions are designed to prevent the recurrence of a situation, as in the present case, where transactions in conventional options result in transactions in underlying stock that have a manipulative and deceptive effect on the market for the stock.

Furthermore, Ragnar agrees to establish a fund consisting of certain revenues derived from specified transactions during the six month period following the entry of the order below. At the end of the period, such fund will be distributed pursuant to a plan prepared by Ragnar to be submitted to the Commission staff for its approval.

Sperandeo agrees for a period of 60 days not to participate [*21] in that portion of Ragnar's business which relates to conventional options.

In view of the foregoing, it is appropriate in the public interest to impose the sanctions specified in the offers of settlement.

Accordingly, IT IS ORDERED that Michael Batterman be, and hereby is, barred from association with any registered broker, dealer, investment company, or investment adviser; provided, that at the end of a two year period he may apply to become so associated in a non-supervisory capacity upon a showing that he will be adequately supervised.

---

[9]   Section 220.3(d)(5) of Regulation T provides for the inclusion of "the amount of any margin customarily required by the creditor in connection with his endorsement or guarantee of any put, call or other option" in calculating margin requirements for a general account. Section 220.3(g)(4) states:

"Any transaction which serves to meet the requirements of paragraph (e) of this Section or otherwise serves to permit any offsetting transaction in an account shall, to that extent, be unavailable to permit any other transaction in such account." Rule 431 of the New York Stock Exchange, as then in effect, required a creditor to establish and maintain a minimum deposit of 25 per cent of the current market value of the optioned stock in connection with his issuance or guarantee of a put, but permitted a short position in the stock to serve in lieu of the required deposit.

In a published interpretation by the Board of Governors of the Federal Reserve System (1973 Bulletin 358; 12 CFR 220.128) the Board stated that a short sale "against the box" involves other considerations because Regulation T "provides in Section 220.3(g) that the two positions must be 'netted out' for the purposes of the calculations required by the regulation. Thus, the Board concludes that neither position would be available to serve as the deposit of margin required in connection with the endorsement by the creditor of an option."

In a published interpretation by the Board of Governors of the Federal Reserve System (1973 Bulletin 358; 12 CFR 220.128) the Board stated that a short sale "against the box" involves other considerations because Regulation T "provides in Section 220.3(g) that the two positions must be 'netted out' for the purposes of the calculations required by the regulation. Thus, the Board concludes that neither position would be available to serve as the deposit of margin required in connection with the endorsement by the creditor of an option."

1976 SEC LEXIS 2053, *21; 46 S.E.C. 304, **311

IT IS FURTHER ORDERED that Victor Sperandeo and Ragnar Option Corporation be, and hereby are, censured.

IT IS FURTHER ORDERED that Ragnar Option Corporation be, and hereby is, restricted for a 12 month period from buying or selling conventional option contracts not traded on an options exchange ("conventional options") on any given security in any given month in an amount that is greater than the lesser of an amount of conventional options covering 15% of the total volume traded in that security for the previous calendar month or an amount of conventional options covering 10,000 shares of that security.

IT IS FURTHER ORDERED that Ragnar Option **[\*22]** Corporation be, and hereby is, restricted for a 60 day period from selling conventional options on a given security in a given week in excess of an amount covering 1,000 shares without acquiriung such excess conventional options from a third party within one business day of such sale.

 **[\*\*313]** IT IS FURTHER ORDERED that Ragnar Option Corporation be, and hereby is, prohibited from arranging for the matching on the floor of any exchange of any stock transactions generated by the purchase or sale of conventional options.

IT IS FURTHER ORDERED that Ragnar Option Corporation establish a fund, not to exceed $25,000, consisting of all revenues in excess of $198,000 earned by Ragnar during the six month period following the entry of this order. Such fund shall consist of all revenues earned by Ragnar during said period from conventional option income, municipal bond trading income, commissions on customer accounts introduced to member firms by Ragnar Option Corporation, and interest income on stock loans. At the conclusion of the six month period, transfers to the fund shall be made to the attorneys for Ragnar Option Corporation to be held in escrow until a plan for disposition of monies so transferred **[\*23]** to the fund, less costs and expenses of the distribution, is approved by the staff of the Commission. Such plan shall be submitted to the staff for its approval within 10 business days following the conclusion of the six month period of the creation of the fund. If the financial information necessary to ascertain the amount of the fund is not readily available, the submission period shall be extended upon notice to the staff until such information is available.

IT IS FURTHER ORDERED that Victor Sperandeo be, and hereby is, prohibited for a period of 60 days from participating in that portion of the business of Ragnar Option Corporation relating to conventional options.

By the Commission.

**Load Date:** 2014-10-28

## *1995 SEC LEXIS 3457*

Securities and Exchange Commission

December 28, 1995; As Corrected

**Reporter**

1995 SEC LEXIS 3457

## Admin. Proc. File No. 3-8511; INITIAL DECISION Release No. 82

In the Matter of SHARON M. GRAHAM, STEPHEN C. VOSS, and JAMES J. PASZTOR

## Core Terms

stock, manipulate, match, broker, girl, volume, violation of section, joint account, margin, thereunder, reckless, broker-dealers, mislead, registered representative, marking-the-close, supervise, customer, buy, margin account, wash sales, per share, brokerage, aiding and abetting, license, dealer, active trading, deceive, nominee, uptick, float

**Counsel:**

APPEARANCES:

David S. Horowitz and Mary Jo Gillette for the Division of Enforcement, Securities and Exchange Commission

Ida Wurczinger Draim for Respondents Sharon M. Graham and Stephen C. Voss

## Text

**INITIAL DECISION**

**BEFORE: Glenn Robert Lawrence, Administrative Law Judge**

These public proceedings were instituted by an Order of the Securities and Exchange Commission dated September 30, 1994 (the Order), issued pursuant to Sections 15(b), 19(h), and 21C of the Securities Exchange Act of 1934 (Exchange Act) to determine whether allegations of misconduct made by the Division of Enforcement (Division) against Respondents [1] Sharon M. Graham and Stephen C. Voss are true and what, if any, remedial action would be appropriate in the public interest.

In substance, the Division alleged that over the period **[*2]** from January 1, 1989 to July 31, 1990 (the trading period), John G. Broumas, former chairman of the board of Madison National Bank of Virginia (Madison of Virginia) and a former director of James Madison Limited (JML) conducted a fraudulent market manipulation scheme in violation of Sections 9(a)(1), 9(a)(2), and 10(b) of the Exchange Act and Rule 10b-5 thereunder. The Division alleges that from approximately January 23, 1989 to May 24, 1990, Respondent Graham willfully aided and abetted and caused Broumas's violations of Sections 9(a)(1) and 10(b) of the Exchange Act and Rule 10b-5 thereunder by, among other things, entering orders for the purchase or sale of JML stock with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale or purchase of JML stock, had been or would be entered by or for Broumas or another party and effected transactions in JML stock that involved no change in beneficial ownership.

---

[1]   Respondent James J. Pasztor has submitted an Offer of Settlement in this proceeding which the Division has recommended that the Commission accept. However, the Commission has not yet acted upon the Settlement Offer.

[2] Specifically, the Division alleges that Graham executed 60 wash trades or matched orders in JML stock. The Division further alleges that Respondent Graham was subject to the supervision [*3] of Respondent Voss, who failed to reasonably supervise Graham with a view to preventing her violations. By answers dated November 3, 1994, Voss and Graham largely denied the allegations in the Order.

The findings and conclusions herein are based upon the preponderance of the evidence as determined from the record and upon my observation of the various witnesses that testified at the hearings that were held in Washington, D.C., from December 12 through 14, 1994, April 10 and 11, 1995, and July 21, 1995, as well as the briefs, arguments and proposals of facts and law of the parties and the relevant statutes and regulations.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Commission filed a complaint in the U.S. District Court for the District of Columbia against Broumas on September 27, 1991. [3] It was alleged that from January 1989 through July 1990, Broumas violated the federal securities laws by marking-the-close [4] and executing wash trades and matched orders in JML [*4] stock. Broumas consented, without admitting or denying the allegations, to the entry of a permanent injunction prohibiting him from future violations of Sections 9(a)(1), 9(a)(2), 10(b) and 16(a) of the Exchange Act and Rules 10b-5 and 16a-3 thereunder. Ex. 830. [5]
 [*5]

**Broumas's Manipulation Scheme**

In 1989 and 1990, JML Class A common stock was listed on the American Stock Exchange ("AMEX"). As of November 7, 1989, there were 6,490,126 shares of that stock outstanding. Officers and directors owned about 32%, leaving a float of approximately 4,413,200 shares. Officers and directors of JML also owned 37% of JML common stock, which was traded over-the-counter and was convertible into the Class A stock, share for share. Ex. 300 (8/17/90 memo); Dec. Tr. 347 (Savarese). Between January 1989 and January 1990, the price of JML Class A stock traded in a range between $ 5 5/8 and $ 7 1/2 (closing price), with most closing prices higher than $ 6 per share. In February 1990, the price declined, and fell to $ 2 1/2 per share on July 20, 1990. From March 16, 1990 through May 9, 1990, the closing price was between $ 5 and $ 5 1/2 per share. After May 9, 1990, it remained below $ 5 per share again. Ex. 306.

On December 31, 1986, JML became owner of the McLean Bank, which changed its name to Madison National Bank of Virginia. Dec. Tr. 120-121 (Broumas). Broumas, a substantial stockholder in the McLean Bank, received a combination of stock and cash for his [*6] $ 6 million interest. Dec. Tr. 121-122 (Broumas). He stayed on as chairman of the board of Madison of Virginia until May 24, 1990, and a member of the board of JML, the holding company, until May 24, 1990. Dec. Tr. 122 (Broumas). Broumas obtained equal shares of both JML Class A and common stock. Dec. Tr. 122-123 (Broumas). Broumas owned approximately 198,000 shares of JML Class A common stock on January 31, 1989, and on March 13, 1989, Broumas owned 193,268 shares or 2.98% of the total amount outstanding. Exs. 808, 300 (8/17/90 Memo, p. 6), 807. He was very wealthy, but suffered severe financial reverses early in 1989. Exs. 120 at 19, 34-36; 807 at 3. In October 1987, when the market crashed, Broumas held, mostly on margin, 225,000 shares of Syntec stock. After the crash, Syntec dropped from $ 16 to $ 4 per share, resulting in Broumas receiving margin calls on the stock. To meet those calls, he borrowed approximately $ 300,000 from Madison of Virginia. Dec. Tr. 123-25.

---

[2]   A trade of this nature that results in no change in beneficial ownership of the stock is referred to a wash sale; a trade of this nature where another party participates is referred to as a matched order.

[3]   SEC v. John G. Broumas, Civil Action No. 91-2449 (D.D.C.)(L.R. No. 12999).

[4]   Marking-the-close trades occur when stock is purchased at or near the end of the trading day on an uptick (i.e. a purchase executed for a price higher than the previously executed trade), in order to affect the closing price. Order at 2 n.2.

[5]   References to pages of the transcript of the hearing held in these matters on December 12, 13 and 14, 1994 are noted as "Dec. Tr. ()," indicating parenthetically the witness whose testimony is cited. Similarly, references to pages of the transcript of the hearing held April 10 and 11, 1995, are noted as "Apr. Tr. ()" and references to pages of the transcript of the hearing held on July 21, 1995, are noted as "July Tr. ()." All references to the Division's Exhibits admitted into evidence at the hearing are indicated as "Ex. ." "RPFF" refers to Respondents' Proposed Findings of Fact.

