## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| I. STEPHEN RABIN, on behalf of himself and all others similarly situated, | : : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | No. 15-551 |
| v. | : | |
| | : | |
| NASDAQ OMX PHLX LLC *et al.*, | : | |
| Defendants. | : | |

MCHUGH, J.                                                     APRIL 21, 2016

### MEMORANDUM OPINION

This case takes me far down the rabbit hole of securities litigation, an area of law that can be as opaque as some of the investment vehicles it seeks to regulate.

Plaintiff in this purported securities class action alleges that Defendants, certain Members of the Philadelphia Stock Exchange, and the Philadelphia Stock Exchange itself (owned and operated through a subsidiary by a Delaware corporation, NASDAQ, OMX Group, Inc.), conspired to deprive Plaintiff of dividends that he and other class members expected to receive by engaging in a highly sophisticated trading strategy that involves "market makers" acting in concert to increase their chances of success. The question before me is whether that strategy, now rendered obsolete by rule changes, crossed the line from heavy-handed to unlawful.

The parties have filed several motions to dismiss Plaintiff's claims. These motions make many overlapping or related arguments attacking perceived procedural and substantive failures of Plaintiff's Complaint (currently, a "Correct Second Amended Complaint" listed on the Docket at Document 105). In the interest of addressing these overlapping and related arguments in a consistent and clear manner, and because the facts are very detailed and it would be highly

1

tedious to repeat them across many opinions, I have decided to address all of these motions in one Memorandum.

For the reasons that follow, I have decided to grant portions of Defendants' Motions and ultimately dismiss all of Plaintiff's Complaint.

## I.  Allegations

Plaintiff, I. Stephen Rabin, is a lawyer and an investor.  He has on multiple occasions engaged in a trading strategy which has been called a "dividend play" and is at the heart of this litigation.  *See, OCC to Adopt a Policy to Restrict Exercises to Net Long Positions* (available at http://www.optionsclearing.com/about/newsroom/releases/2013/05_23.jsp) (last visited April 14, 2016) (describing dividend plays).  Clarity requires a few definitions and a brief description of how this trading strategy operates.

A stock option is a contract to buy or sell a specific underlying security.  When the contract grants its buyer the right to purchase the underlying security at a certain price, the option is known as a "call."  Compl. at ¶ 32.  The buyer pays a premium for the option and later has the right to purchase the underlying security.  When an investor sells a number of options, he has taken a "short" position, and when an investor purchases a number of options, he has taken a "long" position.

Investors do not enter into options contracts directly with one another.  Instead, options all pass through the "Options Clearing Corporation" (OCC).[1]  Compl. at ¶ 30.  When an investor has purchased a call and wishes to execute her right to buy the underlying security, the OCC

---

[1] The Options Clearing Corporation describes itself as "the world's largest equity derivatives clearing organization." Options Clearing Corporation, http://optionsclearing.com/about/corporate-information/what-is-occ.jsp (last visited March 7, 2016).  It "clears transactions for exchange-listed options, security futures and OTC options, … offers clearing and settlement services for transactions in futures and options on futures" and fulfils other functions related to "ensur[ing] that the obligations of the contracts it clears are fulfilled." *Id.*

randomly selects an option-seller to be assigned the obligation to sell the shares he promised when writing the option.  Compl. at ¶ 39.

A "dividend," of course, is a payment that a company makes to investors holding its securities.  Companies only make dividends to investors who own the security on a particular date preceding the dividend.  This date is the "ex-dividend date."  An investor who holds an option for a security must exercise the option to buy the security before the ex-dividend date in order to receive the dividend.

If an investor has purchased a call and the price of the underlying security is higher than the purchase price for the option, the option is said to be "in the money."  Compl. at ¶ 35.  If the investor exercises the call, she will purchase the security for less than its current price on the open market for a net gain.  If an investor exercises an "in the money" option before the ex-dividend date, she will make money on the option and receive the dividend.  Conversely, if an investor has sold a call option, and the option is "in the money" just before the ex-dividend date, the holder of the option is very likely to call the option, and the investor will have sold the underlying securities for less than its current price and lost the ability to collect a dividend.[2]

Although an investor who holds an in the money call just before the ex-dividend date is very likely to exercise the call, not all investors do.  According to Plaintiff, "[t]his failure to exercise is due to various reasons, including mistake or oversight, lack of economic resources to exercise the option, or ignorance of the process."  Compl. at ¶ 40.[3]  These unexercised options are called "open interest."  *Id.*  Because some call holders do not tell the OCC they wish to exercise their calls, the OCC does not assign some call sellers to turn over shares.  Consequently,

---

[2] This is not a total loss for the seller of the option: he still keeps the price the option set for the security plus the premium he charged for the option contract.

[3] Both Plaintiff and Defendants seek to profit from these hapless investors.  The fight here is over control of the profits to be made from the shearing of the sheep.

some call sellers reap a windfall, randomly finding themselves retaining securities that could have been called away, together with the premium for the options and the dividend for the security.  An investor in this position has "skated."  Compl. at ¶ 41.

Plaintiff alleges that he has engaged in multiple transactions with the expectation that he would be able to "skate" on some portion of those options.  He further alleges that Defendants have conspired to make it nearly impossible for investors such as himself to successfully "skate."

Most of the Defendants here are "Market Makers."  Market Makers are investors who are members of an exchange.  They undertake certain responsibilities, such as agreeing to "create liquidity by being continuously willing to buy and sell the security in which they are making a market." *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266 (3d Cir. 1998). They also receive certain privileges.  Plaintiff contends that market makers "are the only options industry participants that are permitted to be in both long and short identical option contracts and to exercise any long options contracts prior to the OCC netting at the end of the day."  Compl. at ¶ 42.  According to Plaintiff, they are also the only entities who can exercise just one side of a position that has both long and short positions.  *Id.*

Plaintiff asserts that market makers' special privileges enable them to arrange huge options trades with each other just before the ex-dividend dates.  Compl. at ¶ 46.  The market makers participating in these trades "exercise their open long call options after the end of the day" and leave their short option positions unexercised.  Compl. at ¶ 47.  When the OCC assigns options and it becomes clear who is skating, "the probability of the market makers' positions not being assigned is maximized" because the market makers' huge trades make up an overwhelming proportion of the entire pool of options.  Compl. at ¶ 47.  Plaintiff contends that

their gain comes at his expense because the odds that a small retail investor such as Rabin will skate are correspondingly reduced.

The remaining Defendants are NASDAQ OMX PHLX LLC and NASDAQ OMX GROUP, INC. (Exchange Defendants).  The former is a "Self-Regulatory Organization" registered with the Securities and Exchange Commission (SEC).  It owns and operates the Philadelphia Exchange (PHLX).  NASDAQ OMX GROUP, INC. is the for-profit company that owns NASDAQ OMX PHLX LLC.  Plaintiff alleges that these Defendants created a cap on fees that market makers must pay for trading on the market.  The cap makes the massive options trades Plaintiffs challenge feasible because without the cap the trades would be too expensive to make money.  Plaintiff accuses the Exchange Defendants of enacting the fee cap specifically to enable the Market Maker Defendants to deprive Plaintiff of expected dividends.

Plaintiff accuses all Defendants of combining in a single conspiracy to engage in or promote these "dividend plays."  He specifically identifies several occasions when these trades occurred.  In August 2010, Plaintiff's call options in Pfizer Inc. securities were assigned as a consequence, according to Plaintiff, of Defendants manipulations.  Compl. at ¶¶ 61–65.  Then again in December, 2010, Plaintiff wrote 100 Pfizer calls which were assigned.  Compl. at ¶ 66.  Plaintiff alleges that Defendants engaged in a dividend play that "drastically increased the open interest pool" in options for the CME group in December 2013.  Compl. at ¶¶ 68–73.

Plaintiff does not say that every market maker engaged in the plays at every opportunity, but he claims that they prearranged trades with fellow market makers and that there was a shared understanding they would cooperate to engage in dividend plays.  The Exchange Defendants' role in the alleged conspiracy was to create fee caps that made the plays economically feasible while benefiting financially from the trading activity.

Both Plaintiff and Defendants seek to profit from the trading strategy described above.  It might be tempting to conclude simply that those who live by options trading strategies (relying on other investors' oversights) risk dying by those strategies.  It is helpful therefore to articulate in as few words as possible why Plaintiff believes he has been wronged.  Although assignments and non-assignments are random, Plaintiff's position is that whether a buyer will skate is not really just luck; if an investor does not skate, it is not simply bad fortune for which no one can be blamed.  Rather, it is a reliable feature of the market that some options will not be exercised and that there will be some pool of "open interest."  Therefore it is also a reliable feature of the market that if $x$ percent of options are not called, then an investor who has sold options that constitute a portion, $y$, of the total pool of options for a particular security that have been sold should have equal opportunity to benefit based on the investment.  Market Makers, according to Plaintiff, are using their privileged position in the market to manipulate the odds of skating so that they capture the vast majority of the open interest at the expense of retail investors, who are left with a much reduced chance to skate and no realistic ability to compete with the market makers.

Plaintiff asserts that Defendants' scheme violates Section 10(b) of the Securities Exchange Act of 1934, now codified at 15 U.S.C. § 78j(b), and Rule 10b-5.  Plaintiff brings a second claim under Pennsylvania state law alleging Unjust Enrichment against Defendants.

Plaintiff makes these claims on behalf of himself and a class of similarly situated investors.  Class certification is not yet upon us, so I do not consider Plaintiff's class allegations.

## II.  Standard of Review

Defendant Summit Securities Group, LLC, filed its Motion to Dismiss (Doc. 110) pursuant to Federal Rule of Civil Procedure 12(b)(1).  The Exchange Defendants filed their Motion to Dismiss under Rules 12(b)(1) and 12(b)(6) (Doc. 111).  Sumo Capital, LLC, also filed its Motion to Dismiss (Doc. 113) under Rules 12(b)(1) and 12(b)(6).  Finally, the remaining Market Maker Defendants move to dismiss Plaintiff's Complaint under Rule 12(b)(6).