1995 SEC LEXIS 3457, *6

On May 1, 1989, Broumas was personally liable on notes owed to banks in the amount of $ 2,733,064, and owed $ 904,000 in mortgages with payments of $ 128,008 per quarter. Ex. 801; Dec. Tr. 168-73 (Broumas). Many of [*7] his liquid assets were in the form of JML stock, both Class A and common, which were held in margin accounts. Dec. Tr. 173-74 (Broumas); Ex. 801. As of May 1, 1990, Broumas's bank loans totaled $ 2,621,981, with quarterly payment requirements of at least $ 104,500. Broumas was having difficulty meeting those interest and loan payments. In addition, the value of his real estate holdings was dropping. Exs. 801, 802; Dec. Tr. 175-176 (Broumas). As a result of these liabilities, among others which he could not repay, Broumas eventually filed for personal bankruptcy in February 1991. Dec. Tr. 214-15 (Broumas); Ex. 800. In November 1994, the United States Attorney for the District of Columbia filed an Information against Broumas charging him with one count of misapplication of funds by a bank officer in violation of _18 U.S.C. § 656_. [6] Ex. 706. The Information alleged a check-kiting scheme conducted by Broumas, using six separate bank accounts at three banks, including Madison of Virginia and Madison of Washington. The purpose of the scheme was to use the float generated by writing checks against accounts for which insufficient funds existed, and using the checks to meet stock margin calls [*8] for JML stock from April through June, 1990. On November 23, 1994, Broumas pled guilty to this Information and admitted to the conduct charged. Ex. 720; Dec. Tr. 209-12 (Broumas).

Broumas's Trading Activity

During 1989 and 1990, Broumas controlled approximately 25 different brokerage accounts, in his own name and others, located at 14 different broker-dealers, through which he placed his wash trades, matched orders, and marking-the-close trades in JML Class A stock. Ex. 1. During 1989 and 1990, Broumas controlled three accounts at H. Beck, a joint account with his wife, and accounts in the name of Les Girls and BC Theatres. He controlled two brokerage accounts at Lara Millard, one jointly with his wife and BC Theatres. He controlled two accounts at Scott & Stringfellow, one in his name and the other jointly with his wife. Broumas controlled two accounts at Voss & Co., jointly with his wife and the other Les Girls. He controlled three accounts at First Potomac, jointly with his wife, Les Girls, and BC Theatres. Broumas controlled accounts jointly with his wife at Capitol Securities, City Securities Corporation, [*9] Investors Group, Ltd., Koonce Securities, and Titan Value Equities Group. Broumas had two accounts in his own name at Johnston Lemon. He controlled accounts in his name at Staib Roberts and Washington Investment Corp. He controlled three accounts at Swan Securities, jointly with his wife, BC Theatres, and Les Girls. He controlled three accounts at Carey Jamison Securities, jointly with his wife, BC Theatres, and Les Girls. Dec. Tr. 126-42 (Broumas).

Broumas had sole authority to place trades, and he was the only person who traded in these accounts; he paid for them out of funds he controlled; and when shares were sold, he received payment. He had the power to control or direct the voting of the shares of JML stock in these accounts during 1989 and 1990. Dec. Tr. 126-42 (Broumas). In 1989 and 1990, Broumas held his JML Class A stock in margin accounts, and he received margin calls that he had to meet or risk sale of the stock. Dec. Tr. 186-89 (Broumas). Broumas believed that broker-dealers required that stock must have a value of $ 5 or more to be held on margin. Dec. Tr. 192 (Broumas). Eventually, Broumas received margin calls from his brokers that he could not meet, and all of his [*10] accounts that held JML Class A stock were sold out by the brokers. Dec. Tr. 212-13 (Broumas). In order to meet margin calls in 1989 and 1990, Broumas admitted that he sold JML stock to himself many times. He called brokers during that time period and asked them whether he had any equity in his margin accounts. Dec. Tr. 193 (Broumas). Then he would direct that shares be bought or sold from one account controlled by him into other accounts controlled by him. Dec. Tr. 193-94 (Broumas); Ex. 1.

Between January 1, 1989, and June 30, 1990, Broumas ordered approximately 545 trades of JML Class A stock. Ex. 1. Of this amount, 420 trades constituted 203 sets of wash trade or matched order transactions. These trades typically involved the purchase and sale of between 3,000 and 12,000 shares of JML stock. Ex. 2. Broumas orchestrated these trades through at least 29 brokerage accounts that he maintained or controlled at 13 brokerage firms in the Washington, D.C. area. Ex. 2, 6.

Broumas could not go to the JML banks and borrow cash because he had reached his limit. Dec. Tr. 201 (Broumas). He therefore arranged wash trades and matched orders for the purpose of obtaining a float in a scheme similar [*11] to

---

[6]   United States v. Broumas, Crim. No. 94-442 (D.D.C.).

1995 SEC LEXIS 3457, *11

check-kiting. Under this scheme, Broumas orchestrated trades between accounts he held at different brokerage firms by calling registered representatives on each side of his trades and giving them instructions to call each other and to trade a specific amount of his JML Class A stock at a specified price. Broumas knew that by calling both sides of the trades, the trades would be executed on the over-the-counter market. Once the trades were completed, Broumas obtained the proceeds from the sale side of the trade one day later, but waited until the settlement date at least one week later to pay for the corresponding buy side. When the settlement date arrived, he sometimes executed another set of wash trades or matched orders and repeated the process. By engaging in this activity, Broumas could, in effect, obtain a "loan" from the brokerage firms where he traded his JML stock. Similarly, Broumas arranged a smaller number of matched orders by following the same procedure, except that he solicited third parties, nominees, to call in one side of the trade. Dec. Tr. 195-201 (Broumas).

Broumas was able to borrow cash by this method of selling shares to himself, and did this instead of [*12] selling JML stock to a buyer in the open market because he wanted to maintain his large holdings of JML stock "at that price." [7] It was important to him to maintain the same general level of JML stock ownership. Dec. Tr. 199-200 (Broumas). For each of the 203 transactions, Broumas made two phone calls, one to each broker on either side of each trade. Ex. 2. In instances where stock was moved to or from accounts that he controlled (John Broumas, John and Ruth Broumas, Les Girls or BC Theatres) to or from nominee accounts, the mechanics of how the calls were made and how the trade was executed was the same as when he moved stock between his own accounts. Dec. Tr. 202-203 (Broumas).

In addition to his own accounts, Broumas also traded JML Class A stock through the accounts of four nominees: a business associate as well as three former Madison employees, one of whom was his grandson. The business associate, L. Lawton Rogers, is a respondent in one of the related Commission administrative proceeding. Admin. Proc. File No. 3-8513. The three former Madison employees are grandson Matthew Johnson, [*13] Michael Connolly, and Kevin Lemmon. Exs. 2, 6. Broumas initiated this arrangement with each nominee. During the trading period, Rogers maintained accounts at H. Beck, Voss & Co., and First Potomac which Broumas controlled. Exs. 120 at 14-15; 280; 281. Rogers ordered, at Broumas's request, 21 trades of JML stock through the above-mentioned accounts. The value of Rogers's trades in JML stock totaled approximately $ 1,060,000. Seventeen of the trades amounted to matched orders, and the other four were two sets of trades that washed between Rogers's accounts. Exs. 2, 6.

Broumas directed Rogers to call specific registered representatives and place a buy or sell order at a specific price for JML stock. Rogers then called in the trade, giving the registered representative the price, amount of shares, and to whom it was to be traded. Exs. 120 at 24-26, 30, 37-38; 282. On two occasions, Rogers placed wash trades between his own accounts. On January 25, 1990, Rogers sold 12,000 shares of JML stock at $ 6.375 per share from his H. Beck account, and bought 12,000 shares of JML stock at $ 6.375 per share for his First Potomac account. Similarly, on February 12, 1990, Rogers sold 12,000 [*14] of JML stock at $ 5.625 per share from his First Potomac account and bought 12,000 shares of JML stock at $ 5.625 per share for his Voss & Co. account. Ex. 2.

Broumas also traded JML stock through nominee accounts in the names of Johnson, Connolly, and Lemmon. During the period from November 1989 to May 1990, Broumas placed 12 matched orders through Johnson's account at H. Beck. Exs. 2, 6. During the period from February 1989 to April 1989, Broumas placed four matched orders through an account Johnson maintained at Swan Securities. Exs. 2, 6; Dec. Tr. 252-53 (Johnson).

Connolly was employed by Madison of Virginia during the relevant period as a vice president and cashier. In the fall of 1989, Broumas told Connolly that he was using these transactions to generate cash to pay maturing bank notes. Connolly understood that Broumas used these trades in his margin accounts to obtain a float, or use of the funds, for several days. Ex. 249. Connolly opened an account with Richard at H. Beck. Chema is a respondent in a related Commission proceeding. Admin. Proc. File No. 3-8508. Although Connolly agreed to allow Broumas to conduct trades through Connolly's account, he never subsequently [*15] signed any documents giving Broumas authority to trade on his behalf, or had any dealings with the broker again. Dec. Tr. 269 (Connolly); Ex. 249. Between January 1990 and May 1990, Broumas placed nine matched orders in JML Class A stock through Connolly's H. Beck account.

Lemmon was employed by Madison of Virginia during the trading period as a vice president in the lending department. Between December 1989 and May 1990, Lemmon maintained accounts at First Potomac and H. Beck through which he allowed Broumas to place 14 matched orders in JML Class A stock. Exs. 2, 6.

---

[7]   This is considered a form of manipulation to avoid the price movements of the market place.

1995 SEC LEXIS 3457, *15

None of Broumas's wash trades and matched orders placed between January 1, 1989 and July 2, 1989 were reported by the registered representatives and broker-dealers who executed Broumas's trades, in violation of the requirements of that National Association of Securities Dealers (NASD) Schedule G. Exs. 2, 4, 310. In addition, many trades after July 3, 1989 were not reported either, again in violation of NASD Schedule G. Exs. 2, 4.

From January 1, 1989 to June 30, 1990, the trading period at issue, all of Broumas's reported trades constituted 40.3% of the total reported market volume for JML Class A stock. From July 1, **[*16]** 1989 to December 31, 1989, all of Broumas's reported trades constituted 55.3% of the total reported market volume for JML Class A stock during that time period. From July 1, 1989 to June 30, 1990, all of Broumas's reported trades constituted 48.2% of the total reported market volume for JML Class A stock during that time period. Exs. 8, 304, 306; Dec. Tr. 61-69 (Boeggeman).

With regard to only the volume of Broumas's wash trades and matched orders reported, from January 1, 1989 to June 30, 1990, all of Broumas's reported wash trades and matched orders constituted 36.6% of the total reported market volume for JML Class A stock. From July 1, 1989 to December 31, 1989, all of Broumas's reported wash trades and matched orders constituted 53.5% of the total reported market volume for JML Class A stock during that time period. From July 1, 1989 to June 30, 1990, all of Broumas's reported wash trades and matched orders constituted 44.1% of the total reported market volume for JML Class A stock during that time period. Exs. 4, 8, 304, 306; Dec. Tr. 61-69 (Boeggeman). Finally, comparing the total volume of wash trades and matched orders reported with the total volume reported only on those **[*17]** days on which reported wash trades and matched orders occurred, from January 1, 1989 to June 30, 1990, Broumas's trades constituted 73.7% of the reported market volume for JML Class A stock. From July 1, 1989 to December 31, 1989, the applicable percentage is 72.4%. From July 1, 1989 to June 30, 1990, the percentage was 73.7%. Exs. 4, 8, 304, 306; Dec. Tr. 61-69 (Boeggeman).

In an attempt to support the price of JML stock, Broumas also engaged in transactions to mark-the-close, "the practice of executing the last transaction of the day in a particular security in order to affect its closing price." Richard L. Warner, 53 SEC Docket 0377, 0379 (1992).Marking-the-close involves a series of transactions, at or near the close of the trading day, i.e., at or within minutes of 4:00 p.m., which either uptick or downtick a security. Dec. Tr. 342, 356 (Savarese). Marking-the-close represents a possible departure from the normal forces of supply and demand that result in the fair auction price for a security, and is of concern to those who regulate the markets. Dec. Tr. 356-357 (Savarese).