Slightly different standards of review apply for motions to dismiss claims pursuant to Rules 12(b)(1) and (6).  To decide a 12(b)(1) motion to dismiss, "a court must first determine whether the movant presents a facial or factual attack." *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012).  "In reviewing a *factual* attack, the court may consider evidence outside the pleadings." *Gould Electronics, Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000) (internal citations omitted and emphasis added).  However, where a *facial* attack challenges the court's jurisdiction on the basis that a plaintiff lacks standing for his claims, "courts apply the standard of reviewing a complaint pursuant to a Rule 12(b)(6) motion for failure to state a claim." *Id.*  Specifically, "[c]ourts must accept as true all material allegations set forth in the complaint, and must construe those facts in favor of the nonmoving party." *Id.*  The court must decide whether plaintiff "assert[s] facts that affirmatively and plausibly suggest that the pleader has the right he claims (here, the right to jurisdiction), rather than facts that are merely consistent with such a right." *Id.* at 244 (citing *Stalley v Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007)).  "In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Gould Electronics*, 220 F.3d at 176.

A court deciding a 12(b)(6) motion proceeds through a two-step analysis.

First, the factual and legal elements of a claim should be separated.  The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief.

*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009) (internal citations omitted).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S 662, 663 (2009).

### III. Standing

A.  As to Summit Securities Group, LLC

Defendant Summit Securities Group, LLC (Summit) attacks Plaintiff's standing to bring his claims.  Mem. Supp. Mot. Dismiss., Doc. 110.  Summit presents public records that show it did not yet exist at the time Plaintiff made any of the trades that form the basis for his claims. Therefore, Summit argues, Summit cannot have injured Plaintiff and Plaintiff has no standing to bring any claims against it.

To support his assertion of standing, Plaintiff relies on the conspiracy that he claims existed among Defendants to engage in the dividend plays.  Plaintiff acknowledges that he only engaged in transactions on dates when eight of the Member Defendants, not including Summit, engaged in dividend plays.  Nonetheless, he argues,

Since all the Member Defendants, including Summit[,] were in a massive conspiracy implementing the dividend play, and the eight Member Defendants were engaged in dividend plays throughout the Class Period, Plaintiff has standing against all thirteen Member Defendants which formed the totality of the same conspiracy, as a whole, including Summit, which was involved in substantial dividend play transactions.

Rabin Mem. Opp. Summit's Mot. Dismiss at 5.

To support this position, Plaintiff cites to *Haas v. Pittsburgh Nat'l Bank*, 526 F.2d 1083, 1088–89 (3d Cir. 1989).  Plaintiff characterizes *Haas* as holding that a class representative with claims against certain defendants has standing to represent the claims of all class members against the eight defendants who engaged in the same conduct.

Plaintiff adds his allegation that Defendants were all part of a single conspiracy.  He contends that co-conspirators are liable to a party injured by a conspiracy even if a particular co-conspirator did not itself directly injure the party.  Plaintiff cites *Kottler v. Deutsche Bank AG* for the proposition that a plaintiff may sue co-conspirators that have not directly injured him, 607 F. Supp. 2d 447, 468–69 (S.D.N.Y. 2009), concluding that all members of the alleged conspiracy are liable to class members who were trading at any time during the Class Period.

In effect Plaintiff advances a syllogism based upon *Haas* and his conspiracy arguments, as follows:

1.  Plaintiff asserts that he has standing against eight member defendants who engaged in transactions at the same time Plaintiff did.

2.  Because he has standing against these eight, he has standing to bring all class members' claims against those eight.

3.  Because Plaintiff alleges all Defendants participated in a conspiracy, all Defendants are liable to class members who were trading after Plaintiff no longer traded.  So the class members have standing against all Defendants.

4.  Because Plaintiff has standing to press class members' claims, and class members have standing to press claims against all Defendant (because of the conspiracy allegation), Plaintiff has standing to sue all Defendants.

5.  Defendant Summit, although it did not exist when Plaintiff engaged in options

transaction, did enter into the conspiracy later.  It is therefore liable to all class members

injured by the conspiracy, and Plaintiff can represent those class members' claims now.

I am impressed with the creativity of this argument, but the conclusion Plaintiff advances

does not follow.  I agree that under *Haas*, a plaintiff with claims against one defendant can

maintain similar claims that other class members have against that defendant.  The plaintiff there

filed a class action claim against three credit card issuers challenging interest rates they charged

their customers.  *Haas*, 526 F.2d at 1086.  The Third Circuit found that the nominal class

representative personally did not have standing to press a certain kind of claim against one bank,

but she nonetheless had standing to press class members' claims of the same kind against the

same bank.  The court explained that the nominal plaintiff "does not have standing against

Mellon Bank on [the] issue," but that she could maintain claims of class members because she

"had claims against Mellon Bank for other violations of the National Bank Act" and her "two

claims against Mellon Bank … are closely related to the commercial transactions on which she

lacks standing."  *Id.* at 1088–89.

*Haas* addressed issues presented by Federal Rule of Civil Procedure 23.  It did not

address Article III standing.  Article III standing is a distinct question from the Rule 23 typicality

analysis that drove *Haas*.[4]  "[W]hether or not Rule 23 would permit a plaintiff to represent a

_____

[4] The court in *Haas* reached its conclusion by distinguishing a Ninth Circuit case about whether a nominal plaintiff's claims were "typical" of class members under Rule 23.  *Id.* at 1088 (citing *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461 (9th Cir. 1973)).  *Haas* discusses this question as one of "standing," but it is important not to conflate standing under Article III with the issue in *Haas*, which is more accurately described as "Rule 23 Standing."

The Second Circuit noted in *Mahon v. Ticor Tile Ins. Co.* that since *La Mar*, courts have sometimes elided the distinctions between Article III standing and the Rule 23 analysis.  683 F.3d 59, 63 (2d Cir. 2012) (explaining that since *La Mar*, some courts have "merged [Article III standing] with the Rule 23 analysis," others have "held that a court should decide class certification first and treat the class as a whole as the relevant entity for Article III purposes," and still others have "ignored [Article III standing] altogether.").

class against non-injurious defendants cannot affect the plaintiff's Article III standing to sue the non-injurious defendants. A federal rule cannot alter a constitutional requirement." *Mahon*, 683 F.3d at 64.   In *Polanco v. Omnicell, Inc.*, 988 F.Supp.2d 451, 464 (D.N.J. 2013), the District Court found that a nominal class representative lacked Article III standing against defendants. The court emphasized that even in a class action, a named plaintiff must satisfy the requirements of Article III standing.  *Id.* ("[T]he fact that a suit may be a class action … adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent") (citations omitted).   Plaintiff here must first be able to satisfy the requirements of Article III standing.

The Federal Constitution permits courts' to only maintain jurisdiction over cases that involve "actual 'cases or controversies.' "  *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 358 (3d Cir. 2015).   "Standing requires that the party seeking to invoke federal jurisdiction 'demonstrate standing for each claim he seeks to press.' "  *Id.* at 359 (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).   "In the context of a class action, Article III must be satisfied 'by at least one named plaintiff.' "  *Id.* (citing *McNair v. Synapse Group Inc.*, 672 F.3d 213 (3d Cir. 2012).

Constitutional standing has three requirements:  "(1) an injury in fact; (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likel[ihood] that the injury will be redressed by a favorable decision."  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (citation omitted).   A plaintiff's alleged injury must be "fairly … trace[able] to the challenged action of the defendant."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

Here, I cannot see how any injury Plaintiff has suffered is fairly traceable to the actions of Summit.  Certainly, Summit did not itself directly injure Plaintiff.  Summit did not exist until after the transactions that give rise to Plaintiff's own claims.  To the extent Plaintiff argues he was injured by Summit because Summit joined a "conspiracy," I disagree.  Plaintiff relies again upon *Kottler v. Deutsche Bank*, and in particular its statement that "If a conspiracy is properly alleged, then injuries suffered at the hand of any particular defendant are imputed to all other conspiracy participants, and a plaintiff can overcome the otherwise absolute bar to standing." *Kottler*, 607 F.Supp.2d at 468–69.

There is a distinction, however, between the situations: (1) in which a conspiracy injures a plaintiff and the plaintiff sues all the members of the conspiracy; and (2) in which a conspiracy injures a plaintiff, another party later joins the conspiracy, and the plaintiff attempts to hold the late-joining conspirator liable for injuries other parties inflicted at an earlier point in time.  The court in *Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.* explains this point.  No. 11-2861, 2013 WL 2386635 at *17 (N.D. Ca. May 30, 2013).  In *Mitsui*, the court considered whether a corporation could be held liable for torts completed before it joined a conspiracy.  *Id.* at *10–11. The court noted in a similar circumstance, another decision held a late-joining conspirator could not be liable because by the time the conspirator joined the conspiracy, "the conspiracy was completed and actionable."  *Id.* at *12.  The court concluded that the late-joining conspirator "was legally incapable of committing the underlying tort … .  Accordingly the [lower] [c]ourt erred in holding it jointly and severally liable for acts committed before it joined the conspiracy." *Id.* at 17.  Instead, conspirators are liable because current members of a conspiracy, through their participation in the conspiracy, can be said to have played a causal role in injuries more directly inflicted by other members of a conspiracy.  But there is no causal nexus between injuries a

plaintiff suffers at one point in time and an entity that joins a conspiracy long after, even when the conspiracy's objective is to keep doing whatever it was that previously injured the plaintiff. The District of Delaware explained that a late-joining conspirator could not be liable to a plaintiff that had ceased to exist before the defendant joined the conspiracy. *Marian Bank v. Electronic Payment Servs., Inc.*, No. 95-916, 1997 U.S. Dist. LEXIS 11560 at *14 (D. Del. Feb. 5, 1997) *(*"[A]ny conspiracy as it related to [plaintiff] ceased to exist when [plaintiff] ceased to exist. Whatever alleged conspiratorial activities were conducted after April 1992 have no relevance to [plaintiff's] alleged antitrust injury and therefore, EPS cannot be held liable."). Similarly here, it can be said that any conspiracy with respect to Plaintiff ceased to exist after Plaintiff no longer participated in any trades that would have exposed him to injury. Conspiracy's "exception to the general rule of standing" is not so broad that defendants who join a conspiracy after a plaintiff can no longer be injured by it can be pursued by that plaintiff.