Between January 18, 1989 and June 25, 1990, Broumas ordered 64 purchases that occurred within **[*18]** the final ten minutes of the trading day; of these, 54 constituted the last trade of the day; and 47 of these purchases were executed on an uptick. Exs. 3, 7; Dec. Tr. 208 (Broumas). In marking-the-close, registered representatives executed Broumas's purchases on either the AMEX or the Midwest Stock Exchange. By using the exchanges, Broumas could assure that his closing purchases would be reported by the exchanges, the reporting services, and the newspapers. He primarily placed his late-day purchases through accounts held at Scott & Stringfellow and H. Beck. Exs. 3, 7. He typically bought 100-200 shares of JML stock at or near the close of the trading day. On a number of occasions, his trades raised the closing price of JML stock by 1/8. Exs. 3, 7. During this time period, he followed the price of JML Class A stock daily in the newspaper. Dec. Tr. 207 (Broumas).

Purchases at the close are especially significant for two reasons. First, brokerage firms use the closing price of a security to arrive at their margin calculations in determining what their margin requirements will be for customers. Generally, many firms require maintenance of equity of 35% in margin accounts. Some firms **[*19]** also use $ 5.00 per share as a level at which they raise margin requirements. Other firms use a lower price. When the stock price reaches that level, many firms raise their requirements in margin accounts to 100% equity, essentially requiring full cash payment for the security. Second, the closing price of a security is the price reflected in the newspapers as the final price for that security for that trading session. Dec. Tr. 357-359 (Savarese). The concern about marking-the-close arises when the practice is repeated, is ongoing, and develops into a pattern. Dec. Tr. 358 (Savarese).

At some point, Adrian C. Havill, a respondent in a related Commission proceeding (Admin. Proc. File No. 3-8510), told Broumas that his office said that Havill could not take these uptick trades any longer. Havill told him the trading was not proper, and that it might affect the market. Dec. Tr. 207-8 (Broumas). Broumas conducted some of his marking-the-close

1995 SEC LEXIS 3457, *19

trades through two accounts at Scott & Stringfellow, which he opened in late August 1989. Ex. 7; Dec. Tr. 288-89 (Havill). His purpose in conducting these marking-the-close trades was to create interest in the stock. He knew that if nobody bought [*20] the stock on a certain day, it would not show up in the newspaper listings the next day. Dec. Tr. 292-94 (Havill). At Scott & Stringfellow, in particular, Broumas would often call and execute trades near the end of the day. If the stock had not traded that day, he bought some shares just to make sure it traded. Dec. Tr. 295-96 (Havill). Broumas would call many times between 3:00 and 4:00 p.m. and instruct Havill, his registered representative at Scott & Stringfellow, to buy at or near the close. Dec. Tr. 300 (Havill).

In 1990, AMEX conducted a study concerning certain trading activity in JML Class A stock, which was then traded on the AMEX. Dec. Tr. 341-42 (Savarese). The study was initiated by the AMEX Equities Surveillance Department in January 1990 when a Participant-at-the-Close Report, which highlights patterns of either upticks or downticks over a period of time in any security, showed a pattern of upticks at or near the close of trading for JML Class A stock. Dec. Tr. 341-42 (Savarese); Ex. 300. The Participant-at-the-Close Report had revealed that, on 9 out of 10 trading days from December 29, 1989 through January 12, 1990, JML closed on a plus or zero plus tick, [8] and that [*21] Scott & Stringfellow had effected the last purchase of the day on 8 of the 9 days. Seven of the 8 trades were executed in the last 5 minutes of trading. All of the firm's at-the-close purchases were for 100 shares and were done on plus or zero plus ticks. Ex. 300 (8/17/90 memo). The study was extended to encompass the time period August 30, 1989 through January 17, 1990. The study concluded that, of the 39 trading sessions during which Broumas was active at Scott & Stringfellow, he executed the last trade of the day on 32 occasions and the trade was effected on a 1/8 uptick on 27 occasions. Ex. 300 (8/17/90 memo). In September 1989, Broumas ordered 15 wash trade transactions, and 11 marking-the-close trades, 9 of which were on the same days as the wash trades. In December 1989, he ordered 11 wash trades or matched order transactions, and 9 marking-the-close trades, 4 of which were on the same days as the wash trades. The pattern continued throughout the trading period. Exs. 2, 3.

Broumas's Violations [*22]

Market manipulation refers generally to practices--such as wash sales, matched orders or rigged prices--that are intended to mislead investors by artificially affecting market activity. *Schreiber v. Burlington Northern, Inc., 472 U.S. 1, 6 (1985).* Manipulation subverts the objectives of the Exchange Act which, among other things, are to "insure the maintenance of fair and honest markets," that is, "markets where prices may be established by the free and honest balancing of investment demand with investment supply." H.R. Rep. No. 1383, 73d Cong., 2nd Sess. (1934) at 11. Section 9(a)(2) of the Exchange Act, which prohibits the manipulation of securities listed for trading on a national exchange, makes it unlawful for a person to engage in a series of transactions that create actual or apparent activity or raise or depress a stock's price when done for the purpose of inducing others to buy or sell the security. Section 9(a)(2) was considered by Congress to be "the very heart" of the Exchange Act, and "its purpose was to 'outlaw every device used to persuade the public that activity in a security is the reflection of a genuine demand instead of a mirage.'" *Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787, 794 (2d Cir. 1969)* (quoting 3 L. Loss, Securities Regulation 1549-55 (2d ed. 1961)), cert. denied, *400 U.S. 822 (1970).* Section 9(a)(2) violations are established by a showing that an individual: 1) effected a series of transactions in a security registered on a national securities exchange; 2) which created actual or apparent active trading in such security, or raised or depressed the price of the security; 3) for the purpose of inducing the purchase or sale of the security by others. Crane at 794-795; Section 9(a)(2) of the Exchange Act.

Section 9(a)(1) prohibits certain manipulative practices, including wash trades and matched orders, when such transactions are done for the purpose of creating the false or misleading appearance of active trading in a security listed on a national securities exchange, or a false or misleading appearance with respect to the market for any such security. To establish a violation of Section 9(a)(1), it must be shown, as it has been in this case, that one or more individuals effected a transaction in a "security registered on a national securities exchange ... which involve[d] no change in the beneficial ownership [*24] thereof, or ... with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such security, has been or will be entered by or for the same or different

---

[8]   A zero plus tick is a purchase executed for the same price as the previously executed trade where that trade was executed for a price higher than the immediately preceding trade.

1995 SEC LEXIS 3457, *24

parties." Section 9(a)(1) of the Exchange Act. It also must be established, as it has in this matter, that the transaction was done "for the purpose of creating a false or misleading appearance of active trading in" such security, "or a false or misleading appearance with respect to the market" for any such security. Section 9(a)(1) of the Exchange Act; see *Michael Batterman, 46 S.E.C. 304, 305 (1976).*

The manipulative activities expressly prohibited by Sections 9(a)(1) and 9(a)(2) of the Exchange Act with respect to a listed security constitute violations of Section 10(b) of the Exchange Act and Rule 10b-5 when such activities involve trading in the over-the-counter market. See, e.g., *United States v. Charnay, 537 F.2d 341, 350-51 (9th Cir. 1976),* cert. denied, *429 U.S. 1000 (1976);SEC v. Resch-Cassin & Co., Inc., 362 F. Supp. 964, 975 (S.D.N.Y. 1973);Edward J. Mawod & Co., 46 S.E.C. 865, 869-71 (1977),* **[*25]** aff'd, *Mawod & Co. v. SEC, 591 F.2d 588 (10th Cir. 1979);Batterman, 46 S.E.C. at 305;Russell Maguire & Co., Inc., 10 S.E.C. 332, 347-49 (1941).*

To establish that an individual has engaged in manipulative practices in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, the Division must prove, as it has done here, that one or more individuals engaged in any act, practice, or course of business which operated as a fraud or deceit upon any person in connection with the purchase or sale of a security. See *SEC v. Kimmes, 799 F. Supp. 852, 858 (N.D.Ill. 1992).* In establishing a violation of Section 10(b) and Rule 10b-5, the Commission must show that the individual acted with scienter. *Aaron v. SEC, 446 U.S. 680, 701-02 (1980).* "Rule 10b-5 … require[s] no additional proof of facts creating a higher burden of proof when compared to subsections 9(a)(1), (2) and (6). In fact, Rule 10b-5 create[s] a lower burden of proof." *Chemetron Corp. v. Business Funds, Inc., 682 F.2d 1149, 1165 (5th Cir. 1982),* reh'g denied, *689 F.2d 190 (5th Cir. 1982),* vacated, remanded, *460 U.S. 1007 (1983),* on remand, *718 F.2d 725,* cert. denied **[*26]** , *460 U.S. 1013 (1983).*

The third element required under Section 9(a)(2)--manipulative purpose--is not required to establish a violation of Section 10(b) and Rule 10b-5. Instead, "it is sufficient for the person to engage in a course of business which operates as a fraud or deceit as to the nature of the market for the security." *Batterman, 46 S.E.C. at 305;* see also *Charnay, 537 F.2d at 350-51.* Such deceit has been demonstrated in this case.

From January 1, 1989 to June 30, 1990, Broumas repeatedly placed orders for wash trades and matched orders in JML Class A stock, which constitute manipulative practices in violation of Sections 9(a)(1) and 9(a)(2) of the Exchange Act. Furthermore, this pattern of conduct violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder because, by creating a false or misleading appearance of active trading in JML Class A stock, it operated as a fraud or deceit upon the marketplace.

Broumas's wash trades and matched orders violated Sections 9(a)(1) and 9(a)(2) of the Exchange Act. Sections 9(a)(1) and 9(a)(2) require that the proscribed activities be engaged in with the requisite manipulative intent. Transactions which violate Section **[*27]** 9(a)(1) can serve as the basis for a violation of Section 9(a)(2). *Michael J. Meehan, 2 S.E.C. 588, 615-618 (1937).* However, transactions such as wash sales and matched orders, as are present in this case, which constitute violations of Section 9(a)(1), have been held to be per se manipulative. Cite?

Respondents argue that there is unequivocal proof that Section 9(a)(1) of the Exchange Act was not violated by Broumas. RPFF at 23. In support of this argument Respondents state in substance that there was no intent to manipulate the market and that a substantial number of the wash sales were unreported and could not have impacted market prices and those that were reported did not impact prices. I disagree. Broumas subverted the normal dynamics of the market by trades that were fictitious on the one hand since he was trading with himself and on the other hand were real since he was using the float to obtain money as if it was a genuine sale. It is considered that investors have the right to assume that security trades are authentic with a dynamic impact on prices and not a device to obtain money from the float through wash sales. With respect to the argument that much of the **[*28]** trades were not reported, the Commission noted in Mawod & Co. that formal reporting is not an essential ingredient in a wash sale violation:

> In the over the counter markets there was no tape. And until the National Association of Securities Dealers, Inc. developed the automated quotation system known as NASDAQ, trading volume was normally something that even an

Elaine Harshman

1995 SEC LEXIS 3457, *28

astute professional could only guess at … But the brokers and dealers through whom orders in a particular issue funnel know whether it is active or inactive. And when it is active that information filters out to investors. [9]

*Mawod & Co., 46 S.E.C. at 870 n. 24.* Further, it has been erroneously argued that the stock manipulation must occur through a national exchange. My reading of Section 9(a)(1) merely requires that the stock be listed on the national exchange (American Stock Exchange in this case), not that manipulation occur through the Exchange. See *Mawod & Co., 591 F.2d at 595-96.*

Respondents also argue that neither respondents nor Broumas ever requested that the wash sales be reported to AMEX and that one must conclude that there was never any manipulative intent in violation of Sections 9(a)(1) and 10(b) of the Exchange Act and Rule 10b-5 thereunder. RPFF at 27. Assuming arguendo the factual correctness of this claim, I disagree with the conclusion. In order to obtain funds from the float, Broumas had to manipulate the market using the wash sale device. It is not considered that the price in a wash sale is genuine, as contemplated by the securities market, since it was between the same person without any competitive pressures. This contrived manipulated price was used to obtain money from a float. The wash sale device that was used to manipulate the price is, under the facts of this case, proscribed by Sections 9(a)(1) and 10(b) of the Exchange Act and Rule 10b-5 thereunder. Accepting arguendo respondents' argument that specific intent is required, the record here clearly establishes specific intent every time Broumas used the wash sale with assistance of Respondent Graham. Additionally, I found that of the 76 trades executed by Voss & Co., 22 **[*30]** trades were reported. This amounted to 202,825 shares of JML class A stock. The volume reported in the newspaper represented largely hidden wash sales and an investor would be beguiled into thinking that there was substantial activity in the market when in fact there was little. The harm to an investor seeking an active market in JML stock is obvious.