Moreover, even if *Haas* were an Article III case, Plaintiff still would not have standing. *Haas* would permit Plaintiff to sue the eight[5] market makers with whom he directly traded for other class members' 10(b) and unjust enrichment claims. These claims satisfy *Haas* because Plaintiff has *some* claims against all of these Defendants, and class members' other claims against these Defendants (i.e. their claims for trades that occurred at times Plaintiff was not trading) are nearly identical. But adding the conspiracy allegation does not then let him also assimilate claims that class members have against other parties. This is true even if the other parties conspired with the parties that Plaintiff does have claims against. In *Haas*, the plaintiff could only adopt class members' claims against defendants the plaintiff could already sue for other claims; he was not permitted to adopt claims against additional defendants. 526 F.2d at

---

[5] Or perhaps only seven. *See* Member Def. Reply Sup. Mot. Dismiss at 24 n.15 ("The Deutsch Declaration states that Exhibit B identifies eight Member Defendants. … In fact, it identifies seven.").

1095.[6]

In summary, Plaintiff lacks standing to sue Summit, and Plaintiff's claims against Summit will be dismissed.

### B. As to Sumo

Next, I turn to Defendant Sumo Capital LLC's ("Sumo") contention that Plaintiff lacks standing to assert claims against Sumo for transactions that occurred in December, 2013 involving Pfizer options.  Sumo contends that Plaintiff does not allege that he actually participated in any options transactions in that round of ex-dividend options trades.  Therefore, Sumo argues, citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Plaintiff has not alleged he suffered an injury in fact and cannot satisfy the requirements of Article III standing.

Plaintiff supports his standing for claims arising out of the December 2013 trading with essentially the same arguments he uses to support his claim of standing against Summit.  He argues that he "Has Standing to Assert Claims Against the Eight Member Defendants Who Injured Plaintiff in the Pfizer Dividend Play With Respect to Any Dividend Play the Eight Member Defendants Engaged in After the Pfizer Dividend Play."  Pl. Mot. Opp. to Sumo's Mot. Dismiss at 9.  Plaintiff argues that under *Haas* he can sue those Defendants as to any *other* dividend play in which they engaged because he may represent class members' claims against those Defendants.  *Id.*  Finally, Plaintiff argues that "it was the overall conspiracy that injured the subsequent option investors, not just the eight Member Defendants in the Pfizer Dividend Play," so Plaintiff can maintain all class members' claims against all Defendants.

---

[6] This distinction makes sense from the perspective of judicial economy.  Adding additional *claims* against a defendant already properly in a lawsuit imposes a much smaller burden on courts and parties than adding additional *parties* to the lawsuit.

As discussed above, Plaintiff's elaborate standing argument appears to conflate Article III standing with the Rule 23 analysis in *Haas* and overextends *Haas* itself.

However, as I read the Complaint, Plaintiff is asserting that Sumo was part of a conspiracy to engage in unlawful practices at times that Plaintiff was trading.  Unlike Summit, Sumo does not attempt to argue that it could not have been part of the conspiracy that Plaintiff alleges.  Plaintiff plausibly alleges that the trades that injured him required coordination to work because pairs of market makers needed to agree in advance to buy and sell similar large numbers of options.  I do not believe that participation in the alleged conspiracy requires each conspirator to engage in dividend plays on every ex-dividend date.  It would logically be a feature of such a conspiracy that the participation of too many market makers in any particular ex-dividend play would dilute participants' earnings.  It follows that to pursue the goals of the conspiracy Plaintiff has alleged, co-conspirators would refrain from trading at every single opportunity and instead make efforts to avoid making dividend plays at the same time as too many other conspirators.  Thus Plaintiff has alleged Sumo's participation in a conspiracy that injured Plaintiff, even if Plaintiff and Sumo did not buy and sell options related to the same ex-dividend date.  I conclude that Plaintiff has standing to pursue his claims against Sumo.  For these reasons, I also conclude Plaintiff may pursue his claims against Defendants BlueFin, HAP, and TSR.[7]

### C.  Administrative Exhaustion

The Exchange Defendants argue that the Court lacks jurisdiction because Plaintiff did not exhaust required administrative remedies.  Administrative exhaustion is a bar to subject matter

---

[7] Bluefin, HAP, SUMO, and TSR filed a separate supplemental reply arguing Plaintiff has no standing to sue them. Doc. 141.

jurisdiction, so, as with standing, I must address the issue of administrative exhaustion to determine whether I have jurisdiction before reaching any substantive issues. *PennMont Securities v. Frucher*, 586 F.3d 242, 246 (3d Cir. 2009).

The Exchange Defendants contend that Plaintiff's complaint against them amounts to nothing more than dissatisfaction with the fee caps that the Exchange Defendants enacted. They are correct to the limited extent that it is the fee caps that enable the massive dividend plays by the market maker Defendants. The Exchange Defendants go on to argue that enacting the fee caps was an exercise of their regulatory functions as a "Self-Regulatory Organization,"[8] and that Plaintiff must first bring his complaints to the SEC and exhaust administrative remedies there.

Plaintiff responds with two reasons why administrative exhaustion should not bar his claims. First, Plaintiff contends that he is challenging "business activities," and not any "regulatory function." Pl. Mem. Opp. Mot. Dismiss at 12. "The SEC's administrative remedies are applicable only to exchanges' actions that invoke the SEC's regulatory powers. Because the fee cap inducing the dividend play does not invoke the Exchange Defendants' regulatory powers, there is nothing to appeal to the SEC." *Id.* Second, Plaintiff argues that exhaustion is not required because the SEC's administrative remedies "do not provide for money damages," and so pursuing administrative remedies would be futile. *Id.* at 13.

As the Supreme Court explained in *McCarthy v. Madigan*, for many decades, courts have enforced administrative exhaustion requirements "because it serves the twin purposes of protecting administrative agency authority and promoting judicial efficiency." 503 U.S. 140, 146 (1992). The Court explained that "where Congress specifically mandates, exhaustion is required. … But where Congress has not clearly required exhaustion, sound judicial discretion

---

[8] The nature and function of SROs is discussed extensively in Section V below.

governs." *Id.* at 144.   The Court explained that traditionally, courts considering administrative

exhaustion have considered factors such as whether exhaustion "may occasion undue prejudice

to subsequent assertion of a court action," whether an administrative agency "was empowered to

grant relief," or whether there are signs "the administrative body is shown to be biased …"  *Id.* at

146–48.   In *McCarthy*, the Court determined that Congress had not mandated exhaustion for

prisoners' complaints before they could file *Bivens* actions for money damages.  *Id.* at 152.   The

Court then turned "to an evaluation of the individual interests at stake" and concluded that it

should not require exhaustion.  *Id.* at 152–54.   The broader principles of *McCarthy* remain valid,

notwithstanding the fact that Congress has superseded the specific holding of the case through

legislation.[9]

The Exchange Defendants do not identify any statute that explicitly requires exhaustion

in this case, but they point out that many courts have required exhaustion for certain claims

against exchanges.

*Standard Inv. Chartered, Inc. v. Nat'l Ass'n Sec. Dealers*, No. 7-2014, 2007 U.S. Dist.

LEXIS 32566 (S.D.N.Y. May 2, 2007), provides a good review of cases where exhaustion has

been required.  2007 U.S. Dist. LEXIS 32566, at *6–7.  The list included challenges to exchange

disciplinary proceedings, delisting disputes, and SRO rule changes.  *Id*.  The court explained that

it is in the context of disciplinary proceedings that "the exhaustion doctrine has been most fully

developed."  *Id.* at *13.  The case did not involve a disciplinary action; rather, plaintiff

challenged two SROs' decisions to consolidate into one entity.  *Id.* at *2–5.  The defendant

changed its bylaws to accomplish the consolidation, and that change was a rule change that had

to be approved by the SEC.  *Id.* at *3, *11–12.  The court reasoned that the plaintiff could have

---

[9] *McCarthy*, which involved the rights of prisoners to bring suits against federal officials, was superseded, as
recognized in *Arctic Express, Inc. v. United States Dept. of Transp.*, 194 F.3d 767, 769 (6th Cir. 1999).

sought adequate remedies to the defendant's action, including an injunction against the challenged rule or a rule change. *Id.* at *19–20 ("The exhaustion doctrine is especially appropriate here, where all of the remedies sought by [plaintiff] are either provided by the Exchange Act's administrative scheme or are plainly improper. [Plaintiff] seeks primarily declaratory and injunctive relief …." ). The plaintiff's request for damages was also subject to exhaustion because the request was "based entirely on a future contingency." *Id.* at *21. *See also Swirsky v. Nat'l Ass'n of Sec. Dealers*, 124 F.3d 59, 63 (1st Cir. 1997) (requiring exhaustion in challenge to disciplinary action); *Altman v. SEC*, 687 F.3d 44 (2d Cir. 2012) (same); *Cook v. NASD Regulation, Inc.*, 31 F.Supp.2d 1245 (D. Colo. 1998) (requiring exhaustion in challenge to Exchange actions related to the settlement of a disciplinary action).