In other instances, the Commission has recognized that, absent an admission, an inference of manipulative intent may be drawn and a prima facie case shown when a person with substantial pecuniary interest in achieving a price change engages in the type of market activity proscribed by Sections 9(a)(1) and 9(a)(2) of the *Exchange Act. Batterman, 46 S.E.C. at 305;Halsey, Stuart & Co., Inc., 30 S.E.C. 106, 123-24 (1949);The Federal Corp., 25 S.E.C. 227, 230 (1947).* This is exactly what happened in the instant case.

Broumas's pattern of placing wash trades and matched orders in JML Class A stock constituted a manipulative practice per se under Section 9(a)(1) of the Exchange Act because it created the false or misleading appearance of active trading in JML Class A stock, and a false or misleading appearance with respect **[*31]** to the market for JML Class A stock. This pattern of conduct also violated Section 9(a)(2) of the Exchange Act because Broumas's purchases and sales created the false and misleading appearance of active trading in JML Class A stock. Broumas's motive can be inferred from the fact that he engaged in an extensive and repeated pattern of placing wash trades and matched orders while having a clear and substantial financial interest in raising or depressing the price of JML Class A stock. Broumas admitted that he faced margin calls if the price of JML Class A stock dropped significantly. He also admitted that he engaged in the pattern of wash trades and matched orders to take advantage of the ″float, ″ i.e., he obtained the use of the proceeds generated by a ″sale″ immediately while not being required to pay for the corresponding ″purchase″ until seven days later. During the eighteen month period in question, Broumas arranged for a total of 484 violative trades in JML Class A stock. See *Thornton & Co., 28 S.E.C. 208, 222-225, 224 n.21 (1948).* The respondent in Thornton used sales tickets for collateral. The Commission found that the purpose of the trade was to create a false **[*32]** and misleading impression of active trading in violation of Sections 9(a)(1) and 9(a)(2) of the Exchange Act. As Thornton indicates, ″Purchasers in over-the-counter as well as the Exchange market are entitled to believe that the Exchange market price which governed the price charged them represents a price established in an independent market free of artificial devices.″ *Id. at 224.* This would by implication require that all transactions be reported and be subject to, as well as effect, the competitive market. Here the failure to report in many instances and the fixing of the prices subverted operation of a free marketplace. Further, the parties who loaned money on margin were defrauded as Broumas engaged in a charade pretending that there were genuine trades at a price set competitively.

Whatever other motives he might have had, Broumas must be deemed reasonably to have anticipated what would follow from his activity. As indicated, Broumas's wash trades and matched orders had a significant effect on the reported volume

---

[9]   I disagree with Respondent that Mawod is inapplicable because it deals with a different market. It is considered that there is a considerable network effect operating for unreported trades for all of the large markets.

Elaine Harshman

1995 SEC LEXIS 3457, *32

during the relevant period. Furthermore, the sheer number of wash trades and matched orders placed by Broumas in JML Class A stock over an eighteen month period, [*33] combined with his use of numerous brokers and nominee accounts, clearly leads to the conclusion that Broumas effected a series of transactions in JML Class A stock, creating apparent active trading in that stock for the purpose of inducing others to buy the stock. See *Meehan, 2 S.E.C. at 615-618.* "Activities [constituting wash sales and matched orders under Section 9(a)(1)] in connection with the purchase or sale of any security operate as a fraud or deceit upon any person and are prohibited by Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. " *Batterman, 46 S.E.C. at 305.*

The Commission has held that elements of proof under Section 10(b) and Rule 10b-5 are different from those under Sections 9(a)(1) and 9(a)(2). Unlike Sections 9(a)(1) and 9(a)(2), no showing of manipulative purpose is required to establish a violation of Section 10(b) and Rule 10b-5. "It is sufficient for the person to engage in a course of business which operates as a fraud or deceit as to the nature of the market for the security." *Id. at 305* (emphasis added).

Broumas's pattern of placing orders for wash trades and matched orders in JML Class A stock clearly operated as a fraud or deceit [*34] upon the investing public by creating the false and misleading appearance of activity in the stock. The investing public is led to believe that the volume in a given stock --as reported in the newspaper--reflects genuine supply and demand for that security. The investing public is deceived when, as here, during an eighteen month trading period, at least 36.6% of the total reported volume in a particular security represents a complete fiction in that there was absolutely no change in beneficial ownership of that stock. The use of nominee accounts in which to conduct such manipulative trading --especially when third party trading authority was lacking--is not genuine demand. *United States v. Stein, 456 F.2d 844, 850 (2d Cir. 1972);SEC v. Commonwealth Securities, Inc., 410 F. Supp. 1002, 1009-1012 (S.D.N.Y. 1976),* aff'd in part, modified in part, and remanded, *574 F.2d 90 (2d Cir. 1978);Mawod & Co., 46 S.E.C. at 871-72.* That practice in and of itself is deceptive.

To establish a violation of Section 10(b) of the Exchange Act, it must be proved that Broumas acted with scienter. Scienter has been defined by the Supreme Court as a "mental state embracing intent to deceive, [*35] manipulate or defraud." *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193* (1976.) The Commission and most circuit courts, however, have held that recklessness will suffice. See e.g., *Mawod & Co., 591 F.2d at 595-96;Michael Joseph Boylan, 47 S.E.C. 680, 687 (1981).* The usual formulation of recklessness cited by the courts is set forth in *Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033 (7th Cir. 1977),* cert. denied, *434 U.S. 875 (1977):*

> Reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers and sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Id. at 1045.* The record reflects such highly unreasonable omissions on the part of the respondents.

Respondents argue that they had no actual knowledge of the fraud. However, proof of scienter in manipulation cases need not be direct, but rather may be inferred from circumstantial evidence, including evidence of price movement, trading activity, and other factors. See, e.g., *Herman & MacLean v. Huddleston, 459 U.S. 375, 390-91 n.30 (1983);Santa Fe Industries v. Green, 430 U.S. 462, 475 (1977);Pagel, Inc. v. SEC, 803 F.2d 942, 946 (8th Cir 1986);Mawod & Co., 591 F.2d at 596.* Further, proof of [*36] manipulation is generally not based on a single activity, but rather on a course of contact showing an intentional interference with the normal functioning of the market for a security. Indeed, manipulation is usually the result of acts, practices, and courses of conduct that deceive the marketplace:

> Proof of a manipulation almost always depends on inferences drawn from a mass of factual data. Findings must be gleamed from patterns of behavior, from apparent irregularities, and from trading data. When all of these are considered together, they can emerge as ingredients in a manipulative scheme designed to tamper with free market forces.

*Pagel, Inc., 48 S.E.C. 223, 226 (1985)* (emphasis added). Moreover, it is not necessary to rely on direct evidence that Broumas willfully manipulated the market. Instead, I may rely on inferences drawn from the evidence adduced at the

hearing to reach the conclusion that an illegal manipulation occurred. *Collins Securities Corp. v. SEC, 562 F.2d 820, 822-23 (D.C. Cir. 1977).*

Broumas had a pecuniary interest in the manipulation for several reasons: he was a director of JML and chairman of the board of Madison of Virginia; he held JML Class A stock on margin in numerous accounts, including nominee accounts; and he was heavily in debt. In addition, by placing wash trades and matched orders, Broumas engaged [*37] in a pattern of trading which is clearly proscribed by Sections 9(a)(1) and 9(a)(2), and which operated as a fraud or deceit on the marketplace by creating the false and misleading appearance of active trading in JML stock. Broumas engaged in this conduct either intentionally or recklessly. Broumas repeatedly engaged in a pattern of activity designed to mark-the-close in JML Class A stock. By placing a series of transactions in JML Class A stock which marked-the-close, Broumas violated Section 9(a)(2) of the Exchange Act because this pattern of trading artificially raised or supported the market price of JML Class A stock at the close. Furthermore, this pattern of conduct violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder because the repeated purchases--executed on an uptick, or a zero plus tick--at or near the end of the trading day had the effect of increasing or supporting the closing price of JML Class A stock on those days.

The Commission has held that the practice of placing orders at or near the end of the day in order to cause the stock to close at an uptick violates Section 9(a)(2) of the Exchange Act. Jacob Schaefer, 12 SEC Docket 1128, 1129 (1977). [*38] As stated above, in order to prove that Broumas violated Section 9(a)(2) by placing marking-the-close trades, it must be proved that he did so for the purpose of inducing the purchase or sale of the security by others. Absent an admission, manipulative intent may be inferred from circumstantial evidence. Although there is plentiful evidence from which such intent might be inferred, I need not rely upon a mere inference; Broumas clearly stated to Mr. Havill that at least one of his motives for placing the late day trades was "to create some interest in the stock because if nobody buys it on a certain day, it doesn't show up in the listing in the paper." He went on to tell Mr. Havill that he didn't want investors to forget that the bank was around, "so he was just trying to stir up a little interest in the stock." Dec. Tr. 293 (Havill).

The practice of marking-the-close also constitutes a violation of Section 10(b) and Rule 10b-5 of the Exchange Act. See e.g., *Stein, 456 F.2d 844 (2d Cir. 1982)* (artificial shoring up of the price through purchases of 100 share round lots, often at the end of the day, on a "plus tick" at various brokers and in the names of various nominees) . Broumas's [*39] pattern of marking-the-close injected into the marketplace an artificial price for JML Class A stock, thus operating as a fraud or deceit on the investing public. Information concerning a manipulation and the artificiality of the market price is material information the public is entitled to know. Given that the Commission has specifically recognized the impropriety of the practice of marking-the-close when done to avoid or reduce margin calls, it is considered that Broumas acted with scienter. Andrew Doherty, 49 SEC Docket 0859, 0861 (1991). [10]

**Respondents Graham and Voss**

Voss & Co., a registered broker-dealer located in Springfield, Virginia, functions as a discount broker for unsolicited customer orders. Voss and Graham Answers, P I.A.; Apr. Tr. 361 (Voss). Voss & Co. is the largest independent discount brokerage firm in Virginia. Apr. Tr. 361 (Voss). Voss is the president of Voss & Co. and has been licensed by the NASD since 1971. He founded Voss in February 1973 with Richard Kulak, a respondent in a related Commission proceeding. Admin. [*40] Proc. File No. 3-8509. He bought out Kulak's interest two years later. Apr. Tr. 335 (Voss). Voss knew Broumas prior to the founding of Kulak, Voss & Co. Apr. Tr. 381. In 1989 and 1990, Voss & Co. cleared its transactions, on a disclosed basis, through U.S. Clearing Corp. Apr. Tr. 202-203 (Pasztor). Voss currently holds a securities principals license and others which he cannot recall. When he started his firm, he was a registered principal. Apr. Tr. 342-43 (Voss). Voss is also a director of Noxso Corporation, and in 1989 and 1990 spent 90 to 95 percent of his time on that company's business. Apr. Tr. 356-57. Graham, licensed by the NASD since May 1984, has been employed by Voss & Co. as a registered representative since September 1984. Graham Answer PII.F. Apart from the instant proceeding, Graham has never been the subject of any disciplinary sanction or proceeding or customer complaint. Apr. Tr. 143-44 (Graham).