In *PennMont Securities v. Frucher*, the Third Circuit found exhaustion was required for a challenge to a fee shifting rule that the exchange enacted. 586 F.3d 242, 245–46 (3d Cir. 2009). The court wrote:

> Once a self-regulatory organization, such as the Exchange, issues a final ruling, that decision is subject to administrative review by the SEC. 15 U.S.C. § 78s(d)(1)-(2). If an aggrieved party is dissatisfied with the SEC's determination, it can obtain further review from the United States Court of Appeals for the circuit in which the aggrieved party resides.

*Id.*

Plaintiff cites counterexamples of his own. In *Barbara v. N.Y. Stock Exch.., Inc.*, an Exchange disciplinary committee charged Barbara, a floor clerk, with various violations and barred him from the Exchange floor. 99 F.3d 49, 52 (2d Cir. 1996). Barbara filed a lawsuit alleging various claims for damages and declaratory relief. The Second Circuit affirmed the trial court's decision to require administrative exhaustion of Barbara's claims for declaratory and injunctive relief because these future Exchange actions "should properly be contested in the

ordinary course of administrative proceedings …" *Id.* at 57.  However, with respect to the plaintiff's damages claims, "the administrative review provisions of the Act do not provide for money damages, and this fact counsels strongly against requiring exhaustion." *Id.*  The court concluded that it would not require administrative exhaustion for the plaintiff's claims "seeking compensation for past harms, rather than the reversal of an adverse Exchange determination." *Id.*  In *Opulent Fund, L.P. v. NASDAQ Stock Mkt.*, No. 7-2683, 2007 U.S. Dist. LEXIS 79260 (N.D. Ga. October 12, 2007), the court found that a plaintiff could challenge an exchange's actions in calculating the NASDAQ 100 index because the index was a product rather than an exercise of any regulatory function.  The index "does not function to protect investors; instead, Nasdaq's actions function to create a market and increase trading." *Id.* at *14.   The court concluded that administrative exhaustion was not required because "Nasdaq's actions do not partake of the same 'regulatory' character as suspending trading, banning traders, or carrying out disciplinary actions.  These actions all involve oversight of the market to protect investors; facilitating derivative trading does not. Nasdaq's market facilitating actions at issue in this case were non-regulatory." *Id*.  As to the argument that the plaintiff challenged a rule that the SEC had approved, the court explained:

> That the SEC approved the pricing formula against which Nasdaq's conduct will be judged does not automatically convert Nasdaq's conduct into an immunized "regulatory function."  SEC approval of a rule imposing a duty on an SRO is not the sine qua non of SRO immunity; engaging in regulatory conduct is.

*Id*.

The Exchange Defendants counter that *Barbara* conflicts with Third Circuit law as enunciated in *PennMont*.  Exchange Defendants argue that *PennMont* declared that there are only two narrow exceptions to the administrative exhaustion requirement:

> 1) when the administrative procedure is clearly shown to be inadequate to prevent irreparable injury; or 2) when there is a clear and unambiguous statutory or constitutional violation.

*PennMont Securities*, 586 F.3d at 246 (citing *First Jersey Securities, Inc. v. Bergen*, 605 F.2d 690, 696 (3d Cir. 1979)).

I find no conflict between the Second Circuit's holding in *Barbara* and the controlling Third Circuit case law. *PennMont* identified two exceptions to exhaustion requirements that apply "when a litigant refuses to exhaust the available administrative remedies provided by the Exchange Act." *PennMont*, 586 F.3d at 246. In that case, the plaintiff sought a prospective injunction against a rule the Exchange adopted, and the Third Circuit identified the specific SEC administrative procedure designed to permit entities like *PennMont* to challenge the exchange decision at issue in the case: 15 U.S.C. § 78y. *PennMont*, 586 F.3d at 246. In contrast, in *Barbara* a party sought money damages as compensation for a past injury. There effectively was no "available administrative remedy" for the injured party. In *Barbara*, the court pointed out that "Barbara has alleged that the Board ultimately ruled in his favor. Barbara's suit is akin to an action for malicious prosecution brought following a determination favorable to the defendant, and the monetary compensation that he seeks cannot be realized through the administrative review procedures of the Exchange Act." *Barbara*, 99 F.3d at 57. Where administrative remedies are not actually available, a court need not get to the question of whether extraordinary circumstances of a case justify waiving the exhaustion requirements.

Additionally, the Third Circuit has explained in other decisions that the "exceptions" to administrative exhaustion requirements are not exclusively limited to the

two articulated in *PennMont*.  *See Tutein v. Insite Towers, LLC*, 572 Fed. App'x 107, 111

(3d Cir 2014) ("These exceptions to the exhaustion requirement, of (1) futility, (2)

violation of statutory or constitutional rights, and (3) inadequate to prevent irreparable

harm, remain good law.") (citing, in addition to *PennMont*, *LaVallee Northside Civic

Ass'n v. Virgin Islands Coastal Zone Mgmt. Comm'n*, 866 F.2d 616, 620 (3d Cir. 1989)).

In the absence of Congressional instructions requiring exhaustion, administrative

exhaustion has always required a careful analysis of the facts of a case rather than a

formulaic application of a rule.

   Having reviewed these authorities, I am persuaded that administrative exhaustion does

not require dismissal.  Exchange Defendants have not identified any administrative procedure

that is available to remedy the wrong Plaintiff alleges.  It is true that the SEC can take a wide

range of actions with respect to the fee cap rule, including enjoining the rule, amending it, and

even bringing its own lawsuit.  An investor such as Plaintiff could even file a petition with the

SEC seeking prospective relief, asking the SEC to enjoin a rule, or could file comments asking

the SEC to suspend the rule change and institute proceedings to determine whether it should be

disapproved.  17 C.F.R. § 201.192; 15 U.S.C. § 78s(b).  "The absence of any monetary remedy

in the grievance procedure also weighs heavily against imposing an exhaustion requirement."

*McCarthy*, 503 U.S. at 154.  Repeal of the fee cap might be a remedy, but only a *prospective*

remedy.  Plaintiff claims that the Exchange Defendants created the fee cap as part of a plan to

enable market makers to manipulate options trading, and that this conspiracy deprived Plaintiff

and other class members of certain income in the past.  Participation in such a conspiracy for the

purpose of increasing its revenues (if Plaintiff could prove it) would certainly not be a regulatory

function of the Exchange, and the Exchange Defendants have not shown (and I have not found)

any administrative remedies that could accomplish anything for Plaintiff other than prospectively altering the fee cap itself.  No remedies have been identified that would address the past injuries or even prospectively address the actual wrongful conduct alleged.

On a final note, Exchange Defendants rely heavily on *Citadel Securities et al. v. Chicago Bd. Option Exch., Inc.*, No. 13-5833, slip op. at 3–4 (N.D. Ill. Aug. 4, 2014).  That case required exhaustion for market makers who sued an exchange to recover improperly charged fees.  The case before me is readily distinguishable because Plaintiff is asking for compensatory damages for fraud rather than reimbursement of fees he paid the Exchange.  In *Citadel*, the plaintiff alleged that an exchange, by enforcing a fee rule, improperly extracted a sum of money from him that the plaintiff wanted back, but here, Plaintiff alleges that Exchange Defendants' fee caps enabled a fraud that injured him.  The direct cause of the plaintiffs' injuries in *Citadel* was the challenged rule, and the remedy sought was essentially rewinding the rule.  There was no need to inject a federal court into a straightforward dispute between an exchange and its market makers.  But here, the plaintiff alleges Exchange Defendants employed the fee cap rule as part of a larger unlawful enterprise that involved market makers and injured retail investors who are not members of the exchange.  The causal connection between the rule and Plaintiff's injuries is not as simple, and the remedy is not so direct that federal court involvement in inappropriate.

To conclude, I do not find that administrative exhaustion deprives me of jurisdiction over Plaintiff's claims.

## IV. Timeliness of 10(b) claim

Several parties challenge the timeliness of Plaintiff's suit.  Defendant Sumo argues in its Motion to Dismiss that Plaintiff's claims based on trading activity in 2010 and 2011 are time barred.  The rest of the Member Defendants, with the exception of Summit (to whom I will refer

as the "Market Makers"), make a similar argument in their joint motion.  Market Makers' Mem. Supp. Mot. Dismiss, Docket 112, at 24–26.

For claims arising under 10(b) and Rule 10b-5, courts apply a statute of limitations that applies to federal civil actions involving claims of fraud or deceit.  *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 637 (2010); 28 U.S.C. § 1658.  Under this statute, claims may not be brought later than either "2 years after the discovery of the facts constituting the violation; or 5 years after such violation," whichever comes first.  28 U.S.C. § 1658(b).  When determining when a fraud is "discovered," courts apply a "discovery rule," which holds that the statute of limitations period for a Section 10(b) securities claim begins "not only once a plaintiff *actually* discovers the facts, but also when a hypothetical reasonably diligent plaintiff would have discovered them."  *Merck*, 559 U.S. at 646–647.  For Pennsylvania unjust enrichment claims, a four year statute of limitations applies.  *Cole v. Lawrence*, 701 A.2d 987, 989 (Pa. Super. Ct. 1997).  Pennsylvania courts also apply the discovery rule to unjust enrichment claims.  Pa. C.S. § 5525(a)(4); *Ruddy v. Mt. Penn. Borough Mun. Auth.*, Nos. 1120 C.D. 2013, 1200 C.D. 2013, 2014 WL 1852002 (Pa. Commwlth. Ct. May 6, 2014).

Plaintiff does not dispute that he alleges wrongdoing in 2010 and 2011 or that he filed his suit in 2015.  The key question, then, is whether he can rely on the discovery rule to argue that a reasonably diligent plaintiff would not have discovered the facts giving rise to Plaintiff's claims within the statutes of limitations.

I find the discovery rule applicable to toll the statute.  Defendants point to various facts that might have raised flags for diligent investors.  There have been general reports in the public sphere about the type of options trading that Plaintiff alleges.  *See, e.g.* Sumo's Mem. Supp. Mot. Dismiss at 8 (citing Self-Regulatory Organizations, Exchange Act Release No. 34-72677, 79 FR

44480, 44481 (July 31, 2014)).  The options trades themselves are publicly reported.  Plaintiff knew that his own options were called away and he did not collect dividends.