Pasztor was employed most recently as vice president and compliance officer by Voss & Co. from January 1983 to March 1992. He reported directly to Voss, who was the sole owner of the firm. Apr. Tr. 171 (Pasztor). Pasztor began working at

---

[10]   There is no contention that the respondents participated or aided or abetted Broumas in marking-the-close transactions.

1995 SEC LEXIS 3457, *40

Voss & Co. in 1982, working as a **[*41]** broker in commodity futures for approximately one year. Apr. Tr. 167-68 (Pasztor). While at Voss & Co., he became licensed in securities and also obtained his principal's license and became branch manager. Apr. Tr. 168 (Pasztor). When Pasztor became manager, there were eight to ten employees of the firm, most registered representatives. Apr. Tr. 168-69 (Pasztor). He worked at Voss & Co. for almost ten years, until March 1992, and for seven or eight of those years was the manager. When he left, he was the manager and held the title of vice-president. Apr. Tr. 168-69 (Pasztor). He is now a manager for Quick & Reilly at its branch office in Greensboro, North Carolina. Apr. Tr. 169-70 (Pasztor). During 1989 and 1990, Pasztor ran the office and was responsible for overseeing the office brokers. He was also responsible for financial reporting, expenses, hiring, and general office management. Apr. Tr. 170-71 (Pasztor).

In 1982 and 1983, Graham had worked for Stuart-James, a penny stock broker-dealer in Florida, as a registered representative before transferring her license to Voss & Co. Apr. Tr. 44-45 (Graham). She functions as a registered representative of Voss & Co. in addition to cashier **[*42]** and back office assistant, positions that she held throughout the relevant time period. Apr. Tr. 44-45 (Graham). Graham has a Virginia securities license, a commodities license, and a principal's license. She obtained her principal's license in February 1990 and acts as a back-up that if one of the managers is not in the office. Apr. Tr. 47 (Graham). Graham has never functioned in the capacity of a day-to-day supervisor at Voss & Co. Apr. Tr. 47 (Graham). She considered Voss and Pasztor her supervisors. Apr. Tr. 78 (Graham).

For at least one year, Chema worked at Voss & Co. at the same time as Graham. Apr. Tr. 47 (Graham). At first Graham did not know Chema's place of employment when he left Voss & Co., but when Graham called Graham to execute trades for John Broumas, she became aware that Chema worked for H. Beck. Apr. Tr. 50 (Graham); Ex. 1105. Graham was familiar with Carole Haynes, who is a respondent in a related Commission proceeding. Admin. Proc. File No. 3-8512. Although she never met Haynes during 1989 and 1990, Graham spoke with her during that time while executing Broumas's trades, and she was aware that Haynes worked at First Potomac. Apr. Tr. 48, 155 (Graham). Although she **[*43]** never met Kulak during 1989 and 1990, Graham spoke with him during that time while executing Broumas's trades. Apr. Tr. 48-49 (Graham). Graham was also familiar with Ronald Lara, who is a respondent in a related Commission proceeding. Admin. Proc. File No. 3-8509. Although she never met Lara during 1989 and 1990, Graham spoke with him during that time while executing Broumas's trades. She knew that Lara worked at Lara, Millard & Associates, Inc. Apr. Tr. 49 (Graham).

In 1989 and 1990, Graham's work station was close to Pasztor's, and they spoke throughout the day. Apr. Tr. 190-191 (Pasztor). She had a good manager-employee relationship with Pasztor during 1989 and 1990 and believed that he was fair. Apr. Tr. 133 (Graham). Graham was less sophisticated than Pasztor with respect to securities trading practices as well as the rules and regulations governing such practices. Apr. Tr. 259 (Pasztor). Pasztor encouraged the brokers at Voss & Co. to consult with him if they had any questions and Graham, would do so. Apr. Tr. 260 (Pasztor). Graham followed Pasztor's recommendation whenever she came to him for advice. Apr. Tr. 260 (Pasztor). In 1989 and 1990, Graham was the firm's primary house **[*44]** broker, handling house accounts on a non-commission basis. Apr. Tr. 44-46, 52 (Graham). Graham's cashier and back office work at Voss & Co. consumed approximately 70 percent of her time. Apr. Tr. 139-40 (Graham). Graham handled an average of 10 to 20 trades a day. Some were house account trades, and some were for her own customers' accounts. Apr. Tr. 151-152 (Graham).

Prior to the hearings in this matter, Graham had never met or even seen Broumas. Apr. Tr. 51 (Graham). She knew him only in the context of her executing his orders as a house account. Apr. Tr. 51-52 (Graham). Graham knew that, prior to 1989, Broumas traded at Voss & Co. through a joint margin house account he held with his wife, in the name of John and Ruth Broumas (the joint account) . Apr. Tr. 51-53, 56 (Graham). During 1989 and 1990, most of the trades in the joint account were executed by Graham. Apr. Tr. 177 (Pasztor). Prior to 1989, Graham had executed some trades in the joint account and she executed trades for Broumas in JML stock as early as April or May, 1988. Apr. Tr. 51-56 (Graham). Initially, when Broumas called to execute a trade, the receptionist referred Broumas to Graham. Eventually, Broumas specifically **[*45]** asked for Graham when he called. Apr. Tr. 52-53, 56 (Graham). Prior to 1989, Graham knew that Broumas was employed by McLean Bank. When the bank's name changed to Madison National Bank of Virginia, she assumed that it had been taken over by James Madison and she knew that Broumas continued his employment there. Apr. Tr. 54-55 (Graham). In 1989 and 1990, Graham knew that Broumas was an officer of Madison National Bank of Virginia, and a director of James Madison, Limited. Apr. Tr. 55, 144 (Graham).

As of December 31, 1988, there were 37,500 shares of JML Class A stock in the joint account. Div. Ex. 400. From January 23, 1989, through May 24, 1990, Broumas directed Graham and others at Voss & Co. to execute a total of 76

1995 SEC LEXIS 3457, *45

over-the-counter trades for JML Class A stock, in which 644,800 shares were traded, using three different accounts: the joint account, an account entitled Les Girls, and an account in the name of L. Lawton Rogers. Exs. 2, 6, 1105; Apr. Tr. 59 (Graham). In 1989 and 1990, the majority of Broumas's trades and holdings in the joint and Les Girls accounts involved JML stock. Apr. Tr. 67-68 (Graham). Of the 76 directed trades of JML Class A stock that occurred in the three **[*46]** accounts, Graham executed approximately 60 of the trades. Apr. Tr. 59-60 (Graham); Graham Answer PII.H.; Ex. 1105. Graham executed a directed trade in JML stock an average of once every one-and-a-half weeks during the 18-month period at issue. Div. Ex. 1105. Pasztor executed some of the remaining 16 Broumas transactions that Graham did not execute. Apr. Tr. 120-121 (Graham). Generally, Broumas would call and give Graham an order to buy or sell JML Class A stock off the exchange, the number of shares to buy or sell, a limit price, and the contra broker with whom he wanted her to trade and she would check the bid and offer price on the AMEX and tell Broumas this information. Apr. Tr. 60-63 (Graham). Graham claimed that she would then go to Pasztor for approval of the trade which would be indicated by his initialing the order ticket. After obtaining Pasztor's approval, Graham would execute the trade. Apr. Tr. 60, 97 (Graham).

If Broumas wanted money out of his margin account after he sold stock, Voss & Co. would have to determine when he deposited his check for the purchase of those shares. The clearing company's policy was to wait three business days for the check to clear. Apr. Tr.  **[*47]** 147-150 (Graham). There were no occasions on which Broumas bought JML stock in his margin account and, before payment was due, sold that stock. He always paid for the stock first and thereafter would sell. Apr. Tr. 148-149 (Graham). In most of the 60 trades that Graham did for Broumas, he would ask for a check the next day on a sale. If the three day criteria was met, Voss & Co. would issue him a check. Apr. Tr. 150-151 (Graham). In 1989 and 1990, Graham dealt with approximately 100 other house accounts. She did not seek Pasztor's approval for these accounts unless there was a problem. Apr. Tr. 65 (Graham).

None of the other house accounts that Graham handled involved trades that were directed in the manner that Broumas directed his. Apr. Tr. 65 (Graham). Although Broumas never told her that he had accounts at any of the brokerage firms with whom she executed these 60 trades, Graham assumed that Broumas had accounts at the other firms; that Broumas controlled the JML shares involved in Voss & Co.'s trades with these firms; and that he had connections with the firms. Apr. Tr. 66-67, 162 (Graham). Graham executed Broumas's trades through approximately three or four other firms on a  **[*48]** regular basis. Apr. Tr. 133-34 (Graham). I find that inasmuch as Graham knew that Broumas made no money on these trades, she knew or should have known that these were wash trades and that some were matched orders. In about mid-1990, Graham asked Broumas why he was engaging in directed trading and he responded that it was a way for him to borrow funds in order to repay outstanding bank loans. Apr. Tr. 136-37 (Graham). Broumas had a history of payment problems at Voss & Co. As early as 1986, Voss & Co.'s clearing firm had restricted the Broumas joint account for one year. Pasztor wanted to shut down Broumas's joint account because of the extensions [11] and his concern that it was being used for check-kiting. Apr. Tr. 284 (Pasztor). Broumas's trading was a gray area to Pasztor with which he was not that familiar, and he relied on Voss's judgment as far as Broumas's trading was concerned. Apr. Tr. 285-86 (Pasztor).

After a conversation with James **[*49]**  Talty, the margin supervisor at Voss & Co.'s clearing firm, who thought that the Broumas joint account had too many extensions and might be being used to check-kite, Pasztor told Broumas and Voss that Broumas could not have any more extensions in his account. Apr. Tr. 193-94 (Pasztor). In a conversation with Pasztor, in which Broumas indicated that he wanted to continue trading with Voss & Co., Pasztor told Broumas to talk to Voss if he desired. Apr. Tr. 194 (Pasztor). In order for Broumas to have continued trading in the joint account in February 1989, he would have had to deposit money or stock into the account. However, Broumas did not do that. If he had satisfied the restrictions imposed on the account, he could have continued to trade. Apr. Tr. 411-13 (Voss). In spite of knowing about extensions and directed trading in the joint account, Voss told Pasztor that he was authorizing the opening of another account for Broumas. Apr. Tr. 195-196, 284 (Pasztor).

The Les Girls account was opened on February 22, 1989 and was signed by Graham. Pasztor also initialed the form based on Voss's approval. Apr. Tr. 196-97, 199 (Pasztor); 71-72 (Graham); Ex. 220 at 5. The Les Girls account was **[*50]** supposedly a partnership between Broumas's wife and daughter. However, neither Graham nor Voss ever talked to

---

[11]    An extension occurs when a customer is late paying for his purchase within the five business day requirement, and has to file for a two-day extension. The five-day rule applied to both cash and margin accounts. Apr. Tr. 68-69 (Graham).

Broumas's wife or daughter, nor did she know that Broumas had a daughter. Broumas ordered all of the trades in the Les Girls account, and Graham considered the Les Girls account to be an account controlled by Broumas. Apr. Tr. 72-74, 76 (Graham). Broumas directed 21 trades in JML Class A stock in the Les Girls account from March 21, 1989 until August 29, 1989. Apr. Tr. 77-78 (Graham); Ex. 1105.