Plaintiff persuasively argues that such facts would not have revealed the basis for the claim he now pursues.  Just because it is public knowledge that a particular type of trading happens does not mean that a reasonable investor would know it happened in a way that injured *him*.  Furthermore, I cannot find that "reasonable options investors follow the daily trading volume of their options."  Pl. Mem. Opp. Member Defendants' Mot. Dismiss at 45.  According to Defendants, the volume of options trades does not impact price.[10]  Why would a diligent investor investigate the volume of options trading activity unless he *already* believed that market makers were engaging in dividend plays?  I can find no answer in Defendants' papers.  Finally, I do not believe that a reasonable investor's knowledge that his own options were called, would have, at that point, triggered the statutes of limitations at issue here.  Assignments are supposedly a random process, and while a reasonable investor would expect, on average, to skate in an amount proportional to the open interest and his own call volume, a reasonable investor would also understand that statistical outliers are bound to happen at some point.  Shooting three "sevens" in a row at a casino's craps table is unlikely, but if it happens, the dice are not necessarily loaded.

For these reasons, I am not persuaded that Plaintiff's claims have run out the relevant statutes of limitations.

### V.  SRO Immunity

Next I consider the Exchange Defendants' argument that they are shielded from liability by a judicially created doctrine known as Self-Regulatory Organization Immunity ("SRO

---

[10] Defendants' arguments about the merits of the 10(b) claim depend on the premise that vastly expanding the volume of options does not affect the price of any security.

Immunity").   As yet, there is no Third Circuit decision addressing this defense.  It was first recognized in this District by *In re Olick*.  No. 99-5128, 2000 WL 354191 at *3 (E.D. Pa. April 4, 2000).  *Olick* involved a claim that an SRO had injured the plaintiff by breaking the SRO's own rules.  While recognizing the absence of controlling precedent, the Court observed that "[t]he Second, Fifth, and Ninth Circuits have all decided the issue, however, and held that self-regulatory organizations … are immune from liability for actions taken in furtherance of their regulatory duties"  *Id.* at *4.  The court held "that the NASD is immune from suit when acting under the aegis of the Exchange Act's delegated authority," and that the plaintiff's claims fell within the scope of such activity, rendering it immune.  *Id.*

In the absence of controlling authority from either the Supreme Court or the Third Circuit, some review of SRO immunity is warranted.  The Securities Exchange Act of 1934 authorized exchanges to provide front-line supervision for the securities industry, by overseeing daily operations and promulgating rules that facilitate the trading and protect the investors.  To a large extent, the Act institutionalized the securities industry as self-regulating.  It was, however, a long journey from Congressional recognition of the importance of exchanges to the judicially created doctrine of SRO immunity.  The rule has its roots in the Supreme Court's decision in *Butz v. Economou,* 438 U.S. 478 (1987), which began the process of extending the type of immunity previously limited to judicial officers to other high governmental officials.  The Fifth Circuit was the first appellate court to import similar principles into securities litigation, but it limited the scope of the defense to individual employees performing functions that were "characteristic of the judicial process."  *Austin Mun. Sec., Inc. v. Nat'l Ass'n of Sec. Dealers,* 757 F.2d 676, 688 (5th Cir. 1985).   In recognizing such a defense, the Fifth Circuit limited its

application to circumstances where "sufficient safeguards exist in the regulatory framework to control unconstitutional conduct." *Id.*

*Austin* was embraced by the Second Circuit in *Barbara v. N. Y. Stock Exch., Inc.*, 99 F.3d 49, 59 (2d Cir. 1996)*,* which held that exchanges themselves should be granted absolute immunity from claims arising out of the performance of federally-mandated disciplinary proceedings.   Although the Court purportedly declined to confer sovereign immunity, it stated that the defendant NYSE's "special status and connection to the SEC" supported immunity.  The Ninth Circuit then expanded the defense beyond disciplinary proceedings in *Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers*, 159 F.3d 1209, 1213 (9th Cir. 1998), where a securities issuer challenged an exchange's decision to temporarily delist its new security.  *Id.* at 1210. While recognizing that the defense had previously been limited to quasi-judicial proceedings involving member discipline, the court concluded that the rationale for granting immunity exists whenever an exchange is exercising quasi-governmental authority.  It held that suspension of trading was regulatory in nature, and therefore "cloaked in immunity."  *Id.* at 1215.  *See also D'Alessio v. N.Y. Stock Exch., Inc.*, 258 F.3d 93, 105 (2d Cir. 2001) (immunity exists when an exchange's "regulatory and general oversight function" are implicated.).  The Second Circuit has even gone so far as to extend immunity in the face of allegations of fraud.  In *DL Capital Group, LLC v. NASDAQ,* 409 F.3d 93, 99 (2d Cir. 2005), it rejected a claim that an exchange's cancellation of trades without  disclosing its intention to do so constituted material misrepresentation, specifically holding that recognition of a fraud exception would undermine the absolute nature of the defense.

The expansion of absolute immunity was questioned by the Eleventh Circuit, sitting *en banc*, in *Weissman v. Nat'l Ass'n of Sec. Dealers*, 500 F.3d 1293 (11th Cir. 2007).  Plaintiff there

alleged that an exchange made material misrepresentations in the promotion of WorldCom stock, a company that collapsed in 2002, in order to increase the exchange's revenue.  *Id.* at 1294.  The court expressed concern over the broad scope of SRO immunity in the Second Circuit and held that the defense should be narrowly construed.  *Id.* at 1298.  It drew a sharp distinction between an exchange's governmental functions and its for-profit commercial activity, and emphasized that immunity should apply only to adjudicatory, regulatory, or prosecutorial activities.  To some degree, this caution  appears to have resonated within the Second Circuit, as exemplified by *In re NYSE Specialists Securities Litigation,* 503 F.3d 89 (2d Cir. 2007).  There, even as the court reaffirmed its earlier decisions on SRO immunity, (in an opinion by then Judge Sotomayor), it directed the lower court to consider whether the defendant exchange should enjoy immunity for alleged misrepresentation about market integrity, citing *Weissman*.  *Id.* at 102–03.

One cannot help but wonder if SRO immunity would have put down such strong roots at a later point in American financial history.  It cannot be disputed that exchanges are far more than backgrounds where trading takes place.  They have evolved over time into entrepreneurial engines in their own right, sometimes competing with the members they seek to regulate. Zachary Flati, *A Modest Proposal:  Right-Sizing Exchange Immunity*, J. OF SEC. OPERATIONS AND CUSTODY, Vol 7, No. 3, p. 218 (2015).  As one telling example, in 2005 the New York Stock Exchange acquired electronic trading company Archipelago, Inc. and transformed itself into a publicly traded company in order to compete with rival markets.[11]  In a post-2008 world, the notion that that exchanges exist only to serve as neutral regulators would be considered extreme naiveté.  In the absence of controlling precedent from the Third Circuit, I am persuaded

---

[11] *Wall Street Journal*, April 21, 2005, "NYSE to Acquire Electronic Trader  and Go Public", *available at* http://www.wsj.com/articles/SB111402555895712242, (updated April 21, 2005).

that the *Weissman* formulation of the rule, with its emphasis on the need to apply the defense more narrowly, represents the better approach.

Because absolute immunity is designed to shield entities from litigation, not just liability,[12] even the Eleventh Circuit has held that the *intent* of an Exchange is irrelevant to the analysis. *Weissman* 500 F.3d at 1297 ("To determine whether an SRO's conduct is quasi-governmental, we look to the objective nature and function of the activity for which the SRO seeks to claim immunity. The test is not an SRO's subjective intent or motivation."). *See also In re NYSE Specialists Sec. Litig.,* 503 F.3d at 98 (test for immunity focused on function, not intent). If immunity depended on an SRO's intent, the purpose of the doctrine would be frustrated, as ordinarily eligibility could not be determined until an advanced stage in the litigation.

The question then is whether the fee cap that is the focus of this case is regulatory in nature. This is not a case of obvious commercial activity, as in *Weissman,* where the Eleventh Circuit denied immunity for promoting a particular stock, or *In re Facebook*, *Inc. IPO Securities and Derivative Litigation,* 986 F.Supp. 2d 428, 450–52 (S.D.N.Y. 2013), where immunity was denied for the development and promotion of software. In these cases, the Exchanges are essentially doing what any private enterprise could do: developing and selling a product.

This case is more analogous to *In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 126 F.Supp.3d 342 (S.D.N.Y. 2015), where the court held that the "creation of complex order types" was a regulatory function because "[b]y establishing a defined set of order types, the Exchanges police the ways in which users of an exchange are able to interact with each other." *Id.* at 357. Similarly, though it was a closer call, the creation of a proprietary data feed about

---

[12] See *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) ("we have repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation").

market activity fell "within the scope of the quasi-governmental powers delegated to the Exchanges." *Id.* at 358.  The court explained, "[a]t bottom, Congress and the SEC have delegated to the Exchanges the task of disseminating market data as part of a market system.  In doing so through proprietary data feeds, the Exchanges are performing that task no less than when they do so through the consolidated feed." *Id.*[13]

Plaintiff largely relies on claims about the Exchange Defendant's intentions in enacting the cap:

> the Exchange Defendants established the fee caps to encourage the dividend play, not for any regulatory, adjudicatory nor prosecutorial purpose.  The fee caps exist solely to increase the Exchange Defendants' trading volume and revenues therefrom.