Voss acknowledged that he was familiar with the circumstances surrounding the opening of the Les Girls account. Apr. Tr. 393-95 (Voss). Voss knew that Broumas had directed the trading in the joint account for many years. Broumas executed 40 trades in the account in JML Class A stock between February 24, 1989 and March 29, 1990. Voss was aware of the trades at the time they were occurring. Apr. Tr. 302 (Pasztor); 401-2 (Voss); Ex. 1105. Pasztor concedes that he too was aware of every one of these directed trades as they were occurring. Apr. Tr. 302 (Pasztor). Pasztor initialed and approved all of the order tickets for trades in the Les Girls account. Apr. Tr. 285 (Pasztor). [12] Pasztor [*51] authorized Graham to reduce the commission to three cents per share on Broumas's trades. Apr. Tr. 82-3 (Graham). Graham stated that she and Pasztor discussed Broumas's trading and felt that Broumas had a peculiar way of trading, with his buying and selling of the same stock. She knew as the cashier that Broumas rarely made money on his trades. Apr. Tr. 85-86, 160, 162-163 (Graham). Broumas told Graham and Pasztor that he owed on a bank note and that he could sell stock and take the money from his stock account to pay it and when he had the funds, he would buy back the stock to maintain his position in JML. Apr. Tr. 87-8 (Graham). This response was a red flag and should have created suspicion. Broumas's trading activity should have been further investigated at this time.

Lawton Rogers had a house account as of June 20, 1980, with Voss & Co. that Graham also [*52] handled on a non-commission basis. Apr. Tr. 106 (Graham). From February 1990, she executed the majority of the six trades in JML Class A stock in the Rogers's account. Ex. 1105. Broumas called in the orders on the trades in the Rogers account and told Graham what he wanted done. However, because Broumas did not have power of attorney in Rogers's account, Graham had to speak directly with Rogers so that he could confirm what trades were to be done. Apr. Tr. 109 (Graham).

At the time she executed these trades in the Rogers account, Graham believed that Rogers and Broumas were friends and that Rogers may have been Broumas's attorney. Apr. Tr. 109 (Graham). Near the end of Broumas's trading, when Broumas owed money, Graham called Rogers to find out the status of Broumas's payment. Apr. Tr. 109-10 (Graham). The trades of JML stock in the Rogers account were directed in the same manner as Broumas's trades. They were also approved by Pasztor prior to Graham executing the trades. Apr. Tr. 110 (Graham). On one occasion, Rogers asked Graham, after she sold 12,000 shares of JML, to courier him a check the next day, and Graham directed the responsible person to do that. Apr. Tr. 111-13 (Graham); [*53] Ex. 1071. This also should have been a red flag to Graham that Broumas was engaging in wash sales. Rogers was able to receive a check within one day after the trade because he had a margin account. However, he was charged interest for the amount of time between when the check was sent and settlement. For purchases, Rogers was still bound by the five business day rule. Apr. Tr. 113 (Graham). Pasztor was aware as it was occurring that there were directed trades in JML stock through the Lawton Rogers account and he informed Voss of this. Apr. Tr. 213 (Pasztor).

Voss told Pasztor that Broumas and Rogers were "bosom buddies" and that he did not have a problem with Rogers directing the trades. Apr. Tr. 213 (Pasztor). During 1989 and 1990, Graham was unaware that Voss & Co. was to report the sales volume for off-exchange trades of exchange-listed securities. Apr. Tr. 113-17 (Graham). The issue came to her attention towards the end of Broumas's trading activity in 1990, through a conversation with a contra broker at Scott & Stringfellow concerning the execution of one of Broumas's trades. The broker asked her whether Voss & Co. was reporting the volume or the trade or not. Apr. Tr. 197-98 [*54] (Pasztor). Graham immediately informed Pasztor of the issue. Apr. Tr. 113-14 (Graham). After this conversation, there were two occasions in May 1990 in which Voss & Co. reported the volume on Broumas's directed trades. Graham thought that Pasztor checked to find out what procedures to follow but the issue was not resolved. Apr. Tr. 113-15 (Graham). Pasztor did not know, in April 1990, that there was any obligation to report volume on the type of trades that were being executed for Broumas. Apr. Tr. 202 (Pasztor).

Pasztor called Dick Orie, who worked in the compliance department of the U.S. Clearing Corporation, to find out whether there were any reporting requirements in Broumas's type of trades. Orie did not seem familiar with the reporting

---

[12]   Respondent Voss argues that he ordered that the Les Girls account be subject to the same restrictions as the joint account but that Pasztor and Graham failed to follow his instructions. While I doubt the accuracy of this claim, Voss would then have been remiss in failing to monitor his instructions. Apr. Tr. 402-3 (Voss).

requirements but he was concerned about Broumas being an insider of JML and told Pasztor to "Get rid of the account." Apr. Tr. 203 (Pasztor). Pasztor told Voss about his conversation with Orie and Voss subsequently called Orie and spoke to him. Apr. Tr. 204 (Pasztor). After speaking to Orie, Pasztor never made any further inquiries or called anyone at the NASD to attempt to find out the volume reporting requirements on off-exchange trades. Apr. [*55] Tr. 207 (Pasztor). Pasztor never understood what the volume reporting requirements were on Broumas's trading of JML Class A stock. Apr. Tr. 207 (Pasztor). Inexplicably, the volume for 22 of Broumas's directed trades of JML Class A stock at Voss & Co. was reported, either by Voss & Co. or the contra broker. The total reported volume on the 22 trades was 202,825 shares. Ex. 4.

Although Pasztor could not recall ever initialing order tickets for Graham when she took orders from Broumas to trade JML stock, he acknowledged that Graham probably came to him for prior approval with respect to quite a few of the Broumas trades. Apr. Tr. 324-25 (Pasztor). Graham could look on her own computer screen to tell if the Broumas account had a debit or an outstanding obligation without coming to Pasztor. Apr. Tr. 323-24 (Pasztor). As a result of reviewing and initialing the order tickets for the Broumas trades, Pasztor had knowledge of every directed trade that Graham did for Broumas. Apr. Tr. 279 (Pasztor). Pasztor was aware of each of the 30 trades in the joint account that took place between January 23, 1989 and May 14, 1990, as each trade occurred. Apr. Tr. 211-12 (Pasztor); Ex. 1105. Pasztor also [*56] was aware of each of the 40 trades of JML stock that Broumas directed in the Les Girls account between February 1989 and March 1990, as each trade occurred. Apr. Tr. 214-15 (Pasztor); Ex. 1105. During the ten years he worked at Voss & Co., Pasztor knew of no other customers who directed trades in the third market in the way that Broumas and Rogers did. Apr. Tr. 192-93, 214, 247 (Pasztor). When he first was asked by Broumas to do a directed trade, he discussed it with Voss prior to executing the trade. Apr. Tr. 191-92 (Pasztor). He had not handled a trade like this before. Voss was in the office, and he asked Voss if directing the trade was something Broumas could do, and Voss said that it was fine. The impression Pasztor had from Voss was that it was not a problem to do the trade. [13] Apr. Tr. 192 (Pasztor).

In April or [*57] May 1990, Broumas wrote a bad check for the purchase of some JML shares, and Pasztor informed Broumas and Graham that Broumas could not trade in his accounts without having cleared funds. Apr. Tr. 207-8 (Pasztor). Voss then met with Broumas for lunch (the lunch), and subsequently, Voss called Pasztor on the telephone and told him that Broumas could place trades again, even though the accounts did not have cleared funds. Apr. Tr. 209 (Pasztor). Voss was aware that Broumas placed additional trades through his accounts at Voss & Co. after this. Apr. Tr. 209-10 (Pasztor). Voss in his supervisory role should have stopped all such trading.

Throughout the time Pasztor was at Voss & Co., including 1989 and 1990, Pasztor spoke to Voss by telephone or in person almost every day, unless Voss was overseas on a trip. Apr. Tr. 173 (Pasztor). Pasztor had no authority over Voss with regard to compliance matters at Voss & Co., or any other firm matters. By contrast, as president and owner, Voss had the authority to overrule Pasztor on any matters. Apr. Tr. 174 (Pasztor). Further, Voss had more experience in the securities business and in compliance matters than Pasztor. Apr. Tr. 281. Pasztor never [*58] reported to anyone other than Voss from the point in time when he became in charge of compliance. Apr. Tr. 234 (Pasztor). When Pasztor assumed his compliance duties, he had the ability to and did go to Voss as a resource regarding compliance matters. Apr. Tr. 234 (Pasztor). When he was made branch manager, Voss & Co. did not have a compliance manual. Pasztor put together the first one at some time prior to January 1989. Voss reviewed the manual, and all subsequent ones, prior to distribution to the registered representatives and others at the firm. Apr. Tr. 235-36 (Pasztor). In 1989 and 1990, Voss & Co.'s compliance manual did not contain procedures designed to detect either wash trades or matched orders. Apr. Tr. 240-41 (Pasztor); Ex. 240. Voss admitted that he did not know whether Voss & Co. had in place written procedures designed to detect or prevent wash trades. He had no recollection at the hearing of what was in the compliance manual. Apr. Tr. 429-30 (Voss).

During 1989 and 1990, Voss did not work in the office on a day-to-day basis. Over time, he was in the office less and less. In the first half of 1989, if he came in, it would be in the afternoons a few times a week and [*59] by 1990, Voss was not coming into the office at all. Apr. Tr. 171-72 (Pasztor). During that time, Voss was involved with a public company, Noxso Corporation, as a director and one of the largest shareholders. Apr. Tr. 172-73 (Pasztor). Pasztor sometimes brought

---

[13]   Respondents' counsel raises the question as to an inconsistency in the record at April Tr. p. 69 where Pasztor indicates that he did not know who directed the first trade. I do not find this significant. What is material is the statement that Voss was consulted and approved of the trade. Whether this was in actuality trade number 1, 2 or 3 is not critical.

1995 SEC LEXIS 3457, *59

problems relating to personnel or accounts to the attention of Voss. There were general principles and rules set up at Voss & Co. so that Pasztor could automatically take whatever actions he needed to take with respect to such problems. However, if there was something that was unusual, he would bring it to the attention of Voss. Apr. Tr. 367-68 (Voss). Voss claimed that, in 1989 and 1990, he had no responsibilities at Voss & Co. Apr. Tr. 368 (Voss). However, he acknowledged that he wanted to know what was going on at the firm financially and personnel-wise. Apr. Tr. 368-69 (Voss). Voss stated that he purposefully delegated compliance responsibility to Pasztor so that he could attend to his other business. Apr. Tr. 427-28 (Voss).

During the period from January 1989 to June 1990, there were two occasions on which Pasztor sought to stop Broumas's trading in JML stock at Voss & Co., but was, in effect, overruled by Voss. Apr. [*60] Tr. 252-53 (Pasztor). Prior to the Les Girls account being opened, Voss knew that Broumas was trading JML stock, that he was trading the same stock over and over again, that he was late paying and had many extensions. That is why the joint account was being shut down. Voss knew of that pattern. Apr. Tr. 303, 304 (Pasztor). The New York Stock Exchange rules prevented the clearing firm from accepting trades in an account which was without funds. Voss informed Broumas and Pasztor that Broumas could not trade further in the joint account until the account had stock or money deposited in it. Apr. Tr. 411 (Voss). When Voss opened the Les Girls account, despite the problems with the joint account, Voss claimed to have applied the same restrictions to the Les Girls account with the same instructions to Pasztor. Apr. Tr. 413 (Voss).

In mid-1988, Voss personally took an order from Broumas for JML stock, either Class A or the common stock. The trade was the first directed trade Voss knew of. Voss believes that Broumas told him where to complete the trade, and that he provided the number of shares, price and the contra broker. The trade was off the exchange. Voss did not ask Broumas at that time [*61] why he was directing the trade. Before February 1989, Voss acknowledges that he may have been aware that Broumas directed trades of JML stock through his account, and that Pasztor may have told him. Apr. Tr. 405-6 (Voss). Pasztor acknowledged that Broumas obviously had knowledge of who was on the other side of the trades. He also acknowledged that Broumas probably had accounts at other firms, and that he had relationships with the firms through which Pasztor executed Broumas's directed trades. Apr. Tr. 308-309 (Pasztor). Further, Voss became aware between 1988 and 1990 that Broumas traded JML stock almost exclusively through his accounts. Apr. Tr. 409-10 (Voss). I do not find Voss's claim credible that he was not aware in 1988, 1989 or 1990 that Broumas had accounts at other firms. Apr. Tr. 419-20 (Voss). Voss did not recall Pasztor telling him in or about February 1990 that Broumas was directing trades of JML stock through Rogers's account. Apr. Tr. 426 (Voss).