Pl. Mem. Opp. Exchange Defs' Mot. Dismiss at 9.  In support, Plaintiff relies heavily upon *Opulent Fund L. P. v. NASDAQ Stock Market Inc.,* No. 7-3683, 2007 WL 3010573 (N. D. Cal. Oct. 12, 2007).  There, the defendant exchange created an index of the largest non-financials securities traded, known as "the NASDAQ-100."  The exchange then priced the value of that index.  An investor who purchased options tied to the index contended that NASDAQ had acted negligently in setting the price and brought suit.  The court rejected immunity, finding that the exchange chose to create the index and disseminate information about it "because of profits from selling the market price data." *Id.* at *12.  Plaintiff here contends that the fee cap is  analogous to the pricing activity in *Opulent*  because defendants here benefit from the trading activity which the fee cap enables. The weakness in this argument is that many different regulations can have the effect of facilitating certain kinds of trading from which an exchange then earns revenue,

---

[13] This distinction between "products" and conduct taken pursuant to delegated legal authority is not bulletproof. Reasonable minds could certainly disagree about whether a particular action by an Exchange falls into one category or another.  But until we receive better guidance from Congress or a higher court, we must work with what we have.

but that secondary effect does not change essentially regulatory nature of the conduct. Furthermore, to the extent that Plaintiff's argument depends upon intent, such an approach is unworkable in the context of threshold immunity.

Plaintiff further argues that creating a fee cap is not a regulatory function, because 1) "the Exchange Defendants' facilitating the dividend play through preferential pricing does not involve oversight of the market to protect investors," and 2) "[t]he SEC, in its regulatory capacity, would not establish a price schedule for effectuating exchange transactions." *Id.* at 10. The first argument is simply a restatement of Plaintiff's contention that intent is controlling, a position I have rejected. The second argument fails because it is an integral part of the securities regulatory scheme is that the SEC delegates to exchanges activities that the SEC itself does not perform. The SEC is not an exchange, so the fact that its area of responsibility extends to trading itself does not mean that a rule regulating trades constitute commercial activity. Indeed, many of the cases recognizing immunity have dealt with trade-related conduct. *See, e.g.*, *In re NYSE Specialists Sec. Litig.,* 503 F.3d at 99*; D'Alessio*, 258 F.3d at 105.

Immunity comes with a cost. As recognized by the Second Circuit, "absolute immunity by its very nature necessarily gives rise to a risk that reprehensible conduct—whether active or passive—will go unpunished …" *In re NYSE Specialists Sec. Litig.,* 503 F.3d at 97. Though I am concerned that SRO immunity fails to take into account the degree to which the profit-making incentives of exchanges overshadow their regulatory responsibility, the Defendant Exchanges have persuaded me that enacting the fee cap that Plaintiff challenges was a regulatory function. The Exchanges regulate trading, and that must include regulating fees that should or should not be paid for certain transactions.

The fee cap is nothing like a product that the Exchanges developed and marketed. Setting (or not setting) fees on transactions is more "regulatory" than even the proprietary data feeds the court in *In re Barclays* determined were a regulatory function.  2015 U.S. Dist. LEXIS 113323 at *33–34.  The fact that the Exchanges earn a profit on the volume of trading that is facilitated by the fee cap is not enough to render the establishment of the cap commercial as opposed to regulatory activity.

Because SRO immunity shields the Exchange Defendants in this case, Plaintiff's claims against them must be dismissed.

## VI. Sufficiency of the 10(b) claim

Next I consider the remaining Market Makers' challenges to the sufficiency of Plaintiff's claim under Section 10(b) of the Exchange Act and Rule 10b-5.  Defendants argue that the claim must be dismissed because it fails to allege specific elements of the 10(b) claim, and in particular fails to plead fraud under Federal Rule of Civil Procedure 9(b) with sufficient particularity.

Congress enacted the Exchange Act in 1934 "in the wake of the 1929 stock market crash and in response to reports of widespread abuses in the securities industry …"  *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 171 (1994).  Section 10(b) of that Act, now codified at 15 U.S.C. § 78j, prohibits:

> any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
> ….
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement[1] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. §78j.  The SEC adopted the related Rule 10b-5 in 1942.  *Central Bank of Denver, N.A.* at 172.

The Exchange Act did not include an explicit private right of action for violations of this statute.   However, courts for decades have recognized the section provides an implied private right of action.  *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975).  This implied right of action has strict limits.   "The scope of the private right of action is more limited than the scope of the statues upon which it is based." *Chadbourne & Parke, LLP v. Troice*, 134 S.Ct. 1058, 1063 (2014).  For example, 10(b) claims are limited to claims by actual purchasers and sellers of securities rather than mere offerees.  *Blue Chip Stamps, Inc.*, 421 U.S. at 731.[14] Section 10(b) is not a federal cause of action for all frauds.  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 162 (2008) ("Section 10(b) does not incorporate common-law fraud into federal law.").  The Supreme Court, interpreting Congressional actions, has also directed lower courts that the implied right of action should not be expanded.   In *Stoneridge*, the Court explained that Congress "imposed heightened pleading requirements and a loss causation requirement upon 'any private action' arising from the Securities Exchange Act."  *Id.* at 165. "Though it remains the law, the § 10(b) private right should not be extended beyond its present boundaries."  *Id.*

A 10(b) claim may be based on allegations of misrepresentation or manipulation. The elements of a misrepresentation claim are well established.  To state a misrepresentation claim under 10(b), a plaintiff must show:

> (1) *a material misrepresentation (or omission)*;
> (2) *scienter, i.e.*, a wrongful state of mind;

---

[14] In *Blue Chip*, a party allegedly made a fraudulent offer of securities in the hopes that the offer would be rejected "in order to discourage respondent [and others] … from accepting what was intended to be a bargain offer so that the rejected shares might later be offered to the public at a higher price."  *Blue Chip Stamps*, 421 U.S. at 726–27.

(3) *a connection with the purchase or sale of a security*;
(4) *reliance,* often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation;"
(5) *economic loss*; and
(6) "*loss causation*," *i.e.*, a causal connection between the material misrepresentation and the loss.

*McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007) (emphasis in original); *Dura Pharma. v. Broudo*, 544 U.S. 336, 341 (2005).

The elements of a manipulation claim are similar. The Third Circuit explained that when alleging a Section 10(b) violation (as part of a Section 29(b) affirmative defense), a claimant must show that its opponent "engaged in deceptive or manipulative conduct by injecting inaccurate information into the marketplace or creating a false impression of supply and demand for the security … for the purpose of artificially depressing or inflating the price of the security." *GFL Advantage Fund, LTD. v. Colkitt*, 272 F.3d 189, 207 (3d Cir. 2001). In *Jones v. Intelli-Check, Inc.*, 274 F.Supp. 2d 615, 626 (D.N.J. 2003), the court took the principles set forth in *GFL Advantage* and combined them with other settled law to define the elements of a10(b) private claim of manipulation as follows:

> *Colkitt*, read in conjunction with the well-established law on pleading a Section 10(b)/Rule 10b-5 claim, instructs that in order to state a claim of market manipulation, a plaintiff must plead that:
> (1) In connection with the purchase or sale of securities,
> (2) defendant engaged in deceptive or manipulative conduct by injecting inaccurate information into the marketplace or creating a false impression of supply and demand for the security;
> (3) that plaintiff reasonably relied on the artificial stock price;[15]
> (4) that plaintiff's reliance proximately caused plaintiff's damages; and
> (5) that defendant acted with scienter.

*Jones*, 274 F. Supp. 2d at 627–28.[16]

---

[15] Because manipulation was raised as an affirmative defense in *GFL Advantage v. Colkitt*, the Third Circuit found no requirement to prove reliance or damages. *Id.* at 206 n. 6.

It also bears emphasis that because Plaintiff's complaint alleges fraud, it must withstand the heightened particularity requirement of Federal Rule of Civil Procedure 9(b).  *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1417 (3d Cir. 1997) (the "particularity requirement has been rigorously applied in securities fraud cases.").

I find that Plaintiff fails to state multiple elements of his claim.

### A.  Manipulation

A Section 10(b) manipulation claim must allege that the defendants engaged in manipulative conduct.  The Supreme Court wrote in *Ernst & Ernst v. Hochfelder* that the term manipulation is "a term of art when used in connection with securities markets."  425 U.S. 185, 199 (1976).

I agree with Defendants that the conduct Plaintiff has alleged does not fall within the definition of manipulation that applies to claims brought under Section 10(b)'s implied right of action, the conduct must involve price manipulation.  In *Ernst & Ernst*, the Supreme Court recognized that "manipulation" in securities cases "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities."  *Id.*  More recently in *GFL Advantage Fund, LTD v. Colkitt*, the Third Circuit stated that a party alleging securities manipulation that violates Section 10(b) must show Defendants were "injecting false inaccurate information into the marketplace or creating a false impression of supply and demand for the stock."  272 F.3d at 207.  In *GFL Adv. Fund.*, the Third Circuit ruled that there was no evidence a party short selling stocks was injecting inaccurate information

---

[16] Plaintiff cites to *Fezzani v. Bear, Stearns & Co., Inc.* for the elements of a 10(b) manipulation claim.  716 F.3d 18, 23 (2d Cir. 2013).  *Fezzani* describes essentially the same elements as *Intelli-Check*, but does not incorporate the Third Circuit's description of "manipulation" from *GFL Adv. Fund.*  "Valid securities-manipulation claims under Section 10(b) must allege: (1) manipulative acts; (2) damage; (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange."  *Fezzani*, 716 F.3d at 23.

into the market or creating any false impressions about supply and demand, principally because there was no evidence that the party's short sales were sham transactions or involved any false information. *Id.* at 207–08.

The Second Circuit has also made statements suggesting limits to the definition of manipulation in 10(b) claims. In *Fezzani v. Bear, Sterns & Co., Inc.*, the Second Circuit wrote that "manipulation violates Section 10(b) when an artificial or phony price of a security is communicated to persons who, in reliance upon a misrepresentation that the price was set by market forces, purchase the securities." 716 F.3d 18, 25 (2d Cir. 2013). The second half of this statement appears to relate to the "reliance" element of a 10(b) claim rather than the "manipulation" element, but the first half comports with the Third Circuit's emphasis on the need to prove injection of false information as fundamental to proof of a 10(b) claim for manipulation.