Voss claimed--and I question the credibility of that claim--that, at the lunch, Broumas did not request that Voss continue to allow Broumas to trade in his accounts at Voss & Co. Apr. Tr. 435-36 (Voss). In the spring of 1990, [*62] Pasztor told Voss about the conversation with Orie concerning the Broumas accounts. Voss called Orie. The question was whether Broumas was violating Rule 144, *17 C.F.R. 230.144*, with his activities in JML. Voss instructed Pasztor to contact JML counsel and obtain an opinion letter, and he did. Apr. Tr. 436-37 (Voss). Voss claims, but I do not find the claim credible, that he was not aware in 1989 or 1990 of the frequency of Broumas's trades in JML stock. Apr. Tr. 465-66 (Voss). Voss claims that Pasztor never told Voss that the Broumas's trades potentially violated the securities laws. Apr. Tr. 283 (Pasztor).

Respondents argue (Resp. Brief at 59) that the Commission is equitably estopped by the NASD's failure to lodge a complaint. This argument is not sound inasmuch as the NASD prosecution of the Schedule G violation is not in issue in the instant case. Rather, the focus of this case is the illegal wash sales. Further, NASD actions do not preclude SEC determinations under the securities laws. As is noted in the record, the SEC was not required to compromise its investigations to provide directions to the respondents.

Respondent Graham Aided and Abetted Broumas's Violations

In [*63] order to establish liability for aiding and abetting, the Division must establish (1) the existence of a primary violation, (2) a "knowledge" requirement, i.e., that the aider and abetter had general awareness that his role was part of an overall activity that was improper, and (3) that the aider and abetter substantially assisted the principal violation. Kevin Upton, 58 SEC Docket 1993, 2001 (1995);*Dominick & Dominick, Inc., 50 S.E.C. 571, 577 (1991).* In applying these elements, all three should be examined collectively, and no single element should be considered in isolation. See *ITT, International Investment Trust v. Cornfeld, 619 F.2d 909, 922 (2d Cir. 1980).*

1995 SEC LEXIS 3457, *63

In my March 24, 1995 order, I found that Broumas manipulated the market for JML Class A stock, and in doing so violated Sections 9(a)(1), 9(a)(2) [14] and 10(b) of the Exchange Act and Rule 10b-5 thereunder. Respondents argue that Broumas lacked the necessary manipulative intent to violate Sections 9(a)(1) and 10(b) of the Exchange Act. However, the findings setting out Broumas's admissions of the illegal scheme he had concocted and conclusions do reflect such intent. The evidence shows that Respondent Graham [*64] had an "awareness of the underlying facts, not the labels the law places on those facts … A knowledge of what one is doing and the consequences of those actions suffices." *SEC v. Falstaff Brewing Corp., 629 F.2d 62, 77* (D.C.Cir.), cert. denied, *449 U.S. 1012 (1980).*

Respondent Graham knew that she was assisting Broumas in carrying out his manipulative scheme inasmuch as she possessed a substantial amount of actual knowledge concerning Broumas's activities. For example, Graham knew that:

. Broumas directed her to execute at least 60 over-the-counter trades in JML Class A stock, during the period January 1989 through May 1990, in three separate accounts, involving hundreds of thousands of shares;

. Broumas was an officer of Madison National Bank of Virginia, and a director of James Madison, Ltd;

. the accounts Broumas controlled in 1989 and 1990 at Voss & Co. traded almost exclusively JML stock;

. it was unusual for a customer of Voss & Co. to direct his trades in the manner that Broumas directed his JML trades;

. Broumas provided every detail [*65] for each of his directed trades, he requested the specific contra broker for each trade, and his trades were with a small number of contra brokers;

. Broumas had accounts at the other broker-dealers where Broumas directed his trades, that he controlled the JML shares involved in Voss & Co.'s trades with these firms, and that Broumas had connections with these broker-dealers;

. Broumas did not seem to make any money on his trading. This was a red flag from which she should have realized these were illegal wash sales; and he paid both margin interest and commissions on his JML trades;

. Broumas had told Pasztor that he was buying and selling JML Class A stock as a means to borrow money to pay bank loans and he later told Graham the same thing;

. Broumas was having difficulty paying for his JML trades on time, and he had received numerous extensions in his joint account;

. when Voss & Co.'s clearing firm would not let Broumas have any additional extensions in the joint account, Broumas appealed to Voss and was allowed to open another account, Les Girls, in which he continued to trade, through Graham, JML Class A stock;

. despite its title and legal designation, Broumas [*66] ordered all of the trades in the Les Girls account, and she considered the account to be Broumas's account;

. Broumas often asked for payment shortly after a sale in his margin accounts, but waited the full five business days, or more, before paying for stock purchases;

. in 1989 and 1990, other than Broumas, the only person who traded JML Class A stock at Voss & Co. was Rogers, a friend of Broumas, and that Broumas ordered the trading in the Rogers account; and

. Broumas was the only one of Graham's customers who always called her with instructions on how and where to complete his trades.

Accordingly, there is ample evidence that Graham was clearly aware of her role in Broumas's manipulative scheme. In fact, she played a central, key role in the scheme.

The Commission has found recklessness to be sufficient for purposes of aiding and abetting liability. *Raymond L. Dirks, 47 S.E.C. 434, 447 (1981),* reversed on other grounds, *Dirks v. SEC, 463 U.S. 646 (1983).* In Lanza v. Drexel & Co. the Court opined:

---

[14]   The Order does not charge Respondent Graham with aiding and abetting Broumas's violation of Section 9(a)(2).

1995 SEC LEXIS 3457, *66

The inquiry normally will be to determine whether the defendants knew the material facts misstated or omitted, **or failed or refused, after being [\*67] put on notice of a possible material failure of disclosure, to apprise themselves of the facts where they could have done so without any extraordinary effort.**

*479 F.2d 1277, 1306 n.98 (2d Cir. 1973)* (en banc) (emphasis added). Graham failed to make adequate inquiry -- "to apprise [herself] of the facts where [she] could have done so without any extraordinary effort" -- and accordingly acted recklessly under the Lanza test.

Registered representatives of broker-dealers are "'under a duty to investigate ... Thus, a salesman cannot deliberately ignore that which he has a duty to know and recklessly state facts about matters of which he is ignorant." *Hanly v. SEC, 415 F.2d 589, 595-596 (2d Cir. 1969).* The concept of duty to inquire runs throughout the federal securities laws. In the context of supervision, the Commission has said that "red flags and suggestions of irregularities demand inquiry as well as adequate follow-up and review." Frederick H. Joseph, 54 SEC Docket 283, 291 (1993); see Edwin Kantor, 54 SEC Docket 293 (1993).

In the context of market manipulation, the Commission has stated that "the totality of [the] circumstances at the least placed [\*68] [the broker] on notice that a searching inquiry was called for as to the nature of the [primary violator's] activity and interest, yet [the broker] made no meaningful investigation. Instead, [the broker] closed his eyes to circumstances indicative of a scheme to create the false appearance of an independent market." *Alessandrini & Co., 45 S.E.C. 399, 404 (1973).*

Graham's conduct demonstrated extreme recklessness:

. In light of all of the things that Graham knew, including her assumption that Broumas maintained accounts at other broker-dealers, Graham was reckless in assuming that wash trading could not be taking place.

. Graham was reckless in executing 60 trades for Broumas in JML Class A stock when she admitted that she knew that he was constantly buying and selling the stock, not making money on his trades, having difficulty paying for them, and believed that Broumas's trading was peculiar. I disagree that Graham fulfilled her duty of inquiry. Resp. Brief at 46. Given her many years in the business, Graham should have inquired what was behind Broumas's conduct. I disagree that she did not know of the impropriety. Id. at 43.

. Graham was reckless in executing [\*69] Broumas's trades when Graham did not know how a customer might effect a wash trade, and did not know that a wash trade involved trading between two accounts that were owned or controlled by the same customer. This is particularly true where, as here, Graham assumed that Broumas controlled both sides of the trade.

. Graham was reckless in executing Broumas's trades in the Les Girls account, when she knew he was not permitted extensions in the joint account, and that Les Girls was also his account.

. Graham was reckless in executing trades directed by Broumas in an account belonging to Rogers.

. Graham was unaware of the volume reporting requirements for the 60 trades in JML Class A stock which she executed for Broumas.

. Graham was unsure whether she had reviewed the Voss & Co. compliance manual prior to 1989, and incorrectly believed that the manual addressed the issue of wash trading.

. Graham was reckless in not realizing that all of the above facts led to the conclusion that Broumas's trading was improper.

"The importance of a broker-dealer's responsibility to use diligence where there are any unusual factors is highlighted by the fact that violations of the anti-fraud [\*70] and other provisions of the securities laws frequently depend for their consummation, as here, on the activities of broker-dealers who fail to make diligent inquiry to obtain sufficient information to justify their activity in the security." *Alessandrini & Co., 45 S.E.C. at 406* (broker-dealer held to have willfully violated or willfully aided and abetted violations of Section 17(a) of the Securities Act of 1933 and Section 10(b) and Rule 10b-5 of the Exchange Act) .

1995 SEC LEXIS 3457, *70

Graham's defense is based on her claims that she relied on her supervisors, Pasztor and Voss, for guidance and to tell her if trades were improper. Specifically, Graham claimed that Pasztor approved and initialed every directed trade that she executed for Broumas in JML Class A stock in advance of the trade. Her testimony is not credible on this point. Pasztor did not require approval on every trade with Broumas. His endorsement of the tickets after the trades was a ministerial act and had no approval function. Graham's computer screen showed if the Broumas account had a debit. Assuming arguendo that the approvals were obtained, Graham still had to comply with the law which she did not. Martin Herer Engelman, 59 SEC Docket 1038, at 1057 n.46 (1995);*Charles Michael West, 47 S.E.C. 39, 43 (1979).*

She was reckless in executing Broumas's orders inasmuch as she "failed or refused, after being put on notice of a possible material failure of disclosure, to apprise [herself] of the facts where [she] could have done so without any extraordinary effort." *Lanza v. Drexel & Co., 479 F.2d at 1306 n. 98.*

To constitute substantial assistance, the broker's actions must be a causal factor but not necessarily the sole factor in bringing about the primary violation. See *Index Fund, Inc. v. Hagopian, 609 F. Supp. 499, 510 (S.D.N.Y. 1985).* Respondent Graham's argument that there was no substantial assistance is insubstantial. Resp. Brief at 49.

Broumas's manipulation depended on the willing assistance, recklessness, and knowledge of Graham and other registered representatives. *Alessandrini & Co., 45 S.E.C. at 410.*

Section 21C of the Exchange Act provides that:

> If the Commission finds, after notice and opportunity for hearing, that any person is violating, has violated, or is about to violate any provision of this title, or any rule or regulation thereunder, the Commission may publish [*72] its findings and enter an order requiring such person, **and any other person that is, was, or would be a cause of the violation, due to an act or omission the person knew or should have known would contribute to such violation**, to cease and desist from committing or causing such violation and any future violation of the same provision, rule, or regulation.

*15 U.S.C. § 78u-3* (emphasis added).