Further underlining the need to demonstrate inaccurate information is the Supreme Court's statement in *Santa Fe v. Green*:

> [T]he Court repeatedly has described the fundamental purpose of the [Exchange] Act as implementing a philosophy of full disclosure; once full and fair disclosure has occurred, the fairness of the terms of the transaction is at most a tangential concern of the statute . … [W]e are reluctant to recognize a cause of action here to serve what is at best a subsidiary purpose of the federal legislation.

430 U.S. 462, 477–78 (1977) (citations omitted).

Here, Plaintiff has not alleged Defendants injected false information into the market. Fundamentally, Plaintiff claims that Defendants abused the advantages conferred on them as market makers by regulations and OCC practices gave them. Plaintiff does not claim they made their options trades in secret, told anyone anything that was not true in connection with their

trading, or engaged in their trades in a way that otherwise shaped the market based on false information.

Plaintiff claims that by making dividend plays, Defendants "created the false impression of market activity."  Pl. Opp. to Mot. Dismiss at 30.  Additionally, it was "[o]nly by exploiting the rules meant to facilitate market making functions [that Defendants were] able to deceive the market into acting on their long positons."  Pl. Opp. to Mot. Dismiss at 31.  These claims mischaracterize the allegedly wrongful transactions.  I am not persuaded that the market activity Defendants generated was "false."  These were hardly sham transactions because Defendants bought and sold options in order to capture open interest.  That is also what Plaintiff did (albeit in much lower volume), and there is no allegation that these transactions misrepresented the value of any of the securities involved.  These transactions also did not "deceive the market into acting on [Defendants'] long positions."  Rather, it was Defendants that decided to exercise their long positions in order to exploit the manner in which the OCC assigned positions and the expected failure of some options purchasers to exercise their own options.

Plaintiff contends that the Exchange Defendants themselves acknowledged dividend plays are "manipulative" when they proposed a change to the Philadelphia Exchange's Rule 782. According to Plaintiff, that change would bar such trades under existing rules precisely because they are manipulative. See Exhibit A, Decl. of Lawrence Deutsch.  The Exchange Defendants dispute this, arguing that the proposed rule amendment is not aimed at dividend plays.  Member Def. Reply Supp. Mot. Dismiss at 7.  Even if Plaintiff were correct that the Exchange Defendants consider dividend plays to be manipulative within the context of Rule 782, such determination

would not necessarily mean that dividend plays are manipulative within the meaning of a private claim under Section 10(b).[17]

The parties dispute whether a plaintiff must allege that a defendant's manipulation had an artificial impact on price. Defendants assert that "[p]rice artificiality is the *sine qua non* of a claim of manipulstion under Section 10(b) and Rule 10b-5" and that "Plaintiff does not allege that the price of any security … was artificial." Mem. Supp. Market Makers' Mot. Dismiss at 17. Defendants further contend that the Third Circuit held in *GFL Adv. Fund v. Colkitt* that manipulation requires a defendant to be "artificially depressing or inflating the price of the security." 272 F.3d at 206. Plaintiff counters that following *GFL Adv.*, the Supreme Court in *S.E.C. v. Zandford* permitted an SEC enforcement action against a broker who stole the proceeds from selling his clients' securities. 535 U.S. 813, 815 (2002). The court below had found that 10(b) did not encompass a claim that was essentially about conversion rather than some form of fraud. *Id.* at 817–18. The Supreme Court reversed, explaining that Section 10(b) "should be construed not technically and restrictively, but flexibly to effectuate its remedial purpose." *Id.* at 819. The broker's alleged thefts were "deceptive because [they were] neither authorized by, nor disclosed to," the victims. *Id.* at 821. This leads Plaintiff to argue that manipulation claims cannot be limited to claims involving artificially influenced securities prices.

I have doubts that *Zandford* can be read so expansively. *Zandford* was an enforcement action by the SEC, so the limitations that courts and Congress have imposed on the private right of action under 10(b) do not apply. Additionally, the element of Section 10(b) at issue in *Zandford* was not whether the broker engaged in "manipulation," but rather whether his theft of

---

[17] See discussion *supra* regarding the distinctions between the statutory meaning of 10(b) and private 10(b) claims.

his clients' securities was "in connection with the purchase or sale of any security." *Id.* at 818.[18]
But I also have doubts that *GFL Adv. Fund* definitively holds that the manipulation element of
private claims under 10(b) must always involve artificially impacted prices.  The court in *GFL*
explained that its dilemma in the case was finding a definition of manipulation that could
distinguish "which activities artificially affect prices and which activities legitimately impact
prices."  272 F.3d at 205.  Market activities that did not have anything to do with the prices of
securities simply were not before the court.  There is nothing in the text of Section 10(b) that
limits manipulation (a concept which, thanks to the boundless creativity of capitalism, can
include many kinds of conduct) to *price* manipulation.

For purposes of this case, I do not have to resolve this quandry.  Apart from the issue of
price, it is clear that manipulation requires the injection of false information into a market or the
creation of a false impression of supply and demand.  Plaintiff has not alleged manipulation that
meets this definition.

I express no opinion on whether the alleged conduct is "manipulative" in the plain
meaning of the word.  However, the implied private right of action under Section 10(b) has been
drawn to remedy some wrongs and not others, and Plaintiff has not shown the conduct alleged
here lies inside 10(b)'s lines.

B.  Reliance

Defendants argue that a plaintiff can only succeed on a manipulation claim under 10(b)
by showing he reasonably relied on a price affected by the defendant's manipulation to enter into
the transaction that caused his injuries.  According to Defendants, Plaintiff cannot make that
showing either directly or by employing a judicially-recognized presumption of reliance.

---

[18] The lower court had found that the real offense in the case was conversion and the presence of securities was
merely incidental.  *Zandford*, 535 U.S. at 818.

Plaintiff counters that he is entitled to a presumption that he relied on an "assumption of an efficient market free of manipulation."  Pl. Mem. Opp. Market Makers Mot. Dismiss at 34 (citing *Fezzani*, 716 F.3d at 22).

As set forth by the Third Circuit in *Malack v. BDO Seidman, LLP*, 817 F.3d 743, 749 (3d Cir. 2010), courts employ presumptions for a variety of different reasons, including fairness, public policy, and logical probability.  This includes situations where proof is difficult, or where a party has superior access to the relevant evidence.  In the context of securities litigation, both the policy interests underlying the statutes, and the logical inferences that that can be drawn from certain varieties of market conduct, carry particular weight.

In the absence of direct evidence, courts have granted plaintiffs a presumption of reliance in certain circumstances.  The Supreme Court explained that it has "found a rebuttable presumption of reliance in two different circumstances."  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148 (2008).  In the first circumstance, a plaintiff is entitled to an assumption of reliance "if there is an omission of a material fact by one with a duty to disclose."  *Id.*  The second theory of assumed reliance is called the "fraud-on-the-market" theory.  Under this theory, "reliance is presumed when the statements at issue become public.  The public information is reflected in the market price of the security.  Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement."  *Id.*

The first presumption does not apply here, and Plaintiff has insisted that he is not asking the court to apply the "fraud-on-the-market" theory.  Pl. Opp. Exchange Def. Mot Dismiss at 20 ("Plaintiff is not, as the Exchange Defendants incorrectly argue, relying on a 'fraud on the market' theory …").  Instead, Plaintiff seeks to rely on an alternative theory that an investor is entitled to "reliance on an assumption of an efficient market free of manipulation."  Pl. Opp.

Member Def. Mot. Dismiss at 34.  Plaintiff contends that investors are entitled to rely on an assumption that a market is free of manipulation and invest in that market.

The presumption of reliance that Plaintiff requests appears somewhat similar to the presumption advanced in *Malack v. BDO Seidman, LLP*, 617 F.3d 743 (3d Cir. 2010), which  the Third Circuit rejected.  In that case, the court considered the "fraud-created-the-market" theory. *Id.*  This theory "posits that '[t]he securities laws allow an investor to rely on the integrity of the market to the extent that the securities it offers him for purchase are entitled to be in the market place." *Id.*  The *Malack* court declined to adopt such an approach.  *Id.* at 749.  The court explained "the theory lacks a basis in any of the accepted grounds for creating a presumption." *Id.*  In particular, the theory "rests on the conjecture that a security's availability on the market is an indication of its apparent genuineness," but the court did not accept that a security's availability on the market significantly enhances the probability that it is genuine.  *Id.*  In addition, the theory would not carry out the Exchange Act's purpose of promoting disclosures because an investor could bring a suit without ever needing to investigate the statements an enterprise marketing a security actually made about that security.  *Id.* at 752–53.

Similarly, here Plaintiff asks the court to presume he "relied on the market" to prevent manipulation.  Under Plaintiff's theory, an investor should be able to assume that all investment vehicles available in the market exist solely on their own economic merits, and not as a result of other traders seeking to maximize their advantage.  For several reasons, I must decline Plaintiff's request.  First, irrespective of the merits of Plaintiff's requested presumption, as the Third Circuit has observed, the Supreme Court's dicta in *Stoneridge*, 552 U.S. at 165, about the scope of § 10(b), lends at least "general support" to the proposition that courts should hesitate to adopt

new theories of reliance in securities litigation.  *Malack*, 617 F.3d at 754.[19]  Second, the reasons

that convinced the Court of Appeals in *Malack* not to adopt the fraud-created-the-market theory

apply with similar force here.  In *Malack*, the Court held that the mere availability of a security

for purchase does not support an inference it is free from fraud.  *Id.* at 749.  Additionally, if an

investor can invoke a (somewhat naïve) legal presumption that market manipulation never exists,

incentives to act prudently by investigating the market by, for example, inquiring into the options

trading volume, would diminish.