A finding that the respondent aided and abetted a violation also will constitute a finding that the respondent's "conduct was necessarily a 'cause' under Section 21C of the Exchange Act of a violation of the securities laws." *Dominick & Dominick, Inc., 50 S.E.C. at 578 n.11.* Because Graham aided and abetted Broumas's violations of Sections 9(a)(1) and 10(b) of the Exchange Act, and Rule 10b-5 thereunder, she also caused the manipulation in violation of Section 21C. Even if Graham had not aided and abetted Broumas's violations, Graham would still have violated Section 21C of the Exchange Act. The "cause" language of this provision includes a "should have known" standard -- classic negligence language. *Knippen v. Ford Motor Co., 546 F.2d 993, 1003 (D.C. Cir. 1976).* Thus, the negligence [*73] standard typically applies in any circumstances where, as here, respondent "should have known" the likely results of her conduct. Accordingly, Graham should have known that Broumas's conduct was illegal.

Respondent Voss Failed to Supervise Graham

Sections 15(b)(4)(E) and 15(b)(6)(A) of the Exchange Act authorize the imposition of sanctions against broker-dealers and associated individuals who fail reasonably to supervise, "with a view to" preventing violations of the federal securities laws, persons who commit such violations, if such persons are subject to their supervision. Those persons and entities charged with the duty to supervise have the serious responsibility of supervising all operations of a broker-dealer firm. *Sutro Brothers & Co., 41 S.E.C. 443, 464 (1963).*

Failure to supervise has been described as being inattentive to supervisory responsibilities, and failing to learn of improprieties when diligent application of supervisory procedures would have uncovered them. *Anthony J. Amato, 45 S.E.C. 282, 286 (1973).* Voss, as president of Voss & Co., notwithstanding red flags, failed reasonably to supervise Graham with a view to preventing her aiding and abetting [*74] Broumas's violations of Sections 9(a)(1) and 10(b) of the Exchange Act and Rule 10b-5 thereunder. See *Edwin Kantor, 51 S.E.C. 441, 446 (1993).* His disclaimer of supervisory responsibility and need to know the securities laws in 1989 and 1990 is not credible or in compliance with the law and regulations. On

the one hand, he insisted on substantial control of his brokerage firm including requiring daily calls by Pasztor and making decisions with respect to Broumas's trading, on the other hand he appears to abdicate control when some illegal conduct occurs. Thomas F. White, 57 SEC Docket 486, 489 (1994),*John H. Gutfreund, 51 S.E.C. 93, 113 (1992).*

Respondent Voss's argument that he did not have supervisory control over Graham is a filaceous argument. He had control over Pasztor who had control over Graham. If Voss had supervised properly, the wash sales would not have occurred. Voss claimed not to have been familiar with the rules, regulations and laws promulgated by the Commission during his ownership of Voss & Co. because he hired other people to do that. Apr. Tr. 344-45 (Voss). Voss did not believe that he had any obligation to be familiar with the securities laws governing [*75] his brokerage business. He claimed to have delegated those duties to people who were specifically hired for that purpose. Apr. Tr. 345 (Voss).

Voss had known Broumas since 1973, and intervened in his behalf when he could not obtain further extensions in his joint account where he was directing his trades. The clearing firm and Pasztor suspected in February 1989 that Broumas might be check-kiting in his account. I do not find credible Voss's denial of knowledge of this or his contention that all authority was delegated to Pasztor. By allowing Broumas to open a second account under Les Girls, Voss overruled Pasztor who wanted to discontinue Broumas's trading and facilitated Broumas's continued trading JML stock at Voss & Co. I do not find Voss's claim that he restricted the Les Girls account credible. Accepting arguendo this contention, the record does not indicate that he properly monitored this restriction arrangement. Voss also overruled Pasztor, as well as the clearing firm, who wished to stop Broumas's trades when Broumas bounced a check in 1990. This was one of many red flags and I find respondents' argument to the contrary insubstantial. Resp. Brief at 54. Voss also knew Broumas [*76] directed trades of JML stock in the Roger's account.

Voss's general disclaimer of knowledge of the compliance manual, the NASD volume reporting requirements, and whether wash trades in 1989 and 1990 were proscribed by his company, demonstrates his failure to reasonably supervise. *Sutro Brothers & Co. 41 S.E.C. at 462-63;John Gutfreund 51 S.E.C. at 110 (1992).*

In 1976, Voss as well as Voss & Co. consented to findings by the NASD of violations of the credit extension and customer protection provisions, and the improper selling of mutual fund shares at a discount from the price stated in the prospectus. In 1978, the NASD found that the firm again violated credit extension provisions. Later that same year, Voss and Voss & Co. consented to NASD findings of record keeping and reporting violations, and of failing to file with the NASD a possibly misleading newspaper advertisement. Ex. 701. In 1983, the Commission affirmed NASD findings that Voss & Co., Voss, and Carole Haynes, then vice president, failed to comply with recordkeeping and reporting requirements, gave customers inaccurate statements describing the firm's credit terms in margin transactions, and permitted two individuals [*77] to engage in a general securities business at a time when they were not registered to do so with the NASD. Ex. 700; Apr. Tr. 353-55 (Voss). In 1984, the Commission affirmed a $ 2,000 fine against the firm and a $ 1,000 fine and five day suspension against Voss. The Commission agreed with the NASD that the firm and Voss charged excessive markups, failed to maintain records and failed to properly review options accounts and transactions. The Commission noted that "the firm and Voss have demonstrated a chronic inability or unwillingness to comply with applicable requirements . . . . This is the fifth NASD disciplinary action against the firm and Voss in the last eight years . . . . We think that the NASD dealt with the firm and Voss too leniently in light of their prior misconduct." In the Matter of the Application of Voss & Co., Inc., et al., 31 SEC Docket 459, 464 (1984). Ex. 701; Apr. Tr. 353-55 (Voss). At the hearing, Voss claimed not to currently remember any of the actions brought against him by the Commission or the NASD. Apr. Tr. 351-52 (Voss).

Appropriate Sanctions

Section 15(b)(6)(A) of the Exchange Act empowers the Commission to "censure, place limitations on [*78] the activities or functions of such person, or suspend for a period not exceeding 12 months, or bar such person from being associated with a broker or dealer" if the Commission finds, after notice and opportunity for hearing, that such sanction is in the public interest and such person has, among other things, willfully [15] violated any provisions of the Exchange Act or the rules and

---

[15]    Willfully means only intentionally committing the act which constitutes the violation. Arthur Lipper Corp. v. SEC, 547 F.2d 171, 180 (2d Cir. 1967): "All that is required is proof that the broker-dealer acted intentionally in the sense that he was aware of what he was doing," quoting 2 Loss, Securities Regulation 1309 (1961); Tager v. SEC, 344 F.2d 5, 8 (2d Cir. 1965). It means "no more than that the

1995 SEC LEXIS 3457, *78

regulations thereunder. See Sections 15(b)(6)(A)(i) and 15(b)(4)(D).

 [*79]

In imposing administrative sanctions, the Commission may take into account such factors as:

> ...the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that his occupation will present opportunities for future violations.

*Steadman v. SEC, 603 F.2d 1126, 1140* (5th Cir., 1979), aff'd on other grounds, *450 U.S. 91 (1981).*

> Congress, in writing Section 15(b) of the Exchange Act, viewed past misconduct as the basis for an inference that the risk of probable future misconduct was sufficient to require exclusion from the securities business. Having been directed by the Act to draw that inference whenever our discretion leads us to consider it appropriate, we must do so if the legislative aim is to be attained.

*Arthur Lipper Corporation, 46 S.E.C. 78, 101 (1975)* (citations omitted).

The Division requests, considering the lack of contrition, the 60 wash trades, the recklessness involved, and that Graham is employed in the securities [*80]  industry, that Graham be suspended from association with any broker, dealer, municipal securities dealer, investment adviser or investment company for a period of nine months and that she be ordered to cease and desist from committing future violations. While I agree with the Division that Graham committed the violations, I agree with the respondents that this sanction is too harsh considering that she received no commissions for the trades, that her supervisors were remiss in reasonably supervising her activities, and that she has no prior disciplinary history. Further, I do not find the collateral bar legally based. Inasmuch as I found that Respondent Graham aided and abetted violations of Section 9(a)(1) and 10(b) of the Exchange Act and Rule 10b-5 thereunder, she shall be ordered, pursuant to Section 21C of the Exchange Act, to cease and desist from committing future violations of these provisions of the securities law.

The Division recommends that Voss be suspended from association with any broker, dealer, municipal securities dealer, investment adviser or investment company for a period of nine months, with the right to reapply after that time in a non-supervisory, non-proprietary [*81]  capacity. They predicate this request based on Voss's lack of contrition, his prior disciplinary history, and his attempt to claim a delegation when in fact he retained supervisory control. I agree with the charges against him but I agree with respondents that the sanctions are too harsh given the fact that Pasztor was primarily in charge. I again disagree with the Division's request for a collateral bar as it does not, in my view have a legal basis. Based on the foregoing, the following order is entered.

**ORDER**

IT IS ORDERED that Sharon M. Graham be suspended from association with any broker or dealer under Sections 15(b) and 19(h) of the Exchange Act for a period of two months. Graham is ordered under Section 21C of the Exchange Act to permanently cease and desist from committing or causing any violation of, and from committing or causing any future violation of, Sections 9(a)(1) and 10(b) of the Exchange Act and Rule 10b-5 thereunder.

IT IS FURTHER ORDERED that Stephen C. Voss be suspended from association with any broker or dealer under Sections 15(b)(6) and 19(h) of the Exchange Act for a period of three months with the right to reapply after that time in a non-supervisory,  [*82]  non-proprietary capacity.

This order shall become effective in accordance with and subject to the provisions of Rule 17(f) of the Rules of Practice. Pursuant to Rule 17(f) of the Rules of Practice, this initial decision shall become the final decision of the Commission as

---

person charged with the duty knows what he is doing." *Hughes v. SEC, 174 F.2d 969, 977 (D.C. Cir. 1949).* Willfulness does not require proof of evil motive. *International Shareholders Services Corp., 46 S.E.C. 378, 382 (1976).* No showing of an intention to violate the law need be made in order to support a finding of willfulness in an administrative proceeding under the Exchange Act. Id.; *A.J. White & Co., 45 S.E.C. 459, 460 n.5 (1974).*

1995 SEC LEXIS 3457, *82

to each party who has not, within fifteen days after service of this initial decision upon him or her, filed a petition for review of this initial decision pursuant to Rule 17(b), unless the Commission, pursuant to Rule 17(c), determines on its own initiative to review this initial decision as to him or her. If a party timely files a petition for review, or the Commission takes action to review as to a party, the initial decision shall not become final with respect to that party.

**Load Date:** 2014-10-28

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| I. STEPHEN RABIN, on behalf of himself: | | |
| and all others similarly situated, | : | **CIVIL ACTION** |
| | : | |
| **Plaintiff,** | : | **No. 2:15-cv-00551-GAM** |
| | : | |
| **v.** | : | **Class action** |
| | : | |
| **NASDAQ OMX PHLX LLC** *et al.*, | : | |
| | : | |
| **Defendants.** | : | |

_____

**ORDER**

AND NOW, this __ day of _____, 2015, upon consideration of Defendant Sumo

Capital LLC's Motion to Dismiss the Corrected Second Amended Complaint, and Brief In

Support Thereof, and any response thereto;


It is hereby ORDERED that:

The Corrected Second Amended Complaint herein is DISMISSED with prejudice as to

Defendant Sumo Capital LLC.


_____

**Gerald Austin McHugh, J.**

**CERTIFICATE OF SERVICE**

I, Zachary J. Ziliak, hereby certify that on August 12, 2015, true copies of the foregoing Defendant Sumo Capital LLC's Motion to Dismiss Corrected Second Amended Complaint with Prejudice, together with a Brief in support thereof, and a Form of Order, were served on all counsel of record via the Court's ECF system. I further caused the foregoing document, together with all supporting papers to be served via first-class mail upon the following yet unrepresented Defendant:

> V Trader-CG, LLC
> 1818 Market Street
> 18th Floor
> Philadelphia, PA 19103

s/ Zachary J. Ziliak
ZACHARY J. ZILIAK, Esq.