Furthermore, as Defendants point out, the presumption Plaintiff seeks would so broadly

apply it would very nearly render the reliance element of private 10(b) claims a nullity.  Under

Plaintiff's interpretation, the element would be satisfied whenever an investor is trading in a

market and manipulation causes an injury.

Ultimately, the law prevents me from recognizing the theory under which Plaintiff seeks

a presumption of reliance.  At oral argument, Plaintiff seemingly admitted that the theory of

reliance he advances is unique and would be an "evolution" of the law.  See Tr. of Arg., Dec. 7,

2015 at 58:21–24 ("But in this case, which is a more unique case, it doesn't fit neatly in that and

that's why courts over time that have looked at reliance have had to evolve how you use it.").

The record here is not sufficiently compelling for me to accept that invitation.

C.  Scienter

A private 10(b) plaintiff must prove that a defendant acted with "a mental state

embracing intent to deceive, manipulate, or defraud."  *Tellabs, Inc. v. Makor Issues & Rights,

Ltd.*, 551 U.S. 309, 319 (2007).  A circuit split as to how a plaintiff must plead the presence of

---

[19] I am not convinced that *Stoneridge* necessarily marks a turning point in securities litigation to the degree that Defendants suggest, and I suspect that the Third Circuit's use of the phrase "general support" in describing the high court's *dicta* might reflect similar doubts.  *See, e.g.,* Donald Langevoort, *Reading Stonebridge Carefully: A Duty-Based Approach to Reliance and Third-Party Liability Under Rule 10B-5*, 158  U. PA. L. REV. 2125 (2010).

that mental state was resolved by Congress when it enacted the Private Securities Litigation Reform Act (PSLRA). *Id.* at 320. Through the PSLRA, Congress imposed stringent uniform requirements on 10(b) plaintiffs. These requirements included that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The statute left "strong inference" undefined, leading the Supreme Court in *Tellabs* to articulate a definition for "strong inference" and a test for applying it. A court:

> must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff … but also competing inferences rationally drawn from the facts alleged. …. To qualify as "strong" … we hold, an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent."

*Tellabs*, 551 U.S. at 314. Alternatively, the Court framed the question as follows : "the reviewing court must ask: when the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 326.

Defendants argue that Plaintiff has failed to allege facts permitting any inference of scienter, and even if the court could draw some inference of fraudulent scienter, it is at least as plausible to infer that Defendants acted with a lawful state of mind.

It is certainly *possible* to infer the Market Makers acted with an intent to deceive by engaging in the dividend plays Plaintiff challenges. It is also possible that Defendants believed that they were exploiting a privileged position in the market to take advantage of the mistakes of smaller investors. It is similarly possible Defendants were intending to deceive or defraud other investors. But it is *equally* plausible that Defendants believed they were engaging in a completely legal trading strategy. It weighs heavily in Defendants' favor that the dividend

trading strategy Plaintiff challenges here has been widely publicized, *see e.g.*, Jia Hao, et al. *Ex-dividend Arbitrage in Option Markets,* THE REVIEW OF FINANCIAL STUDIES, Vol. 23, No. 1 p. 272 (2010); *Dividend Trade Strategies in the U.S. Options Industry,* International Securities Exchange Whitepaper (March 2010). There is little doubt that financial industry regulators knew about the strategy and did not forbid it in the Philadelphia Exchange. *See*, Self-Regulatory Organizations, Exchange Act Release No. 34-72677, 79 FR 44480, 44481 (July 31, 2014) ("dividend plays are an options trading strategy that has been executed for many years.").

Plaintiff argues that it is enough to allege Defendants intentionally engaged in manipulation, and advances the following syllogism: Plaintiff argues that Defendants intentionally engaged in dividend plays, those dividend plays were manipulative, therefore Defendants possessed "a mental state embracing intent to deceive, *manipulate*, or defraud." Pl. Opp. Market Makers Mot. Dismiss at 35–36 (citing *Tellabs*, 550 U.S. at 319). (emphasis in original). In the first instance, this argument fails because I have found Plaintiff has not alleged "manipulation" as that term has been defined for private 10(b) claims by controlling precedent. Second, this argument mischaracterizes the meaning of scienter by confusing intent with effect. By Plaintiff's logic, merely intentionally engaging in conduct that turns out to be manipulative of the market would satisfy the scienter requirement. But fraudulent scienter requires more than intentional conduct; it requires willful intention to engage in wrongful conduct in the inception of the act. One of the most cogent definitions of scienter is set forth in a torts treatise: "The central elements of the tort of fraud or deceit … are a defendant's *knowledge* that its representation is false and *intent* to deceive the plaintiff thereby." *Owen & Davis on Prods. Liability,* § 3:7 (4th Ed. 2014) (emphasis in original). It is not enough for Plaintiff to allege Defendants were

engaging in dividend plays; Plaintiff must allege they intended to deceive him by placing their trades.

Plaintiff has not reached the high standard for scienter under Section 10(b).

### D.  Particularity

Because I find that Plaintiff has not alleged crucial elements of his claim, I will not separately address whether his complaint complies with Federal Rule of Civil Procedure 9 throughout.

## VII.   Unjust enrichment

Plaintiff's second substantive claim alleges under Pennsylvania law Defendants are unjustly enriched by their dividend plays.  Defendants attack the claim on two grounds. First, Defendants argue that the claim is preempted by federal law.  Second, they argue that Plaintiff fails to state the claim.

### A.  Preemption

It cannot be disputed that under the Supremacy Clause of the Federal Constitution, the federal government has the authority to preempt state law.  *Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 324 (3d Cir. 2009).  Courts have recognized that preemption can take several forms.  A statute enacted by Congress can explicitly preempt a state law.  *See English v. General Elec. Co.*, 496 U.S. 72, 79 (1990) ("Congress can define explicitly the extent to which its enactments pre-empt state law.").  Preemption may also be implicit.  *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 373 (2000).  Implicit preemption occurs when federal law conflicts with a state law.  *Id.* ("state law is naturally preempted to the extent of any conflict with a federal statute.").

Implicit preemption also occurs when there is no actual conflict between federal and state law, but "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 373 (citation removed).

The Member Defendants argue that the Securities Litigation Uniform Standards Act (SLUSA) expressly preempts Plaintiff's unjust enrichment claim.[20]  15 U.S.C. § 78bb(f)(1) states:

> No covered class action based upon the statutory or common law of any State or subdividion thereof may be maintained in any State or Federal court by any private party alleging—
> (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or
> (B) that the defendant used or employed any manipulative device or contrivance in connection with the purchase or sale of a covered entity.

Defendants argue that Plaintiff's Pennsylvania unjust enrichment claim on behalf of himself and a class of similarly situated investors clearly falls within this preemption statute.  Plaintiff responds that Defendants' arguments supporting dismissal of the 10(b) claim establish that the conduct in question falls outside the scope of the Act.  I disagree, because the consolation prize for failing to set forth a claim under federal securities law cannot be the right to challenge the identical conduct under an alternative theory of state law.

In *Merrill Lynch Pierce Fenner and Smith Inc. v. Dabit*, the Supreme Court rejected an argument that the preclusive effect of SLUSA is limited to claims that fall within court-created restrictions to private 10(b) suits.  547 U.S. 71, 84–85 (2006).  The plaintiffs in the case could not state a private 10(b) claim because of a judicially-created, policy-based limit on the private 10(b) action.  *Id.* at 80–81 (citing *Blue Chip Stamps*, 421 U.S. at 731–32).  It observed that courts

---

[20] They do not appear to argue field or conflict preemption, but the concerns addressed by those doctrines are implicit in their arguments.

have interpreted Section 10(b) broadly, and Congress imported Section 10(b)'s language into SLUSA's preclusion statute, so the court found that it has the same meaning and reach. *Id.* at 85. The plaintiff's claim, therefore, could fail as a 10(b) private claim, and still be preempted by SLUSA. *Id.*

*Dabit* has particular relevance here.  The plaintiff there brought a class action, and sought to avoid the legal requirement that only purchasers and sellers have standing to sue under Section 10(b) by defining the class as "holders" of the securities.  Plaintiff went on to argue that because such a class of investors could not proceed under federal law, the claim was not precluded by SLUSA.  The Supreme Court unanimously rejected this argument, holding that the preemption provisions of the Act must be broadly construed lest claims Congress intended to prohibit simply shift to state courts. *Id.* at 86.

Plaintiff's reliance upon *Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058, 1060 (2014), is misplaced, because the securities at issue there were not governed by SLUSA, rendering its preemption provisions inapplicable.

The Third Circuit has clearly defined the contours for SLUSA preemption:

> Under existing "in connection" case law, we find several factors relevant in distinguishing between preempted claims and those remaining within the province of state law: first, whether the covered class action alleges a "fraudulent scheme" that "coincides" with the purchase or sale of securities, *Zandford,* 535 U.S. at 825, 122 S.Ct. 1899; second, whether the complaint alleges a material misrepresentation or omission "disseminated to the public in a medium upon which a reasonable investor would rely," *Semerenko,* 223 F.3d at 176; third, whether the nature of the parties' relationship is such that it necessarily involves the purchase or sale of securities, *see Angelastro,* 764 F.2d at 944 (noting that customers maintain brokerage accounts "for the very purpose of trading in securities"); and fourth, whether the prayer for relief "connects" the state law claims to the purchase or sale of securities, *see Dabit,* 395 F.3d at 48.

*Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294, 302 (3d Cir. 2005).

Applying that test to the allegations here, the inescapable conclusion is that Plaintiff's state law claims are precluded.[21]

**VIII.   Conclusion**

For the reasons above, I will dismiss Plaintiff's Complaint.  An appropriate order follows.


_____/s/ Gerald Austin McHugh
United States District Court Judge

---

[21] Because I am confident that the claims are precluded, there is no need to consider the merits of Plaintiff's unjust enrichment theory.